**CUEVAS & GREENWALD, P.C.**
*Attorneys for Debtor,*
**Rockwood Real Estate Advisors LLC**
**475 Park Avenue South - 26th Floor**
**New York, New York 10016**
**Tel. No. 212-983-1922**
**Wayne M. Greenwald, Esq.**
**Carlos J. Cuevas, Esq.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
**In re**                                            **Chapter 11**

**ROCKWOOD REAL ESTATE ADVISORS LLC, Case No. 09-13566 (SMB)**

                              **Debtor.**
--------------------------------------------------------X

=========================================================
**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN.
ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.
THE ANNEXED DISCLOSURE STATEMENT HAS NOT BEEN
APPROVED BY THE COURT.**
=========================================================

## DEBTOR'S DISCLOSURE STATEMENT

Rockwood Real Estate Advisors LLC, formerly DTZ Rockwood LLC,

Debtor-and-debtor in possession ("Rockwood" and/or the "Debtor"), submits this

disclosure statement ("Disclosure Statement") pursuant to § 1125 of 11 U.S.C. §

101 *et seq.* (the "Bankruptcy Code") with regard to its proposed Modified Plan of

Reorganization ("Plan"), dated August 23, 2010,  .  Unless otherwise noted, all capitalized terms contained herein shall have the same meaning as capitalized terms contained in the Plan.  A copy of the Plan is annexed hereto as Exhibit "A."

**THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE CREDITORS WITH ADEQUATE INFORMATION ABOUT THE DEBTOR AND THE PLAN OF REORGANIZATION SO AS TO ENABLE THEM TO MAKE AN INFORMED JUDGMENT AND DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION.**

## PRELIMINARY STATEMENT

The information contained in the Disclosure Statement was derived from the Debtor and the Debtor's books and records and files.

## BACKGROUND

1.       On June 1, 2009, Debtor filed its voluntary petition for relief, under Chapter 11 of 11 U.S.C. (sometimes referred to as the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court")

2. The Debtor continues to possess its properties and operate its business as a debtor-in-possession, pursuant to Bankruptcy Code sections 1107 and 1108.

3. No creditors' committee has been constituted in this case.

4. The last date for Creditors to file proofs of claim in this case was May 25, 2010.

5. On May 26, 2010, Rockwood filed a proposed plan of reorganization (the "Plan").

6. After an initial hearing on the proposed Disclosure Statement, the Debtor modified the Plan. That modified Plan was filed with the Court on July 20, 2010 A subsequent Modified Plan was filed on August 23, 2010.

7. In summary, the Plan provides for Rockwood to: (a.) pay its Secured Creditors in full over time; b.) pay its general unsecured creditors 20% of the allowed amount of their claims over time; c,) use its cash flow and capital contributions to fund these payments

## ABOUT THE DEBTOR

8. Rockwood provides real estate advisory and transactional services to institutional, corporate and private investor clients on a national basis.

9.      Rockwood's advisory services include distressed asset/portfolio resolution; debt/equity restructurings; partnership/joint venture restructurings; pre and post-petition consulting and construction advisory services. Rockwood's transactional services include investment sales; portfolio sales; note sales, debt & equity finance; and real estate related corporate recapitalizations and M&A. Rockwood also provides its services in Mexico, through Rockwood Asociados LLC ("Asociados"), its wholly owned subsidiary of Rockwood.[1]

10.     Rockwood's revenues are generated from fixed advisory fees and success fees, which are usually contingent on completing a transaction (e.g. property sale, arranging a financing, etc.). Historically, 70% or more of Rockwood's revenues were generated from contingent brokerage fees from property sales and financings.

11.     Rockwood is co-managed by John W. Magee ("Magee"), who founded Rockwood in 1991 and Dan McNulty ("McNulty"), who joined in 1993. Magee and McNulty each hold the title of Co-Chairman and Co-CEO of Rockwood. Rockwood has 42 employees, including 10 Asociados employees. When this case started, Rockwood had offices in New York, Miami, Orlando, Dallas, Chicago, Atlanta, Palm Beach Gardens and Mexico

_____

[1] Asociados is not a debtor in this case.

City. (Of these locations, Rockwood continued to be obligated under leases for its offices in Chicago, Atlanta and Palm Beach Gardens, which had beenclosed prior to the Petition date.)

### *Rockwood's Subsidiary-Hargrave*

Rockwood has a subsidiary, Rockwood Hargrave LLC ("Hargrave"). Hargrave filed its own petition to reorganize under chapter 11 of the Bankruptcy Code with the Court on April 14, 2010, Case No. 10-03212-smb. Hargrave owns a 20% interest in Vitesse 99, LLC ("Vitesse") which owns, operates and charters a 100 foot Hargrave motor yacht, named "Vitesse."

## CONDITIONS AND EVENTS PRECIPITATING THIS CASE

12. During the four years prior to the May 2006 sale of a 50% interest in Rockwood to DTZ Holdings plc ("DTZ"), Rockwood achieved 49.8% compound annual growth in revenues, peaking at $41,300,000 for FYE[2] 2/28/06. After the sale to DTZ, Rockwood's revenues declined to

---

[2] "Fiscal year ended."

$29,753,000 for FYE 4/30/07[3], $23,525,000 for FYE 4/30/08 and $16,335,177 for FYE 4/30/09.

13. This severe decline in revenues resulted from integration issues after the sale to DTZ, followed by a significant loss of transactional (i.e. real estate brokerage) revenues resulting from the declining US economy, collapse of the US and global financial markets and the impact of both on US real estate markets. This decline in transactional business and the general loss of revenues, during the 18 months before June 1, 2009, caused Rockwood to close offices in Chicago, Atlanta and Palm Beach Gardens, plus reduce its total staff by 55% (from 115 to 52).

14. The demand for transactional services is significantly down for Rockwood and all of its competitors.

15. However, there is an increasing demand for real estate workout and restructuring advisory services. Unlike most of its competitors, Rockwood has a broad depth of historic, senior level experience in providing such services. However, during the past 10 years, most of Rockwood's staff was dedicated to providing transactional services.

---

[3] Rockwood changed its fiscal year end to April 30 to coincide with DTZ's fiscal year end

16.    Rockwood added staff with the appropriate expertise and reduced staff

dedicated to the transactional business, to meet this growing demand for

advisory services.

17.    DTZ, Rockwood's 50% owner, was also subjected to many of the same

market driven issues as Rockwood.  Therefore, on May 18, 2009, DTZ sold

its equity interest in Rockwood, to Rockwood, for a nominal amount.

18.    Rockwood's increasing cash-flow difficulties made it unable to pay its

accounts payable, lease obligations and legal fees associated with a law suit

by a prior Rockwood shareholder (the "Littman Action").  Additionally,

those legal fees were escalating and the lawsuit was diverting Rockwood's

attention from its business.  Moreover, a decision adverse to Rockwood in

the Littman Action could devastate Rockwood's survival.

19.    Rockwood commenced this Chapter 11 case on June 1, 2009, to address

these issues and preserve its status as a leader in its field.  The following

description of this case shows how Rockwood succeeded in this endeavor.

## THE COMMENCEMENT OF HARGRAVE'S CASE

19.     On or about January 20, 2010, a meeting among Vitesse's members was held to determine whether the vessel should be sold immediately. The necessary vote approved the sale.

20.     Vitesse's managing non-member, Monocle Management Limited, Inc.("Monocle") intentionally failed to sell the Vitesse, as instructed. Instead, it purchased interests of members who voted to sell the vessel. This was done apparently to maintain its revenues as Vitesse's manager.

21.     Hargrave ceased paying capital calls as a member of Vitesse. Monocle and Vitesse threatened to assert a lien and foreclose on Hargrave's interest in Vitesse. Hargrave filed its case with the Court to preserve its interests in Vitesse, assert its rights as a member of Vitesse and seek damages resulting from Monocle's and Vitesse's actions.

## SIGNIFICANT EVENTS IN THIS CASE

Pre-Filing

22.     In anticipation of the filing, Rockwood had extensive conferences with its counsel. As Rockwood would do with its own restructuring clients, Rockwood outlined its business objectives and considered the bankruptcy reorganization vehicles for achieving those objectives.

23. For a smooth entry into its case, Rockwood arranged for debtor-in-possession loans from its principals, John Magee (through Rockwood Realty Associates, Inc. of which John Magee is the sole shareholder and through which Mr. Magee owns his interests in Debtor) and Dan McNulty. It also gained its secured creditor, Signature Bank's, cooperation in allowing Rockwood to use Signature Bank's cash collateral in Rockwood's operations.

## Initial Filings

24. Upon filing this Case, Rockwood filed usual "first day orders" in reorganization cases. It sought authority to retain its professionals and continue financial systems. Rockwood also filed motions seeking the Court's permission to use Signature Bank's cash collateral and obtain the loan from Messrs. Magee and McNulty.

25. Interim orders were entered granting those motions. Authority to use these funds was ultimately granted by the Court.

26. One of Rockwood's reasons for filing this case was resolving the Littman Action. Despite the financing motion being essential to Rockwood's survival in this case, Steven Littman objected to Rockwood obtaining the loan. His objection was overruled. However, Mr. Littman's obstreperous

tactics in this case were only beginning.

Assuming and Rejecting Leases

27.     Rockwood's retrenching entailed jettisoning underutilized and expensive

        leaseholds.  Rockwood obtained Court authority to reject its leases for

        premises in Atlanta, Palm Beach Gardens, Miami and Chicago.

28.     Rockwood renegotiated the lease for its principal office in New York City.

        This included Rockwood surrendering a portion of the leasehold which was

        subject to a sublease.  The transaction provides Rockwood with a substantial

        savings through reduced rent obligations.

29.     The Debtor moved to assume its lease for its office in Orlando, Florida.  The

        area had proven revenues and the lease was economical.  The motion was

        granted over Steven Littman's objection.

Littman Litigation

30.     In 2006, Steven Littman sued Rockwood, its principals and management in

        *Littman v. Magee et al.*, Supreme Court of the State of New York, New

        York County, Index No. 2006-602176.  Mr. Littman claimed that he was

        defrauded when he sold his equity interests in Rockwood to Rockwood.  He

        demanded $63,000,000 ($16,200,000.00 of compensatory damages and

        $46,800,000 of punitive damages), claiming that he received less than what

his interests where actually worth, due to undisclosed information.

31. Upon filing its reorganization case, Rockwood removed the action from state court to the Bankruptcy Court. Rockwood also commenced its own action against Mr. Littman, asserting, among other things, that monies Rockwood paid to Littman for his equity interests are voidable fraudulent conveyances and that Bankruptcy Code§ 510(b) mandated subordinating Mr. Littman's claims to those of all other creditors.

32. At an initial conference on these actions before the Bankruptcy Court, the parties agreed to mediate their disputes. After several sessions with former chief bankruptcy judge, Melanie Cyganowski, it was recognized that the dispute would not be resolved through mediation. The parties resumed litigation.

33. However, litigation was not restricted to the parties' dispute. Steven Littman sought orders in the reorganization case authorizing: a.) him to examine Rockwood's principals and attorneys about allegedly receiving fraudulent conveyances; b.) him to sue Rockwood's principals and attorneys about allegedly receiving fraudulent conveyances; and c.) the appointment of an examiner to examine these allegations. The Court denied the relief, recognizing that the motions were pursuing Littman's parochial agenda.

34.　The Court did appoint Kenneth Silverman, Esq, as an examiner for the sole purpose of considering whether Rockwood's principals' sale to DTZ of 50% of their interests in Rockwood was a voidable fraudulent conveyance in their favor.[4]

35.　In pursuing his motions, Mr. Littman violated an order providing confidentiality protections for Rockwood's documents.  Rockwood moved to hold Steven Littman and his counsel in contempt.  Rockwood also moved to dismiss Littman's amended complaint.

36.　Rockwood's dual repost resulted in Steven Littman agreeing to settle his claim for $800,000 (the "Littman Settlement"); one and one-quarter percent (1.25%) of the total amount he demanded.

Facilitating the Settlement

37.　To fund the Littman Settlement, Rockwood needed Court approval, which it received, and funds independent of its cash flow.

38.　The creditor body received Rockwood's motion for authority to enter into the settlement.  Rockwood also obtained the Court's permission to borrow

---

[4] Rockwood's analysis of the issue is in the Voidable Transfer Analysis section of this Disclosure Statement.  The Examiner has reviewed it and takes no issue with it or its

an additional $600,000 from Messrs. Magee and McNulty on a subordinated basis to fund the settlement.

Crafting the Plan of Reorganization

39. Rockwood recognized that this case could proceed on one of two tracks. One with a settlement with Mr. Littman before confirmation of a plan of reorganization. The other with Steven Littman objecting to confirmation of a proposed plan reorganization.

40. Since mediation failed, Rockwood prepared a plan of reorganization which anticipated a hard-fought confirmation process. Rockwood prepared a plan of reorganization employing "pre-emptive cramdown," involuntary releases by Littman of his claims against Rockwood, its principals and management and mandatory subordination of his claim. Rockwood had its attorneys research legal authority to confirm that plan of reorganization if circumstances warranted it.

41. Gratefully, Rockwood achieved a settlement with Steven Littman.

42. Therefore, you have the Plan which is described in this Disclosure Statement.

conclusions.

43. In April, 2010, the Debtor changed its name to Rockwood Real Estate Advisors LLC. The Debtor sought Court approval of the name change.

44. A detailed statement of the events in this case can be found by reviewing the docket maintained by the Bankruptcy Court concerning Rockwood's case at the Bankruptcy Court's website, www.nysb.uscourts.gov. A PACER password is necessary to access the docket.


### *Events in Hargrave's Case*

45. Upon filing its case, Hargrave commenced an adversary proceeding in the Court against Vitesse, Monocle and Monocle's principal, Loren Simkowitz.

46. The Adversary proceeding seeks, among other things, $900,000 in money damages arising from the defendants' failure to sell the vessel as directed.

47. Rockwood intended to use its portion of the proceeds from the sale of Vitesse to fund the Plan. Vitesse and Monocle's breaches of duty have obstructed that ready and anticipated source of funding.

48. The Debtor, Vitesse and Monocle engaged in mediation on July 23, 2010. They achieved a settlement which includes a $425,000 payment to Hargrave with Vitesse and Monocle waiving whatever claims they have against Hargrave.

.

## PLAN OF REORGANIZATION

**THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN OF REORGANIZATION. IT IS A SUMMARY ONLY, AND CREDITORS AND PARTIES IN INTEREST ARE URGED TO READ THE PLAN OF REORGANIZATION IN FULL FOR ITS TERMS AND THE TREATMENT OF THE VARIOUS CLASSES OF CLAIM HOLDERS.**

## CLASSIFICATION AND PAYMENT OF CLAIMS AND INTERESTS

49.  Class 1 Consists of:

Non-priority Pre-Petition Claims of EmployeesThe Debtor Anticipates this amount to be approximately $ 168,666. This Class represents pre-petition "commission" payments owed to Rockwood non-management employees which exceed the priority claims allowed by 11 U.S.C. 507. To perform the Plan, it is essential that the Debtor retain these employees by expediting these payments.

49.  Class 2 Consists of

The Secured Claim of Signature Bank. Signature Bank filed a proof of claim for the sum of $2,242,410.32, of which $1,720,000 remains

unpaid as of August 1, 2010.

50. <u>Class 3 Consists of:</u>

All General Unsecured Claims Except for the Claims of Insiders.  The claims docket maintained in this case reflects claims totaling $1,072,870 for this Class.  Based on discussions with Class 3 creditors that have filed proofs of claims and pre-petition payables acknowledged by the Debtor, Rockwood estimates Allowed class 3 Claims equal  , $1,339,654.

51. <u>Class 4 Consists of:</u>

Unsecured Claims of the Debtor's Equity Security Holders Based on Pre-Petition Loans Made to the Debtor.  The proofs of claim filed by Class 4 members totals $12,421,992.

52. <u>Class 5 Consists of:</u>

Unsecured Claims Arising from the Sale of Equity Security Interests in the Debtor**.  Steven Littman filed two Proofs of Claim totaling $16,350,000.

53. <u>Class 6 Consists of:</u>

The Holders of 100% of the Equity Security Interests in the Debtor

60.   Class 1 – Non-priority Pre-Petition Claims of Employees. Class 2 - The

Secured Claim of Signature Bank, Class 3 -All Unsecured Claims Except for

the Claims of Insiders are impaired and entitled to vote to accept or reject

the Plan. 61. Class 5- Unsecured Claims Arising from the Sale of Equity

Security Interests in the Debtor is not impaired and will not receive a ballot

to reject or accept the Plan.

62   Class 4 - Unsecured Claims of the Debtor's Equity Security Holders Based

on Loans Made to the Debtor and Class 6- Holders of Equity Security

Interests in the Debtor will receive nothing under the Plan and are deemed to

have rejected the Plan.  Therefore, they will not receive a ballot to reject or

accept the Plan.

63.   In the event of a controversy as to whether any Claimant or Class of

Claimants is impaired under the Plan, the Court shall, after notice and a

hearing, determine the outcome of such controversy.


## MEANS OF PAYMENT OF
## CLAIMS AND INTERESTS UNDER THE PLAN


## PROVISIONS FOR TREATMENT OF CLAIMS

**Unclassified Claims:**

64. <u>Administration Claims Except for the DIP Loans From Magee & McNulty</u>

Each Allowed Administration Claim shall be paid in full by the Reorganized Debtor on the Effective Date in Cash or on such other terms as may be agreed upon by the holder of such Allowed Administration Claim and the Reorganized Debtor. All Allowed Administration Claims that become due after the Confirmation Date shall be paid by the Reorganized Debtor when due or on the Effective Date or as soon as practicable thereafter. The Debtor's retained Professionals, Cuevas & Greenwald, P.C. Prager & Fenton and Miller & Wrubel have agreed and the Debtor shall pay these Professionals 80% of their Allowed Fees on the Confirmation Date with the balance of Allowed Fees being paid on or before March 1, 2011. . Cuevas & Greenwald, P.C. has agreed to cap the amount of its Allowed Claim at $400,000 for services rendered through the Effective Date.

65. Administration Claim of the DIP Loan from Magee & McNulty :

These Claims shall, unless otherwise agreed to, be converted Claims into a capital contribution into the Debtor which will be applied as "new value' supporting the treatment of Equity Security Holders in Class 6 of the Plan.

66. <u>Administration Claim of the Subordinated DIP Loan from Magee & McNulty:</u> These Claims shall, unless otherwise agreed to, convert their

allowed Claims into a capital contribution into the Debtor which will be applied as "new value' supporting the treatment of Equity Security Holders in Class 6 of the Plan

67.   <u>Priority Claims Except for Priority Tax Claims:.</u> Each Allowed Priority Claim Except for Tax Claims shall be paid in full by the Debtor  on the Effective Date in Cash or on such other terms as may be agreed upon by the holder of such Claim and the Debtor.  To the extent that the gross Claim of a holder of such Priority Claim exceeds the dollar amount entitled to priority treatment by Bankruptcy Code § 507, the non-priority portion of that Claim shall be treated as a Class 1 Claim.

687.   <u>Priority Tax Claims:</u> Unless otherwise agreed to, each Claimant holding an Allowed Priority Tax Claim shall receive on account of such claim deferred cash payments from the Reorganized Debtor, over a period of five years after the Petition Date, of a value, as of the Effective Date equal to the Allowed Amount of such Claim.  Payments shall be made quarterly, in arrears.  Interest shall accrue on the unpaid principal balance at the rate of four per-cent (4%) per-annum.  However, nothing herein shall prevent or prohibit the Reorganized Debtor from satisfying Allowed Priority Tax Claims in full on the Effective Date of the Plan or such other time as may be

practicable and which provides for the payment of Allowed Priority Claims prior to five years from the Petition Date..9.  Non-priority  Pre-Petition Claims of Employees (Class 1)Each holder of an Allowed Class 1  Claim shall receive 100% on account of such Allowed Unsecured Claim paid in equal monthly payments, paid in arrears, without interest over three years following the Effective Date. However, in any event, subject to all other payments to creditors of the Debtor being current, the Debtor may, in its sole discretion, accelerate the payments due to such unsecured creditors.

709.  The Secured Claim of Signature Bank (Class 2):  Allowed Class 2 Claimants shall retain the most senior security interest in all of the Debtor's assets.  Class 2 Claimants need take no further action to perfect the security interest granted by the Plan.  Commencing on the Effective Date or as soon as practicable thereafter, the Allowed Class 2 Creditors shall receive on account of their Allowed Secured Claim: a.) payment of $20,000; b.) payment of $20,000 on the first business day of each succeeding month after the Effective Date until the Allowed Class 2 Claim is paid in full; and c.) interest on the outstanding principal balance of the Class 2 Claim, which shall accrue at an annual rate of  interest equal to the Prime Rate plus 200 basis points; however, in any event, the Allowed Class 2 claim shall be due

and payable, in full, within one year after the Effective Date. The Reorganized Debtor may pre-pay all or a portion of the Allowed Class 2 Claim in whole or in part without any penalty. Notwithstanding anything to the contrary set forth in the Plan and/or the Confirmation Order, the provisions of the Plan and/or the Confirmation Order shall not affect, impair, prejudice, release or terminate in any way (i) the claims, causes of action, rights and remedies of the Class 2 Claimant against any person or entity other than the Debtor and/or (ii) the liens and/or security interests in non-estate property held by or granted to the Class 2 Claimant as security for any indebtedness and/or obligations of the Debtor and/or persons or entities other than the Debtor.

710.  All Unsecured Claims Except for the Claims of Insiders (Class 3):  Unless otherwise agreed to, each holder of an Allowed Class 3 Unsecured Claim shall receive on account of such Allowed Unsecured Claim: 20% of their Allowed Claim, which shall be paid in equal quarterly payments, commencing on the first anniversary of the Effective Datein arrears, without interest over five years following the Effective Date.However, in any event, subject to all other payments to creditors of the Debtor being current, the Debtor may, in its sole discretion, accelerate the payments due to such

unsecured creditors.

721. <u>Unsecured Claims of the Debtor's Equity Security Holders Based on Loans Made to the Debtor (Class 4):</u> Allowed Class 4 Claimants shall receive no distribution on account of their Allowed Claims.

732. <u>Unsecured Claims Arising from the Sale of Equity Security Interests in the Debtor(Class 5):</u> Pursuant to Bankruptcy Code § 510(b) the Allowed Claims of the Allowed Class 5 Claimants are subordinated to: a.) all Claims asserted against the Debtor; and b.) the holders of the Equity Security Interests represented by Class 6.  As their distribution under the Plan, Allowed Class 5 Claimants shall receive only those payments provided by the Stipulation between the Debtor, its principals, management and Steven Littman which was approved by Bankruptcy Court Order on March 1, 2010.

743. <u>The Holders of Equity Security Interests in the Debtor (Class 6):</u> Holders of Equity Security Interests in the Debtor shall receive no distribution on account of their interests.  Existing interests in the Debtor shall be cancelled. The Debtor shall issue and/or recognize new equity security interests in the Debtor pursuant to Section 12.11of the Plan

## <u>MEANS FOR EXECUTING THE PLAN</u>

75. Plan Implementation: The Plan is to be implemented in a manner consistent with Bankruptcy Code § 1123.

76. The Debtor expects that on the Effective Date it shall require not more than $470,929.00 for making the required distributions.

    Funding for the payment of all Claims shall come from: (I) cash on hand on the Effective Date; (II) cash from the marshaling of the Debtor's assets; (III) the Debtor's operating revenues; (IV) proceeds from actions commenced by the Debtor; (V) the conversion of the DIP Loans From Magee & McNulty from debt to a capital contribution, pursuant to sections 4.02 and 4.03 of the Plan, ,(VI) $385,000 from  the proceeds from the action *Rockwood Hargrave, LLC v. Vitesse 99, LLC et al*, pending in the Court, Case No. 10-03212-smb (the "Hargrave Litigation") and (VII) if necessary, up to $200,000 in loans from John Magee.

77. On the Effective Date, the Debtor shall issue and/or recognize equity security interests calculated and based on *pro rata* share of  the DIP Loans made by the Debtor's members (collectively "Total Member Loans"), together with any unpaid accrued interest thereon, provided by the Members to the Debtor, which are outstanding as of the Effective Date.

78.     On the Effective Date, Members' percentage ownership in the Debtor shall reflect the *pro rata* share of Total Member Loans comprising Administration Claims, together with any unpaid accrued interest, thereon, provided by the Members to the Debtor, which are outstanding as of the Effective Date.   It is anticipated that the resulting distribution of equity security interests shall be as follows:

| Member | Pre-Confirmation Ownership Interest | Class 1A and 1B Claims (Balance as of Conf. Date) | Post-Confirmation Date Ownership Interests |
|---|---|---|---|
| John Magee | 37.49260% | $737,461 | 50% |
| Dan McNulty | 37.49260% | $736,588 | 50% |
| Ackerman Group** | 25.01480% | $0 | 0.0% |
| Total | 100.00000% | $1,474,049 | 100.00000% |

\*     Note that irrespective of the fact that the loans provided by each of Magee and McNulty are not equal, their respective membership interests in the Company as of the Confirmation Date shall be equal (i.e. 50%/50% of the remaining ownership after deducting the Ackerman Group interests).

\*\*    The Ackerman Group is comprised of four trusts controlled by Don Ackerman: DEA Trust, which owns 18.7608% (pre-Confirmation); SJA Trust, which owns 3.7524% (pre-Confirmation); CKO Trust, which owns 1.2508% (pre-Confirmation); and MAA, which owns 1.2508% (pre-Confirmation).   Post Confirmation, The Ackerman Group interests would be reduced pro rata to the total indicated under Post-Confirmation Date Ownership Interests.

80.     Attached hereto as Exhibit C is the Debtors five year cash flow projection, which includes projected revenues and expenses and the payments to Creditors as described herein.

81.     The Debtor's attorneys, Cuevas & Greenwald, P.C. shall act as collection agent for the marshaling of the Debtor's assets and disbursing agent for the payments to be made under the Plan.

82.     If there are any monies remaining with the Debtor as the result of undistributed funds or funds which are returned, such funds shall revert and

become the Reorganized Debtor's property, free and clear of any and all Claims and encumbrances of the Claims which are provided for under the Plan.

83. If there are any monies remaining with the Debtor after all distributions provided for under the Plan are made, such funds shall revert and become the property the Reorganized Debtor, free and clear of any and all Claims and encumbrances of the claims which are provided for under the Plan.

84. The Debtor shall continue to manage its properties and ventures in implementing the Plan until and after the Effective Date.

85. The Reorganized Debtor may, at its own election, transfer, convey and/or refinance its business and/or interests in its business or properties.

86. If the Debtor and/or Reorganized Debtor makes a transfer of property under the Plan which transfer might otherwise be subject to a stamp tax or similar tax, including a transfer tax, such transfers shall not be subject to such tax to the fullest extent permitted by Bankruptcy Code § 1146.

87. The Plan shall be deemed to be substantially consummated upon: a.) the making of a distribution to any class of Creditors, pursuant to the Plan; and b.) John Magee and Daniel McNulty converting the DIP Loans From Magee & McNulty from debt to a capital contribution, pursuant to sections 4.02 and

4.03 of the Plan.

## THE REORGANIZED ROCKWOOD'S
## OPERATIONS AND MANAGEMENT

88.  The reorganized Rockwood will continue its operations and focus of its

business.

89.  Rockwood's existing management will continue to manage the reorganized

Debtor.  Rockwood's executive management is:

90.  John Magee/Co-Chairman & Co-Chief Executive Officer

Magee is Co-Chairman, Co-Chief Executive Officer and founder of

Rockwood.  He co-manages the firm with Daniel McNulty. Prior to forming

Rockwood in 1991, Mr. Magee was Executive Vice President and Chief

Operating Officer of The Harlan Company, a New York based real estate

investment banking firm. While at Harlan, he developed and managed the

firm's workout, advisory and transactional businesses. Prior to joining The

Harlan Company, Mr. Magee was Senior Vice President and Partner of

Eastdil Realty, Inc., specializing in real estate portfolio dispositions and

workouts. Prior to Eastdil, Mr. Magee was Senior Vice President, Director

of Real Estate and member of the Executive Committee of Korvettes, Inc., a

New York based department store chain.

91.  Dan McNulty/Co-Chairman & Co-Chief Executive Officer

Daniel McNulty is Co-Chairman and Co-Chief Executive Officer of Rockwood and co-manages the firm with Mr. Magee. Since joining the firm in 1993, Mr. McNulty directed the execution of assignments for real estate assets with an aggregate value in excess of $18 billion. Prior to joining Rockwood in 1993, Mr. McNulty was a Director at Prudential Real Estate Investors, where he was responsible for the marketing and disposition of $750 million of general and separate account properties and asset management of a $400 million industrial, office and retail portfolio. Mr. McNulty holds a B.S. in Engineering and Finance from Michigan State University. Mr. McNulty serves on the New York Real Estate Roundtable.

92.  Ellen Burke/Chief Financial Officer & Partner

Ellen Burke is Chief Financial Officer and Partner of Rockwood. Prior to joining Rockwood in 1996, Ms. Burke was Director of Administration at Rosen Seymour Shapss Martin and Company, a medium sized New York based public accounting firm. Prior to joining Rosen, Ms. Burke was Controller for Adam Young, Inc., a television representative firm where she was involved in the acquisition of television stations for the firm. Ms. Burke is a Certified Public Accountant and has been adjunct professor of

accounting at Cornell University's School of Industrial and Labor Relations. In addition to serving as a member of the American Institute of Public Accountants (AICPA), she served as a member of the Board of Directors for the Westchester Chapter of the New York State Society of CPAs. Ms. Burke holds a B.A. from Boston University and an M.B.A. in Accounting from Iona College.

93.    <u>Robert Vegliante/General Counsel & Partner</u>

Robert Vegliante is General Counsel of Rockwood and a partner. Prior to joining Rockwood, Mr. Vegliante served as General Counsel and Secretary with SLSB, LLC, a Connecticut-based company established to develop and sponsor structured products for the capital markets. Prior to SLSB, Mr. Vegliante served for over 9 years as a Deputy General Counsel of Citigroup Asset Management, where he was responsible for managing a division of the firm's legal staff overseeing more than 150 open-end and closed-end investment companies, UITs and variable funds. He was also responsible for general securities law matters involving registered investment advisors and registered broker dealers relating to the management and sale of investment products. Mr. Vegliante holds a B.S. in Biology from Manhattan College and a J.D. from Columbia University School of Law.

94. All of Rockwood's senior professionals are described at its website: www.dtzrockwood.com/executive-profile.

95. Effective March 29, 2010, the name of the Debtor was changed from DTZ Rockwood LLC to Rockwood Real Estate Advisors LLC.

96. Simultaneous with Confirmation, DTZ Rockwood Holdings LLC ("Holdings"), which is a holding company that owns all of the membership interests in the Debtor and the vehicle through which the Members own their respective interests in Rockwood, will be merged or otherwise collapsed into Rockwood.


## EXECUTORY CONTRACTS

97. This Disclosure Statement described Rockwood's pre-petition Executory Contracts which have already been assumed or rejected.

98. Rockwood identified on the Schedule annexed to the Plan (which is annexed hereto as Exhibit D) additional Executory Contracts which are specifically rejected on the Confirmation Date. All such executory contracts are being rejected by the Debtor, pursuant to Bankruptcy Code § 365 and shall be of no further force or effect of any nature whatsoever. Any pre-petition Executory Contract of the Debtor not specifically identified on said

Schedule or which is not the subject of a pending application to assume on the Confirmation Date, shall be deemed assumed.

99. Any Entity whose Claim arises from rejection of an Executory Contract shall, to the extent such Claim becomes an Allowed Claim, have the rights of a Class 3 Claimant with respect thereto.

100. Any Entity who has a claim against the Debtor by virtue of the operation of Section 10.02 of the Plan may file a Claim with the Clerk of the Court and serve a copy of same upon the Debtor in accordance with the notice provisions of Section 16.02 of the Plan within thirty (30) days following service upon such Entity of notice of entry of the Confirmation Order or order authorizing such rejection, whichever is later. If such Claim is not filed within the specified time, it shall be forever barred from assertion against the Debtor and its property. The Debtor shall provide prompt notice of rejection to the other parties to any rejected executory contract so they may timely exercise their rights. The Confirmation Order shall also provide for such notice.

101. Any Claim filed in accordance with the provisions of Section 10.04 of the Plan shall be treated as a Disputed Class 3 Claim until the period of time has elapsed within which the Debtor may file an objection to such Claim with no

such objection being filed.

102. **Conditions to Occurrence of the Effective Date.**

re: The entry of the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, becoming a Final Order,is the condition precedent to the occurrence of the Effective Date. However, the Debtor may, in its sole discretion, waive the condition that the Confirmation Order become a Final Order.

## EFFECT OF THE PLAN ON CLAIMS AND EXISTING INTERESTS

103. Injunction:

In implementation of the discharge provided for herein, except as otherwise expressly provided in the Plan (including obligations in respect of Claims as at the Effective Date): (a) all Persons who have held, hold or may hold Claims or Interests against the Debtor are permanently enjoined on and after the Effective Date: (I) from commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind with respect to any such Claim or Interests against the Debtor or the property of the Debtor with respect to any such Claim or Interests, (ii) from the

enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor or the property of the Debtor  (iii) from creating, perfecting or enforcing, directly or indirectly, any encumbrance of any kind against the Debtor, or against the property of the Debtor, with respect to any such Claim or Interests, and (iv) from asserting, directly or indirectly, any set-off, right of subrogation, or recoupment of any kind against any obligation due the Debtor, or against the property of the Debtor with respect to any such Claim or Interests,  Nothing contained in this Section shall prohibit the holder of a timely filed Claim to which the Debtor has timely filed an objection from litigating its right to seek to have such Claim declared an Allowed Claim. The Confirmation Order shall make provision for this injunction.

104.  <u>Releases:</u>

Except as otherwise provided for in the Plan on the Effective Date, all Claims, including, but not limited to, those based upon guarantees of collection, payment or performance, indemnity bonds or obligations, performance bonds, contingent liabilities or contract obligations, or other similar undertakings made or given by the Debtor prior to the Petition Date as to the obligations or performance of another or of any other Person and/or in connection with the promulgation and obtaining the confirmation of the Plan, shall be discharged, released and of no further force or effect.

105. <u>Certain Terminations:</u>

Except as otherwise provided for in the Plan, on the Effective Date, all instruments evidencing indebtedness of the Debtor impaired by the Plan shall be deemed canceled as against the Debtor.

106. <u>Rights if Plan not Confirmed:</u>

If Confirmation of the Plan does not occur, the Plan shall be deemed nuland void, and in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor; nor in such event shall any statement contained in the Plan constitute an admission of any fact by the Debtor in any further proceedings involving the Debtor.

107. <u>Exoneration</u>

To the extent permitted by applicable law, if the respective affiliates, officers, directors, members, representatives, attorneys, accountants, financial advisors, and agents of the Debtor and their professionals act in good faith, they shall not be liable to any Claimant or holder of an Equity Security Interest, or any party with respect to any action, forbearance from action, decision, or exercise of discretion taken during the period from the Petition Date to the Effective Date in connection with a.) the operation of the Debtor; b.) the proposal or implementation of any of the transactions provided for or contemplated under this Plan; or c.) the administration of this Plan or the distribution to be made pursuant to this Plan, other than for willful misconduct or gross negligence. The Debtor and its respective

affiliates, officers, directors, members, representatives, attorneys, accountants, financial advisors, and agents, may rely on the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtor, pursuant to an order of the Court, and such reliance shall conclusively establish good faith. Any objection to this Section by any Claimant or holder of an Equity Security Interest shall be filed by the deadline established by the Bankruptcy Court for objecting to Confirmation of this Plan or shall be waived.

## MISCELLANEOUS AND JURISDICTION PROVISIONS

108. The Bankruptcy Court will retain jurisdiction for the purposes, including but not limited to:

- to hear and determine any objections to the allowance of Claims;

- to determine any and all applications for the retention of and compensation for Professional Persons and similar fees (Professional Persons employed by the Debtor's estate after the Effective Date may be paid pursuant to an invoice if there are no objections to the invoice within ten (10) days after it is served on

any parties requesting notice pursuant to Bankruptcy Rule 2002(I) by regular mail; provided, that any objection to such an invoice will be heard by the Bankruptcy Court);

- to determine the value of and extent of Secured Claims;

- to determine any and all applications, adversary proceedings, and contested or litigated matters properly before the Court and pending on the Confirmation Date or brought after the Confirmation Date;

- to modify the Plan pursuant to § 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in the Confirmation order to the extent authorized by the Bankruptcy Code;

- to hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan, the Confirmation order, and any other documents executed and delivered in connection with the Plan;

- to hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Court in the Bankruptcy Case;

- to hear and determine any and all controversies and disputes arising

under, or in connection with, the Plan;

- to adjudicate all controversies concerning the classification of any Claim;

- to liquidate damages in connection with any disputed, contingent or unliquidated Claims;

- to adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

- to adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the Bankruptcy Case;

- to recover all assets and properties of the Debtor wherever located, including the prosecution and adjudication of all causes of action available to the Debtor as at the Confirmation Date;

- to determine all questions and disputes regarding recovery of and entitlement to the Debtor's assets and determine all claims and disputes between the Debtor, and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

- to enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and to impose such

limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary or appropriate;

- to enter an order or final decree closing and terminating the Bankruptcy Case; and

- to make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions thereof and/or the Confirmation order.

109. Quarterly fees which are payable to the Office of the United States Trustee, pursuant to 28 U.S.C. § 1930 which have accrued but not been paid prior to the Confirmation of the Plan shall be paid by the Debtor not later than the Effective Date of the Plan. Quarterly fees which are payable to the Office of the United States Trustee, pursuant to 28 U.S.C. § 1930 which accrue after the Confirmation of the Plan through the entry of a final decree in this case, shall be paid by reorganized Rockwood as they become due.

110. The reorganized Debtor shall continue to be responsible for the preparation and filing of operating reports from the Confirmation Date of the Plan through the entry of a final decree in this Case.

111. The reorganized Debtor shall be responsible for filing the required post-

confirmation operating reports and payment of the quarterly fees to the United States Trustee, pursuant to 28 U.S.C. § 1930. The Confirmation Order shall provide that the Reorganized Debtor shall be responsible for filing the required post-confirmation operating reports and payment of the quarterly fees to the United States Trustee, pursuant to 28 U.S.C. § 1930.

## FINANCIAL ANALYSIS AND LIQUIDATION ANALYSIS

112. Annexed hereto as Exhibit "B" is the Debtor's balance sheet and liquidation analysis.

113. It is estimated that if this case were a liquidation, under chapter 7 of the Bankruptcy Code, after deducting for chapter 7 and 11 administration expenses, Secured Claims, and priority claims, there would be no assets available to make a distribution to general unsecured creditors.

114. In contrast, the Debtor expects the provisions of the Plan to provide general unsecured creditors with a 20% distribution on account of the principal amount of their Allowed Claims if the Plan is confirmed.

115. Accordingly, the Debtor believes that the Plan is in the best interests of its Creditors and should be accepted by all classes of Creditors.

116. Based on its projections (Exhibit "C") Rockwood believes that its Plan is

feasible.  However, as a company in which 100% of its revenues are generated from fees for services, and given the fact that there is no way to accurately forecast future performance, or for that matter future business, the only basis for supporting future projections is a combination of historic performance and current business trends.   In that regard, as a point of reference, attached hereto as Exhibit E is a summary of revenues and profits achieved by the Debtor over the past 12 years; together with Background Notes explaining certain aspects of the Debtor's financial history.  The fact is that during a time of stability in the real estate and capital markets and immediately prior to the encumbrance of what turned out to be an ill-fated partnership with DTZ, the Debtor achieved gross revenues of $41.9 million and a $9.1 million EBITDA, as reflected in its audited financial statements for the fiscal year ended 2/28/06.  Since that time, for the reasons explained under Background Notes in Exhibit E, the Debtor has experienced significant declines in revenues and profits, which were a contributor to its decision to file for bankruptcy.  At this point, following four dismal years in the real estate and capital markets, market indicators, both with respect to the Debtor's business as well as the market as a whole appear to be improving.   While the Debtor's future business success continues to be

unpredictable, the projections contained in Exhibit C reflect the Debtor's best estimate for the future performance of the Debtor and it is worth noting that the revenue projection for the fiscal year ending 4/30/11 is less than half of what was achieved for the fical year ended 2/28/06. When considering the alternative of Chapter 7 liquidation, the consequences of which are projected in Exhibit B, under Liquidation Analysis, it becomes clear that the continuing business of the reorganized Debtor provides the greatest likelihood of satisfying creditor's claims in accordance with the proposed Plan of Reorganization, described herein.

## RISKS IN ACCEPTING THE PLAN

117. The distributions to be received by Creditors under the Plan is not without risk.

118. The market in which Rockwood operates is highly competitive.

119. Moreover, the real estate market is volatile and unpredictable.

120. While Rockwood believes that it is well equipped to survive in this economic environment, there is no guarantee that it will.

121. However, Rockwood has a long history and it believes that this case has solved those problems which could obstruct its future success.

122. Moreover, Rockwood believes that the anticipated distributions under the

Plan can be realized and are better than any known alternative to the Plan.

## VOIDABLE TRANSFER ANALYSIS

123.  The right to pursue preference, fraudulent conveyances or other types of claims under Bankruptcy Code sections

544(b), 547, 548, 549, and 550 or applicable state law will survive the Plan.

124.  Rockwood and its counsel are investigating whether such claims exist. Thus far, they believe that they found approximately $100,000 in voidable preferential transfers..

125.  However, they can change their opinion after further analysis.

**Whether the Sale by the Debtor's Principals of Fifty Per-cent of Their Interest In the Debtor to DTZ Holdings, PLC., Was a Fraudulent Conveyance**

126.  In May 2006, DTZ Holdings, PLC., obtained fifty percent (50.00%) of the Members' equity interests in the Debtor in exchange for $28,405,312 in cash and $7,395,398 of restricted stock of DTZ Holdings, PLC and the Debtor receiving $9,198,750 to fund compensation to non-Member employees. (the "DTZ Transaction").

127.  Steven Littman alleged that the DTZ Transaction is a voidable fraudulent

conveyance from the Debtor which benefited the Debtor's equity security holders. Mr. Littman provided no legal authority to support his contention.

128. Succinctly stated, In April 2005, Mr. Littman retired his interest in the Debtor in exchange for $2,125,000 in payments from the Debtor. Mr. Littman contended that the transaction in which he retired his interests in the Debtor plus the DTZ Transaction combined to give the Debtor's remaining members a voidable fraudulent conveyance from the Debtor. Mr. Littman retiring his interests in the Debtor, in exchange for a payment to him by the Debtor, increased the remaining members' interests in the Debtor. The remaining members later sold 50% of their interests in the Debtor in the DTZ Transaction. As part of the DTZ Transaction, the Debtor received more than $9,000,000 for compensation to non-insders.

129 From the Debtor's perspective, these transactions did not result in a transfer of the Debtor's property to the Debtor's remaining members. Therefore, there was no transfer to the remaining members which could be a fraudulent transfer.

130. The Debtor's counsel examined this allegation and the DTZ Transaction thoroughly, applying applicable law. This examination resulted in the conclusion that the Debtor's estate has no claim against the equity security

holders resulting from the DTZ Transaction.

131. Mr. Littman's allegation has been contentious and of concern to the Court. The following is the Debtor's detailed analysis of these transactions. . Parties in interest can draw their own conclusions.

## The DTZ Transaction

132. On May 10, 2006, the Debtor was known as Rockwood Realty Associates, L.L.C. Its equity security holders (Members) were Rockwood Realty Associates, Inc., which is a holding company that is wholly owned by John Magee, Daniel McNulty and four trusts maintained by the Ackerman Group (the "Ackerman Trusts"). Together, they owned 100% of the outstanding equity interests in the Debtor.

133. On May 10, 2006, a "Membership Interest Purchase Agreement" was entered into by DTZ Holdings PLC, DTZ Debenham Tie Leung Incorporated and the Members (the "Membership Agreement").

134. Under the Membership Agreement, the Members transferred to DTZ Holdings PLC, 50% of all of their outstanding limited liability company interests in the Debtor. In exchange for fifty percent (50.00%) of the Members' equity interests in the Debtor, DTZ Holdings PLC transferred to

the Members, a total of $28,405,312 in cash and restricted stock in DTZ Holdings, PLC, having a value at the time of the transaction of $7,395,938. Additionally, the Debtor received $9,198,750 from DTZ Holdings PLC, to be utilized to fund compensation to non-Member employees.

135. After the DTZ Transaction, the Debtor changed its name to DTZ Rockwood LLC.

## Legal Analysis

136. The Bankruptcy Code offers two vehicles for avoiding fraudulent conveyances. Bankruptcy Code § 548, entitled "Fraudulent Transfers and Obligations," is the Bankruptcy Code's own tool for avoiding fraudulent conveyances.[5] Bankruptcy Code§ 544, entitled "Trustee as Lien Creditor

---

[5] 11 U.S.C.A. § 548 provides:

**548. Fraudulent Transfers and Obligations**

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

    (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

and as Successor to Certain Creditors and Purchasers," makes judgment

creditors' state law remedies available to bankruptcy trustees and debtors in

possession.[6] Here, this includes New York State's Debtor & Creditor Law's

---

(B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

[6] 11 U.S.C. § 544 provides, in pertinent part:

### § 544. **Trustee as Lien Creditor and as Successor to Certain Creditors and Purchasers**

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to

fraudulent transfer avoiding provisions, sections 270 through 279.

137.    By its terms, Bankruptcy Code § 548 can avoid only those fraudulent transfers which were made within two years of the filing date of the bankruptcy case[7].  New York Debtor & Creditor Law's "reach-back period" is six years.[8]

138.    The DTZ Transaction and any arguable transfer occurred more than two years before this case commenced.  Therefore, a challenge to a fraudulent conveyance arising from the DTZ Transaction could be made only through New York Debtor & Creditor Law, made applicable to this case by Bankruptcy Code§ 544.

---

such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title. . . .

[7] 11 U.S.C. § 548(a).

## <u>The Need for and Lack of a Conveyance by the Debtor</u>

139.    A conveyance is essential to any action to avoid a fraudulent conveyance

under New York Debtor & Creditor Law. [9]  New York Debtor & Creditor

---

[8] *In re Die Fliedermaus LLC*, 323 B.R. 101, 107 (Bankr. S.D.N.Y. 2005).

[9] The applicable sections of New York Debtor & Creditor Law and their elements are:

### § 273. Conveyances by Insolvent

*Every conveyance made* and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration. (Emphasis supplied).

To establish a fraudulent conveyance under New York law, a litigant must demonstrate: (1) that there was a conveyance, (2) that the transferor would become insolvent as a result of the conveyance, and (3) there was no fair consideration for the conveyance. *U.S. v. Sweeny*, 418 F.Supp. 2d 492, 498 (S.D.N.Y. 2006).

### § 273-a. Conveyances by Defendants

*Every conveyance made* without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.  (Emphasis supplied).

To prevail on a fraudulent conveyance claim, under New York statute governing conveyances by defendants in actions for money damages, plaintiff must prove that (1) conveyance in question was made without fair consideration, (2) at the time of the transfer, transferor was a defendant in an action for money damages or a judgment had been docketed against transferor, and (3) final judgment has been rendered against transferor that remains unsatisfied.  *In re Frank Santora Equipment Corp.*, 256 B.R. 354, 373 (Bankr. E.D.N.Y. 2000).

### § 274. Conveyances by Persons in Business

*Every conveyance made* without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his

Law defines a "conveyance" as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible

---

hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent. (Emphasis supplied).

Under New York law, a transfer by a debtor is deemed constructively fraudulent if it is made without "fair consideration," and one of the following conditions is met: (1) the transferor is insolvent or will be rendered insolvent by the transfer in question, (2) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, or (3) the transferor believes that it will incur debt beyond its ability to pay. *In re Jacobs*, 2008, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008).

### § 275. Conveyances by a Person about to Incur Debts

***Every conveyance made*** and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. (Emphasis supplied).

Under New York law, a conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration" and any of the following conditions is met: (1) the transferor is insolvent or will be rendered insolvent by the transfer in question, (2) the transferor is engaged or is about to engage in a business or transaction for which its remaining property constitutes unreasonably small capital, or (3) the transferor believes that it will incur debt beyond its ability to pay. *In re Allou Distributors, Inc.*, 2008, 387 B.R. 365, 404 (Bankr. E.D.N.Y. 2008).

### § 276. Conveyance Made with Intent to Defraud

***Every conveyance made*** and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. (Emphasis supplied).

To allege a claim under actual fraud provision of New York fraudulent transfer law, plaintiff must allege that (1) the thing transferred has value of which creditor could have realized a portion of its claim, (2) that this thing was transferred or disposed of by debtor, and (3) that the transfer was done with actual intent to defraud. *In re Monahan Ford Corp. of Flushing*, 2006, 340 B.R. 1, 38 (Bankr. E.D.N.Y. 2006).

property, and also the creation of any lien or encumbrance." [10]

140. The DTZ Transaction did not result in a conveyance by the Debtor. All conveyances were made solely by Messrs., Magee, McNulty and Ackerman (transfer of equity interest in the Debtor) and DTZ Holdings, PLC. (transfer of cash and equity security interests in itself). The members' transfer to DTZ Holdings, PLC., of their interests in the Debtor is not considered a conveyance for fraudulent conveyance purposes.[11] Nor, did the Debtor have any property interest in the equity interests owned by its members.[12]

141. The absence of a conveyance within the purview of New York Debtor Creditor Law renders the DTZ Transaction free from a fraudulent conveyance taint. The Debtor has no claim against Messrs. Magee, McNulty or Ackerman resulting from the DTZ Transaction.

---

[10] New York Debtor & Creditor Law § 270.

[11] *Martes v. USLIFE Corp*., 927 F.Supp. 146, 148 (S.D.N.Y. 1966) (Corporate parent's sale of its stock in wholly owned subsidiary to third party did not give rise to fraudulent conveyance as against subsidiary's judgment creditor, where sale did not involve conveyance of anything by subsidiary or depletion of subsidiary's assets; sale necessarily left subsidiary in exactly same position vis-a-vis its ability to respond to creditors' claims as it occupied before sale.)

[12] *Matter of Calamity Jane's, Inc*., 22 B.R. 5, 7 (Bankr. D.N.J. 1982)*, citing, In re Texas Consumer Finance Corporation*, 480 F.2d 1261, 1266 (5th Cir. 1973); *In re Journal-News Corp*.

<u>Fair Consideration</u>

142. A voidable fraudulent conveyance also requires that the transferor receive less than "fair consideration" for the conveyance.[13]

143. New York Debtor & Creditor Law[14] defines "fair consideration" as:

> Fair consideration is given for property, or obligation,
>
> a.) When in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b.) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

144. In the DTZ Transaction, the Debtor conveyed nothing. Nevertheless, the Debtor received $9,198,750 from DTZ Holdings, PLC, and an economic opportunity to work with DTZ. Unquestionably, the Debtor received more than "fair consideration" as a result of the DTZ Transaction.

---

193 F.2d 492 (2d Cir. 1951).

[13] See fn. 5.

[14] New York Debtor & Creditor Law § 272.

145. Moreover, after the DTZ Transaction, the Members made loans to the Debtor totaling more than $20,000,000. These funds would have been unavailable to the Debtor without the DTZ Transaction.

146. This debt is being converted to a capital contribution in the Debtor147. Two essentia[...] Transaction.

## No Fraudulent Conveyance by "Collapsing Transactions"

148. At the Examiner's request, the Debtor expanded its inquiry to, "whether the DTZ Transaction and the Littman Transaction, together, result in a voidable fraudulent conveyance to its members?" The question applies the "collapsing doctrine."[15]

149. Under the "collapsing doctrine" multiple transactions are collapsed and treated as steps in a single transaction for analysis under the fraudulent conveyance laws. [16] The doctrine applies generally to where: 1.) one transferee gives fair value to the debtor in exchange for the debtors property, and 2.) the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the

---

[15] *In re M. Fabrikant & Sons, Inc.* 394 B.R. 721, 731 (Bankr.S.D.N.Y. 2008).

debtor's property, and the second transferee receives the consideration provided by the first transferee, while the debtor retains nothing.[17]

150. Applying the "collapsing doctrine," Steve Littman was the first transferee. Unlike the paradigm, the Littman Transaction resulted in a $2,125,000 obligation to Steven Littman and $743,711.22 in fraudulent conveyances from the Debtor to Steven Littman.[18] It is true that the Debtor's members benefited from that transaction. Their equity interests in the Debtor increased. However, they received none of the Debtor's property.[19]

151. The DTZ Transaction was the second transaction. As discussed above, none of the Debtor's property was transferred in the DTZ Transaction. Instead, the Debtor received initially $9,198,750 capital and another $20,000,000+ in loans over time. Again, this is the reverse of the paradigm.

152. Moreover, in a collapsed transaction and a light least favorable to its members, the Debtor received more than $29,000,000 attributable as from its members in exchange for the $2,125,000 to be paid to Steven Littman

---

[16] *Id.*

[17] *Id., citing. HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir.1995)

[18] Complaint, in *DTZ Rockwood LLC v. Littman*, Bankruptcy Court SDNY, Adv. No. 09-01263-smb,

which benefited them.  This represents a 1,265% return to the Debtor on the $2,125,000 payment.[20]  The Debtor believes that this would be considered a very favorable rate of return.  The Debtor benefitted substantially from the collapsed transaction.

153.    The consideration must also be given in "good faith."  Good faith has been defined as:

> (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others . . ."  In short, "the lack of good faith imports a failure to deal honestly, fairly and openly."[21]

154.    After the DTZ Transaction, the Debtor's members, other than DTZ,  injected more than $10,000,000 into the Debtor.  Those funds were used to pay the Debtor's creditors and operating expenses.  When this case was filed, the

---

[19] See, fn. 8

[20] New York State law does not appear to require that the value be transferred contemporaneously.  There is authority saying that new value payments made to the transferor after purportedly fraudulent conveyance can provide consideration for the transfer. See, Cook and Mendales, THE UNIFORM FRAUDULENT TRANSFER ACT: AN INTRODUCTORY CRITIQUE , 62 AMBKRLJ 87, 89

[21] *In re Allou Distributors, Inc., 404 B.R. 710, 717 (Bankr. E.D.N.Y. 2009), citing, Ostashko v. Ostashko*, 2002 WL 32068357 at *22-23 (E.D.N.Y.2002) and *Southern Indus., Inc.*

Debtor had only $874, 081.68 in trade debt.[22]    Clearly, the Debtor's memebers did not intend to defraud the Debtor's creditors.  Their actions protected the Debtor's creditors, even at their own expense.

155.    Accordingly, even as a "collapsed transaction," the DTZ Transaction plus the Littman Transaction did not result in a voidable fraudulent conveyance to the Debtor's equity security holders..

## TAX CONSEQUENCES

156.    The Debtor does not anticipate that the Debtor shall be subject to any unfavorable tax consequences arising from the Plan of reorganization.

157.    Each individual interested party is advised to confer with a tax professional to determine the tax consequences of the Plan to that individual.

## CRAMDOWN

---

*v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945, 948-49 (2d Dep't 1978).

[22] Exclusive of primary landlord's claim. Debtor's Schedule "F"

158.   Under Bankruptcy Code § 1129(b), so long as the Plan is accepted by the holders of claims of at least one non-insider class, the Plan may be confirmed by the Bankruptcy Court by "cramming down" the various non-assenting classes.

159.   The Debtor intends to seek confirmation of the Plan under Bankruptcy Code § 1129(b) if it deems it necessary.

## VOTING REQUIREMENTS WITH RESPECT TO THE PLAN

160.   The Plan will be confirmed if it is accepted by the requisite majorities of the Debtor's Creditors.  The requisite majorities with respect to each class are at least two-thirds (2/3) in dollar amount, and more than one-half (½) in number of allowed eligible claims that actually vote within the time period prescribed by the Court.

161.   Ballots are enclosed.  Ballots should be completed as promptly as possible and returned to the Debtor, c/o its counsel, Cuevas & Greenwald, P.C., 475 Park Avenue South 26th Floor, New York, New York  10016 Attn:  W. M. Greenwald, Esq.,  The Bankruptcy Court has set  October _ ____, 2010, at 5:00 Eastern Time  as the last date for receipt of ballots.  That date may be extended only by further Order of the Bankruptcy Court.

162.  In addition to voting, a creditor or party in interest would have the right to

object to the Plan, in writing, on any appropriate grounds.

**ANY BALLOT RECEIVED AFTER THE LAST DATE FOR RECEIPT OF BALLOTS WILL NOT BE COUNTED IN THE DETERMINATION OF WHETHER A CLASS HAS APPROVED THE PLAN OF REORGANIZATION**

163.  The Bankruptcy Court has also designated October ___, 2010 at 10:00 a.m.

as the date and time with respect to the hearing to confirm the Plan of

Reorganization.

**THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN OF REORGANIZATION AND SHOULD NOT BE RELIED ON FOR VOTING PURPOSES. CREDITORS ARE URGED TO READ THE PLAN OF REORGANIZATION IN FULL. CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL, TO FULLY UNDERSTAND THE PLAN OF REORGANIZATION.**

**THE PLAN OF REORGANIZATION IS COMPLEX AT LEAST TO THE EXTENT THAT IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT WITH THE DEBTOR, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN OF REORGANIZATION CANNOT BE MADE WITHOUT UNDERSTANDING IT.**

**FURTHERMORE, IT MUST BE EXPRESSLY UNDERSTOOD THAT NO REPRESENTATIONS**

**CONCERNING THE DEBTOR HAVE BEEN AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

## CONCLUSION

164. The Debtor believes that the annexed Plan is fair to all parties concerned and is the best available alternative to creditors under the circumstances.

165. The Debtor therefore requests that you execute the acceptance form transmitted to you in connection with this Disclosure Statement and return

same to Debtor's counsel as soon as possible.

Dated: New York, New York
        August 23, 2010

CUEVAS & GREENWALD, P.C.
*Attorneys for the Debtor and*
*Debtor in Possession*,
Rockwood Real Estate Advisors LLC
475 Park  Avenue South - 26th Floor
New York, New York 10016
212-983-1922

By: /s/ Wayne M. Greenwald Officer
       Wayne M. Greenwald


ROCKWOOD REAL ESTATE ADVISORS LLC

By: /s/     John Magee

   John Magee

Co-Managing Member

## EXHIBIT A

Debtors Plan of Reorganization, which is annexed hereto and made a part hereof

under separate cover.

## EXHIBIT B

### Debtors Balance Sheet and Liquidation Analysis

## Balance Sheet as of March 31, 2010; Liquidation Analysis as of April 30, 2010

| Assets | Balance Sheet | Liquidation Value |
|---|---|---|
| Cash & Receivables | $141,911 | $602,606 |
| Property & Equipment | 4,395,905 | 200,000[23] |
| Goodwill | 352,340 | 0 |
| Due from Affiliates | 6,187,911 | 450,000[24] |
| Other Assets | 220,615 | 0 |
| Total | $11,298,682 | $1,252,606 |
| | | |
| Liabilities | | |
| Secured Bank Debt | $1,820,000 | $1,800,000 |
| Other Secured Debt (Capital Leases, Furn. & Equip. Loans, etc.) | 409,070 | 409,070 |
| Investments in Partnerships | 1,500,119 | 0 |
| Admin Loans Priority | 800,000 | 800,000 |
| Admin Loans (Subordinated) | 600,000 | 0 |
| Admin. Accounts Payable | 164,045 | 164,045 |
| Admin. Professional Fees | 306,353 | 679,000[25] |
| Deferred Rent | 1,789,604 | 0 |
| Payables re: General Unsecured Claims | 1,259,106 | 0 |
| Admin. Chapter 7 Fees | 0 | 100,000[26] |
| Priority Taxes (filed) | 853,189 | 200,000 |
| Priority Lease Payments re: Assumed Leases | 0 | 12,452,533 |
| Loans Payable to Members | 12,470,735 | 0 |
| Priority Employee Compensation Payments | | 71,429 |
| Total Balance Sheet Liabilities | $21,972,221 | |
| Claims to be Satisfied (before Unsecured receive distribution) | | $16,676,077 |
| | | |
| Unsecured Claims | | |
| General Unsecured Claims (Class 5) | | $1,259,106[27] |
| Loans Payable to Members | | 12,470,735 |
| Unsecured Employee Salary Claims (Class 5a) | | 168,666 |
| Total Unsecured Claims | | $13,898,507 |

---

[23] Estimated
[24] Estimated liquidation value of Debtor's share of a boat held in a wholly owned subsidiary.
[25] Estimated
[26] Estimated

# EXHIBIT C

## Five Year Cash Flow Projection

| Revenue | FYE 04/30/10 | FYE 04/30/11 | FYE 04/30/12 | FYE 04/30/13 | FYE 04/30/14 | FYE 04/30/15 |
|---|---|---|---|---|---|---|
| Projected Gross Revenue | $12,178,588 | $20,000,000 | $24,000,000 | $28,000,000 | $32,000,000 | $36,000,000 |
| % Over Prior Year | -25.29% | 64.22% | 20.00% | 16.67% | 14.29% | 12.50% |
| Less Commissions | $4,652,700 | $9,180,000 | $11,340,000 | $13,500,000 | $15,660,000 | $17,820,000 |
| % of Gross Revenue | 38.20% | 45.90% | 47.25% | 48.21% | 48.94% | 49.50% |
| Less Payroll Taxes on Commissions (Note 1) | $78,796 | $459,000 | $567,000 | $675,000 | $783,000 | $891,000 |
| Total Net Revenue | $7,447,093 | $10,361,000 | $12,093,000 | $13,825,000 | $15,557,000 | $17,289,000 |

| Expenses | FYE 04/30/10 | FYE 04/30/11 | FYE 04/30/12 | FYE 04/30/13 | FYE 04/30/14 | FYE 04/30/15 |
|---|---|---|---|---|---|---|
| Salary & Payroll Expense | $2,733,509 | $3,196,872 | $3,538,715 | $3,835,651 | $4,087,434 | $4,411,805 |
| Bonuses (Salary & Bonus Staff) | $44,471 | $200,000 | $240,000 | $280,000 | $320,000 | $360,000 |
| Payroll Taxes (Note 1) | $144,185 | $83,638 | $188,936 | $205,783 | $220,372 | $238,590 |
| Insurance - employee (Note 2) | $656,114 | $740,800 | $826,880 | $957,568 | $1,077,325 | $1,233,057 |
| Travel, Meals & Entertainment (Note 3) | $599,408 | $600,000 | $720,000 | $840,000 | $960,000 | $1,080,000 |
| Auto Expense (Note 4) | $129,510 | $138,000 | $142,140 | $146,404 | $150,796 | $155,320 |
| Rent – New York (Note 4) | $960,464 | $1,127,400 | $855,312 | $880,971 | $907,401 | $934,623 |
| Rent – Miami (Note 4) | $62,460 | $69,756 | $71,849 | $74,004 | $76,224 | $78,511 |
| Rent – Orlando (Note 4) | $75,369 | $74,700 | $76,941 | $79,249 | $81,627 | $84,076 |
| Rent – Dallas (Note 4) | $14,136 | $13,230 | $13,627 | $14,036 | $14,457 | $14,890 |
| Rent - Chicago | $39,048 | $0 | $0 | $0 | $0 | $0 |
| Rent – Mexico City (Note 4) | $151,624 | $192,000 | $197,760 | $203,693 | $209,804 | $216,098 |
| Equipment Rental (Note 4) | $81,161 | $96,000 | $98,880 | $101,846 | $104,902 | $108,049 |
| Office Supplies (Note 5) | $148,678 | $150,000 | $180,000 | $210,000 | $240,000 | $270,000 |
| Telephone (Note 4) | $318,416 | $276,000 | $289,800 | $304,290 | $319,505 | $335,480 |
| Messenger & Postage (Note 6) | $12,635 | $40,000 | $48,000 | $56,000 | $64,000 | $72,000 |
| Accounting | $95,678 | $320,000 | $200,000 | $225,000 | $250,000 | $275,000 |
| Legal (Note 7) | $164,020 | $100,000 | $120,000 | $140,000 | $160,000 | $180,000 |
| Insurance – Other (Note 8) | $543,083 | $613,689 | $675,058 | $742,564 | $816,820 | $898,502 |
| Dues & Subscriptions | $28,036 | $24,000 | $34,000 | $44,000 | $54,000 | $64,000 |
| Education | $2,384 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Repairs & Maintenance (Note 9) | $18,434 | $12,000 | $12,600 | $13,230 | $13,892 | $14,586 |
| Marketing (Note 10) | $68,779 | $100,000 | $240,000 | $420,000 | $640,000 | $720,000 |
| Research (Note 11) | $225,982 | $240,000 | $288,000 | $336,000 | $384,000 | $432,000 |
| Payroll Expense | $11,498 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Consulting Fees | $16,349 | $0 | $0 | $0 | $0 | $0 |
| Computer Expense (Note 12) | $141,171 | $120,000 | $144,000 | $168,000 | $192,000 | $216,000 |
| Corporate Taxes (Note 13) | $184,953 | $218,360 | $231,658 | $243,241 | $255,403 | $268,173 |
| Miscellaneous Expenses | $67,348 | $61,000 | $36,000 | $36,000 | $36,000 | $36,000 |
| Capital Lease | $357,155 | $426,000 | $426,000 | $426,000 | $426,000 | $426,000 |
| Exp. Offset - Mexico VAT Exch. Rate Var. | ($111,681) | ($100,000) | ($100,000) | ($100,000) | ($100,000) | ($100,000) |
| Total Expenses (Before Plan Payments) | $7,984,376 | $9,147,445 | $9,810,156 | $10,897,530 | $11,975,959 | $13,036,761 |

| Total Net Cash Flow (Before Plan Payments) | ($537,283) | $1,213,555 | $2,282,844 | $2,927,470 | $3,581,041 | $4,252,239 |
|---|---|---|---|---|---|---|
| % of Gross Revenues | -4.41% | 6.07% | 9.51% | 10.46% | 11.19% | 11.81% |

| Plan Payment Expenses | FYE 04/30/10 | FYE 04/30/11 | FYE 04/30/12 | FYE 04/30/13 | FYE 04/30/14 | FYE 04/30/15 |
|---|---|---|---|---|---|---|
| Amortization payments to Signature Bank | $200,000 | $240,000 | $240,000 | $240,000 | $240,000 | $840,000 |
| Interest Payments to Signature Bank | $66,096 | $89,000 | $88,000 | $73,000 | $59,000 | $44,000 |
| Priority Payments (Lawyers, Consultants, etc.) | $0 | $679,000 | $0 | $0 | $0 | $0 |
| Priority Payments (Taxes) | $0 | $32,628 | $43,504 | $43,504 | $43,504 | $43,504 |
| Priority Payments to Employees | $0 | $71,429 | $0 | $0 | $0 | $0 |
| Payments to employee as unsecured creditors | $0 | $42,165 | $56,220 | $56,220 | $14,055 | $0 |
| Payments to general unsecured creditors | $0 | $37,773 | $50,364 | $50,364 | $50,364 | $50,364 |
| Payments to Littman | $600,000 | $0 | $100,000 | $100,000 | $0 | $0 |
| Expense Offset - Member Contributions | ($1,600,000) | ($200,000) | $0 | $0 | $0 | $0 |
| Expense Offset - Sale of Vitesse & Other | $0 | ($450,000) | $0 | $0 | $0 | $0 |
| Total Plan Payments (Net of Contributions) | ($733,904) | $541,995 | $578,088 | $563,088 | $406,923 | $977,868 |

| Total Net Cash Flow (After Plan Payments) | 196,621 | 671,560 | 1,704,756 | 2,364,382 | 3,174,118 | 3,274,371 |
|---|---|---|---|---|---|---|
| % of Gross Revenue | 1.61% | 3.36% | 7.10% | 8.44% | 9.92% | 9.10% |

| Estimated Opening Cash Balance | 376,239 | 572,860 | 1,244,420 | 2,949,176 | 5,313,558 | 8,487,675 |
|---|---|---|---|---|---|---|

| Estimated Cash Balance (End of Period) | 572,860 | 1,244,420 | 2,949,176 | 5,313,558 | 8,487,675 | 11,762,047 |
|---|---|---|---|---|---|---|

## EXHIBIT D

## EXECUTORY CONTRACTS BEING REJECTED

Name and Address of Other Party                    Description

1.    Canon Business Solutions-East              Fax Machine
      21146 Network Place
      Chicago, IL 60673

2.    OCC Financial Services, Inc.              Fax Machine
      13824 Collection Center Drive
      Chicago, IL 60693

3.    Xerox                                     Copier for NY Office
      POB 650361
      Dallas, TX 75265

4.    South Dearborn, LLC                       Lease for Chicago Office
      7 Corporate Plaza
      Newport Beach, CA 92660

5.    Tew Cardenas, LLP                         SubLease for Miami
      1441 Brickell Avenue, 15th Fl       Office
      Miami, FL 33131

6.    3801 PGA Acquisition Co.                  Lease for West Palm
      NAI Merin Hunter                          Beach Office
      1601 Forum Place, Suite 200
      West Palm Beach, FL 33401

7.    Westport Advisors, Ltd.                   Sublease for West Palm
      3801 PGA Blvd.                            Beach Office Space
      West Palm Beach, FL 33401
8.    UHY Advisors TX, LLC                      Sublease for 3rd Floor of
      12 Gateway Plaza                          NY Office space
      Suite 200

Houston, TX 77064

| | | |
|---|---|---|
| 9. | Monarch Centre Associates, LLC<br>c/o Morgan Stanley Real Estate<br>3424 Peachtree Road, N.E.<br>Suite 800<br>Atlanta, GA 30326 | Lease for Atlanta Office |
| 10. | GE Capital<br>PO Box 3083<br>Cedar Rapids, IA 52406 | Lease for Furniture and Equipment |
| 11. | GE Capital<br>PO Box 3083<br>Cedar Rapids, IA 52406 | Copier and Printer |

# EXHIBIT E

## Financial History

Rockwood's financial performance over the past 12 years is comprised of the following:

| FYE | 12/31/97 | 12/31/98 | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 | 12/31/04 | 2/28/06 |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $6.9 | $9.3 | $9.8 | $9.9 | $10.3 | $13.8 | $18.3 | $26.6 | $41.3 |
| Growth | 51% | 35% | 5% | 1% | 4% | 34% | 33% | 45% | 55% |
| EBITDA/CF* | $1.4 | $2.1 | $0.4 | -$2.0 | -$0.4 | $2.2 | $1.3 | $4.9 | $9.1 |
| % of Revenues | 20% | 23% | 4% | N/A | N/A | 16% | 7% | 18% | 22% |
| Staff | 32 | 40 | 39 | 40 | 38 | 48 | 63 | 71 | 81 |
| Office Openings | PBG | | | Chicago | | | Mex. City | Orlando | Atlanta |
| | | | | | | | | | Dallas |

| FYE | 4/30/07 | 4/30/08 | 4/30/09 |
|---|---|---|---|
| Revenues | $30.5 | $23.2 | $16.3 |
| Growth | -26% | -24% | -30% |
| EBITDA | -$5.1 | -$12.7 | -$3.5 |
| % of Revenues | N/A | N/A | N/A |
| Staff | 115 | 101 | 52 |
| Office Openings | Miami | | |

\*   Rockwood did not report EBITDA until FYE 2/28/06; prior to that it operated on the basis of cash flow.

<u>Background Notes Regarding Financial History</u>

1. Rockwood was formed in 1991, by John Magee as Rockwood Realty Associates to provide real estate advisory and transactional services to institutional, corporate and private investor clients. Dan McNulty joined in 1993 and began building the firm's institutional brokerage business, which has successfully completed more than $24 billion of real estate transactions, to date.

2. On May 10, 2006, DTZ Holdings plc ("DTZ"), a global real estate advisor based in London, acquired a 50% interest in Rockwood for $45 million of cash and DTZ stock and the firm was re-named DTZ Rockwood LLC.

3. For the four years prior to the sale to DTZ in May 2006, DTZ Rockwood achieved 49.8% compound annual growth in revenues, peaking at $41,300,000 for the fiscal year ending 2/28/06.

4. After the acquisition by DTZ in 2006, DTZ Rockwood, at the direction of DTZ, began implementing an aggressive strategy to expand its brokerage business to provide full national coverage. The plan included opening new offices in key US cites and increasing the size of the firm's brokerage staff. As of 2007, DTZ Rockwood, operated 8 offices in the US and Mexico, maintained a staff of 115 (an increase of 62% over the prior two year period) and was seeking, together with DTZ, to further expand its coverage by opening offices in every major US city and increasing total DTZ Rockwood staff to approximately 150.

5. During the three years following the acquisition by DTZ, DTZ Rockwood experienced a 63% decline in revenues. This decline in revenues resulted from a combination of integration issues during the first year after the sale to DTZ, followed by a significant loss of real estate brokerage revenues resulting from the declining US economy, collapse of the US and global financial markets and the impact of both on US real estate markets.

6. As a result of the market downturn, DTZ abandoned its expansion ambitions in North America, and in mid-2008, ceased funding its share of DTZ Rockwood's cash requirements; leaving DTZ Rockwood with significant ongoing financial obligations associated with the expansion initiative.

7. As a result of DTZ's lack of interest in the US expansion, as of May 18, 2009, DTZ Rockwood acquired the 50% interest previously purchased by DTZ for a nominal amount.

8. Notwithstanding Rockwood's downsizing efforts and curtailment of expenses, which were in reaction to a severe decline in transactional revenues, the residual burden of the prior DTZ related expansion initiatives combined with the protracted collapse of the capital and transactional markets, proved to be too great a hurdle to overcome through conventional means.

9. As a result, on June 1, 2009, DTZ Rockwood filed a voluntary petition to reorganize under Chapter 11 of the United States Bankruptcy Code.

10. As previously indicated Rockwood expects to successfully emerge from its Chapter XI proceeding by mid-June 2010, to begin implementing the business and operating initiatives contemplated herein and to return Rockwood to the high levels of long term growth it previously achieved.