Cuevas & Greenwald, P.C.
Attorneys for Debtor
1250 Central Park Avenue
Yonkers, New York 10704
Tel. No. 914.964.7060
Carlos J. Cuevas
Wayne M. Greenwald

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re                                                                    Chapter 11

DTZ ROCKWOOD LLC,                                    Case No. 09-13566 (SMB)

                          Debtor.

--------------------------------------------------------X

**MOTION FOR ORDERS: (A) AUTHORIZING AND SCHEDULING AN AUCTION TO SOLICIT BIDS FOR THE SALE OF SUBSTANTIALLY ALL ASSETS RELATED TO THE DEBTOR'S BUSINESS FREE AND CLEAR OF LIENS, INTERESTS AND ENCUMBRANCES; (B) APPROVING BIDDING PROCEDURES AND CERTAIN FEE PROTECTIONS; (C) APPROVING ASSET PURCHASE AGREEMENT OR SUBSEQUENT OVERBID; (D) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE; (E) ESTABLISHING PROCEDURES FOR DETERMINATION OF CURE AMOUNTS AND FOR APPROVAL OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO THE SALE; AND (F) ESTABLISHING THE FORM AND MANNER OF NOTICES RELATED THERETO; MEMORANDUM OF POINTS AND AUTHORITIES**

**TO: THE HON. STUART M. BERNSTEIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

DTZ Rockwood LLC  by its attorneys, Cuevas & Greenwald, P.C., for its Motion for

Orders: (A) Authorizing and Scheduling an Auction to Solicit Bids for the Sale of Substantially

All Assets Related to the Debtor's Business Free and Clear of Liens, Interests and

Encumbrances; (B) Approving Bidding Procedures and Certain Fee Protections; (C) Approving

1

Asset Purchase Agreement or Subsequent Overbid; (D) Scheduling a Hearing to Consider Approval of the Sale; (E) Establishing Procedures for Determination of Cure Amounts and for Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant to the Sale; and (F) Establishing the Form and Manner of Notices Related Thereto, respectfully represents:

## PRELIMINARY STATEMENT

1.     Rockwood Real Estate Advisors LLC (f/k/a DTZ Rockwood LLC)[1] (the "**Debtor**"), as debtor-in-possession, has entered into a certain Asset Purchase Agreement, dated as of March 18, 2011, as amended pursuant to a certain First Amendment to Asset Purchase Agreement, dated as of April 6, 2011, a copy of which is attached hereto as <u>Exhibit A</u> (as amended, the "**Purchase Agreement**") with Rockwood- CWFS LLC (the "**Purchaser**") for the sale of substantially all assets of the Debtor free and clear of all liens, claims, encumbrances, and other interests (the "**Assets**").

2.     The Debtor hereby moves the Court (the "**Sale Motion**") for the entry of an order, substantially in the form of the order attached hereto as <u>Exhibit B</u> (the "**Sale Procedures Order**"): (a) authorizing and scheduling an auction (the "**Auction**") to sell the Assets (the "**Sale**"); (b) authorizing and approving the sale and bidding procedures to be employed in connection with the proposed Sale and the Auction, as set forth in the Purchase Agreement and attached hereto as <u>Exhibit 1</u> (the "**Bidding Procedures**"); (c) authorizing and approving a certain Termination Fee and Break-Up Fee (both as defined below); (d) establishing a deadline and procedures to determine cure amounts related to

---

[1] In May 2010, the Debtor filed a motion seeking authority to change its name and to change the case caption.

and otherwise approving the assumption and/or assignment of the executory contracts and unexpired leases to be assumed (to the extent not previously assumed) and assigned by the Debtor to the Purchaser pursuant to the Sale (the "**Assigned Contracts**"); (e) approving the form and manner of notices of the Sale, the Auction, the Bidding Procedures, and the deadline and procedures relating to the Assigned Contracts; and (f) scheduling a final hearing to consider approval of the Sale (the "**Sale Hearing**").

3.     The Debtor further requests that, at the Sale Hearing, the Court enter an order, substantially in the form of <u>Exhibit C</u> attached hereto (the "**Sale Order**") (a) approving the Sale (i) to the Purchaser pursuant to the Purchase Agreement, or (ii) to another bidder submitting a higher and better offer at the Auction; (b) approving the Purchase Agreement or a substantially similar asset purchase agreement with the applicable purchaser; (c) authorizing the Debtor to sell the Assets free and clear of liens, claims, encumbrances, and other interests; and (d) approving the transfer of the Assigned Contracts.

## INTRODUCTION

4.     On June 1, 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

5.     The Debtor continues to operate its business and manage its property as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.     No Chapter 11 trustee has been appointed.

7.     No committee of unsecured creditors has yet been appointed in this reorganization case.

8.     The Debtor provides real estate advisory and transactional services to institutional, corporate and private investor clients on a national basis. Advisory services provided by

the Debtor include distressed asset/portfolio resolution; debt/equity restructurings; partnership/joint venture restructurings; pre and postpetition consulting and construction advisory services. Transactional services provided by the Debtor include investment sales; investment portfolio sales; note sales, debt and equity finance; corporate recapitalizations; and real estate related M&A.

9.   This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (N).

10.   The statutory predicate for the relief requested herein is 11 U.S.C. §§ 105, 363, 364, 365, 503(b) and 507(a) of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); Rules 2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy Rules of this Court; and the Amended Guidelines for the Conduct of Asset Sales established and adopted by the Court pursuant to General Order M-383.

## MARKETING OF THE BUSINESS AND PROPOSED SALE

11.   In April 2010, Debtor's management prepared a new business plan that included the need to find a strategic partner that would enable the Debtor to prosper.

12.   In seeking a partner, Debtor's management, Messrs. John W. Magee and Daniel McNulty ("**Messrs. Magee and McNulty**") determined that in order to sustain the Debtor's business and its ability to successfully implement a plan of reorganization, it would need to identify a strategic partner that would provide (a) capital to fund the Debtor's Chapter 11 Plan, (b) sufficient operating capital going forward and (c) as important, an internally generated source of revenues which would sustain the Debtor until a full market recovery

occurred. From the potential partner's perspective, (a) the partner would have to be interested in adding a real estate advisory and transactional services business to its business lines and (b) it would have to believe it was getting sufficient strategic value for the $3+ million it would have to fund to meet the Debtor's capital needs, because it would be investing in a company that had operated at a loss since filing for bankruptcy in June 2009, on top of more than $21 million of losses during the three years prior to the Debtor's Chapter 11 filing.

13.    The Debtor had numerous conversations with its clients and relationships, which encompassed the broad real estate marketplace, to identify a partner. As might be expected, interest was very limited given the Debtor's financial performance during the prior four years and the fact that Rockwood was in bankruptcy.

14.    Commencing in June 2010, the Debtor had preliminary conversations with prospective strategic partners.

15.    In August of 2010, the Debtor identified four firms that it believed would meet the criteria described above, all of whom were in the business of managing massive special servicing portfolios, involving CMBS assets. The four firms identified were: (i) LNR Partners, (ii) CWCapital (**"CW"**), which is owned by Fortress, (iii) C-III, which is owned by Island Capital, and (iv) Midland Loan Services. The four identified firms are the top four special servicers and it was believed by the Debtor that access to the portfolios under management by each to provide sales and financing services would provide the means to sustain the Debtor's business going forward, until the market fully recovered. Special servicing assets under management for each firm are currently as follows: LNR Partners - $201 billion; CW -$150 billion; C-III - $116 billion; and Midland - $61 billion. Special

servicers other than these four manage significantly smaller portfolios that the Debtor determined would not sufficiently support Rockwood's financial needs.

16. Preliminary discussions took place with all four firms to determine whether there would be interest in the concept of partnering with Rockwood. Both LNR Partners and Midland were not interested in expanding their existing services to include disposition and financing services. On the other hand, in September 2010, both CW and C-III expressed strong interest and the Debtor's principals commenced comprehensive, simultaneous discussions and negotiations with both.

17. In the case of both CW and C-III, they were only interested in an outright acquisition of all of the assets of the Debtor and both were only interested if Messrs. Magee and McNulty would agree to long-term employment contracts. Negotiations with both took place through early November 2010, which resulted in similar offers being discussed and submitted. The primary differences in the two offers were that (a) CW agreed to fund payment to the Debtor's creditors on the effective date of a Chapter 11 plan versus C-III funding the payments over time in accordance with the Debtor's previously submitted plan, which was approved by a vote of the creditors, and (b) the CW special servicing portfolio provided a much larger ($150 billion) and higher quality internally generated source of brokerage and consulting revenues for Rockwood than the smaller ($116 billion) C-III portfolio.

18. As a result of the comparative differences between the two offerors, and in particular the improved treatment of the creditors in the CW offer, in mid-November 2010 the Debtor elected to move forward with CW. During the next three months CW and Fortress, its parent, conducted due diligence regarding the Debtor, followed by document production

and negotiation, leading up to the Purchase Agreement, which has been executed by the Debtor and the Purchaser.

19. CW created the Purchaser to purchase substantially all of the Debtor's assets pursuant to the terms and conditions of the Purchase Agreement.

20. Under the Purchase Agreement: (i) the purchase price shall be $3,180,000, and (ii) the Purchaser shall deposit within one (1) Business Day after the Contract Date, $160,000 as a good faith deposit.

21. The Purchase Agreement is subject to higher and better offers.

22. The Purchase Agreement provides for certain sale and bidding procedures, and Fee Protections (as defined below), which are discussed herein.

23. As discussed below, pursuant to the Purchase Agreement, the sale, transfer, and/or assignment of the Assets and the Assigned Contracts shall be free and clear of (i) all Liens (as defined in the Purchase Agreement), interests and encumbrances, and (ii) any successor liability.

## SALE AND BIDDING PROCEDURES

24. The Purchase Agreement requires entry of a Sale Procedures Order which must contain, among other things, certain requirements for qualified counteroffers and other bidding protections as set forth in the Bidding Procedures attached hereto as Exhibit 1.

25. The Debtor requests that the Court enter the Sale Procedures Order and approve the Bidding Procedures.

## TERMINATION AND BREAK-UP FEES

26. Under Section 8.4(c) of the Purchase Agreement, in the event that the closing under the Purchase Agreement does not occur within forty five (45) days from the execution of the

first amendment to the Purchase Agreement and such agreement is terminated, for any reason other than (i) due to a material breach of the Purchaser or (ii) an Alternative Transaction (as defined below), the Debtor shall be responsible for and pay a termination fee by reimbursing the Purchaser for all of the Purchaser's reasonable, actual out-of-pocket legal, tax, accounting, due diligence and other expenses incurred in connection with the Purchase Agreement (the "**Termination Fee**"). Also, under Section 8.1(c) of the Purchase Agreement, if the Debtor sells, transfers, leases or otherwise disposes of the purchased assets (or any portion thereof) in a transaction or a series of transactions with one or more persons other than Purchaser in any circumstance (the "**Alternative Transaction**"), the Debtor shall pay to Purchaser in cash at the closing of such Alternative Transaction a break-up fee of $250,000.00, as partial reimbursement of the Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transactions contemplated by the Purchase Agreement (the "**Break-Up Fee**", collectively with the Termination Fee, the "**Fee Protections**"). In the event the Purchaser bids at the Auction, the Purchaser will receive a "credit" in an amount equal to the amount of the Break-Up Fee as set forth in the Purchase Agreement.

27.     The Termination Fee and the Break-Up Fee, when earned, (i) shall have priority over any and all administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114, as applicable, of the Bankruptcy Code, which allowed super-priority claim shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtor, including any amounts that are recovered or otherwise received by the Debtor in

respect of claims under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of, or any other avoidance actions under, the Bankruptcy Code; and (ii) shall be secured by a perfected lien on all of the Debtor's assets and any proceeds therefrom, including the proceeds of an Alternative Transaction, that is junior only to Signature Bank and superior to the secured liens of Messrs. Magee and McNulty. The Break-Up Fee, if applicable, shall be set aside from the sale proceeds of the Alternative Transaction, at closing, pending payment of such amount to the Purchaser.

28. The Fee Protections constitute a critical component in the Purchaser's willingness and decision to enter into the Purchase Agreement and continue negotiations with the Debtor.

## DISCLOSURE OF EXTRAORDINARY PROVISIONS UNDER LOCAL RULES/ GENERAL ORDER M-383

29. The Purchase Agreement has the following provisions that may be deemed to be "extraordinary provisions" under General Order M-383 and are hereby disclosed:

(a) *Termination Fee and Break-Up Fee*. The Fee Protections are discussed separately herein.

(b) *Agreements with Management*. One of the conditions to the effectiveness of the Purchase Agreement is the execution of employment agreements between the Purchaser and the Debtor's principals (Messrs. Magee and McNulty), which include bonus agreements with, and loans to (evidenced by promissory notes from) the Debtor's principals. The Debtor believes that such employment agreements are fair and were negotiated in good faith. Messrs. Magee and McNulty retained their own independent counsel in negotiating those agreements.

(c) *Avoidance Actions Regarding Assigned Contracts*. Under the Purchase

9

Agreement, purchased assets include any avoidance actions that currently exist and may exist pertaining to or arising out of or relating, directly or indirectly, to the Assigned Contracts or regarding the non-debtor parties to such Assigned Contracts.

(d)  *Findings As to Successor Liability*. The Purchaser's acquisition of the purchased assets shall be free and clear of any "successor liability". The consummation of the Purchase Agreement shall not subject the Purchaser to any liability whatsoever with respect to the prepetition or postpetition operation of the business of the Debtor in any form or manner whatsoever, including, without limitation, by reason of any theory of successor or transferee liability, *de facto* merger, or substantial continuity, whether known or unknown, contingent or liquidated, or arising under principles of tort, contract, common law, or otherwise, and whether asserted or unasserted as of the closing of the transactions contemplated by the Purchase Agreement.  The Purchaser shall have no liabilities or obligations except as specifically set forth in the Purchase Agreement.

(e)  *Sale Free and Clear of All Liens, Claims and Encumbrances*. The sale of the purchased assets under the Purchase Agreement shall be free and clear of all liens, claims, encumbrances and other interests, including Liens as defined in the Purchase Agreement, with any such liens, claims and encumbrances to attach to the proceeds of sale in accordance with applicable law.

(f)  *Relief From Bankruptcy Rules 6004(h and 6006(d))*. The Sale Order shall be immediately effective and enforceable upon its entry by the Court, notwithstanding the applicability of Bankruptcy Rules 6004(h) and 6006(d).

## RELIEF REQUESTED

30.  As set forth above, by this Motion, the Debtor requests entry of two separate orders.

31.     First, the Debtor seeks entry of the Sale Procedures Order, the proposed form of which is

annexed hereto as <u>Exhibit B</u>. The Debtor proposes that the Sale Procedures Order be

heard at the earliest possible hearing date and that the Auction and Sale Hearing be set for

the later of (i) fourteen days after the entry of the Sale Procedures Order or (ii) at least

twenty-one days after service of the Sale Motion and related pleadings. Among other

things, the Sale Procedures Order will (i) approve the Bidding Procedures attached hereto

as <u>Exhibit 1</u>, which establish rules pursuant to which prospective bidders will qualify to

submit counterbids, (ii) schedule an auction to be held at the United States Bankruptcy

Court for the Southern District of New York , (iii) approve the Fee Protections, (iv)

approve the notice procedures related to the entry of the Sale Procedures Order and the

Sale Order, and (v) set a hearing date for the Court to consider the Sale of the Assets to

the party determined to be the winning bidder under the Bidding Procedures.  The

Debtor's management believes that the proposed Bidding Procedures are reasonable and

necessary for the sale process to proceed fairly and effectively.

32.     The Debtor also seeks the entry of  the Sale Order, the proposed form of which is

annexed hereto as <u>Exhibit C</u>, approving the Sale and the transfer of the Assigned

Contracts as set forth above.  The Debtor proposes that the Court enter the Sale Order at a

hearing to be held shortly after completion of the Auction (and which will be scheduled

in the Sale Procedures Order). The annexed form of Sale Order reflects a sale of the

Assets to  the Purchaser pursuant to the Purchase Agreement, but obviously the form of

the actual Sale Order will be tailored to reflect the outcome of the Auction and the

Court's review thereof. In any event, the Sale Order should contain the basic provisions

set forth in <u>Exhibit C</u> concerning approval of the Sale and transfer of the Assigned

Contracts to the ultimate buyer.

## POINTS AND AUTHORITIES

### *Bankruptcy Sale under Bankruptcy Code Section 363(b)*

33.     Section 363 of the Bankruptcy Code provides authority for a trustee and, through the application of Bankruptcy Code section 1107(a), a debtor in possession, "after notice and a hearing, [to] use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The authority to sell assets conferred upon a debtor by Section 363 (b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc)*, 950 F.2d 1492, 1495 (9th Cir. 1991). Further, 11 U.S.C. § 105(a) allows the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

34.     A bankruptcy court's power to authorize a sale under Section 363(b) is to be exercised at the court's discretion. *In re WPRV-TV, 983 F.2d 336, 340 (1st Cir. 1993), New Haven Radio, Inc. v. Meister (In re Martin-Trigona), 760 F.2d 1334, 1346 (2d Cir. 1985), Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983)*.

35.     Courts have also required that the debtor provide reasonable and adequate notice of the sale, that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the buyer. See, e.g., *In re Ewell, 958 F.2d 276 (9th Cir. 1992)* (declining to set aside or modify a sale pursuant to 11 U.S.C. § 363 because the price was fair and reasonable and the buyer was a good faith purchaser pursuant to *Section 363(m) of the Bankruptcy Code)*; *In re King-Wilson,* 1998 U.S. Dist. LEXIS 16595 at *11-12

(N.D. Cal. Oct. 13, 1998).

36. In *Lionel*, the Second Circuit Court of Appeals held that the standard for the proper
exercise of the debtor's discretion is a good business reason. *In re Lionel Corp.*, 722
F.2d at 1071. The Second Circuit in *Lionel* adopted, in part, the following criteria for
evaluating whether a good business reason exists for authorizing a sale of substantially all
of the assets of a debtor:

> (1) the proportionate value of the asset to the estate as a whole;
>
> (2) the amount of elapsed time since the filing of the petition;
>
> (3) the likelihood that a plan will be proposed and confirmed in the near
> future;
>
> (4) the effect of the proposed disposition on future plans of reorganization;
> and
>
> (5) *most importantly*, whether the assets to be sold are decreasing or
> increasing in value.

*Id.* n4. See also, *Committee of Asbestos-Related Litigants v. Johns-Manville Corp.
(In re Johns Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (Where a
debtor seeks authority to act under Bankruptcy Code § 363, the debtor's actions
should be approved if such debtor demonstrates good faith and the exercise of sound
business judgment); *The Official Comm. Of Subordinated Bondholders v. Integrated
Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992),
appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (once a debtor articulates a valid business
justification, "[t]he business judgment rule 'is a presumption that in making a business
decision the directors of a corporation acted on an informed basis, in good faith and in the
honest belief that the action was in the best interests of the company.'").

37.    In *In re General Motors Corp.*, 407 B.R. 463, 490-91 (Bankr. S.D.N.Y. 2009) the court

stated that the jurisprudence under Bankruptcy Code Section 363(b) had evolved.  A

court is permitted to authorize the sale of all of a debtor's assets prior to the

confirmation of a plan of reorganization under certain circumstances.  The following are

the issues that a bankruptcy court should address:

> a. Does the estate have the liquidity to survive until confirmation of a plan?
>
> b.  Will the sale opportunity still exist as of the time of plan confirmation?
>
> c.   If not, how likely is it that there will be a satisfactory alternative sale
> opportunity, or  a stand-alone plan alternative that is equally desirable (or better)
> for creditors? and
>
> d.   Is there a material risk that by deferring the sale, the patient will die on the
> operating table?

*Id.*, 407 B.R.  at 491.

38.    The Debtor's determination to enter into the Purchase Agreement and to pursue the Sale

as set forth herein is a valid and sound exercise of its business judgment. The Debtor

lacks the liquidity to survive until confirmation of a Chapter 11 plan because the Debtor

is running out of funds.  It is doubtful that the prospective purchaser will wait until

confirmation.  Absent an immediate sale, the Debtor will be forced to liquidate.

39.    The Debtor respectfully submits that the proposed sale of substantially all of the

Debtor's assets related to the business as set forth herein is entirely consistent with the

guidelines set forth in *Lionel* and its progeny. The proposed Sale should, therefore, be

approved.

40.     The Debtor believes that a prompt sale will maximize the amount that the Debtor, its estate and its creditors may realize for the value of the assets. The terms and conditions of the Auction and the Bidding Procedures are fair and reasonable and in the best interest of the Debtor, its creditors, and its estate.

41.     Moreover, the Purchase Agreement is the product of substantial prepetition marketing, and good faith, arms' length negotiations between the Debtor and the Purchaser. The Debtor is confident that the winning bid that emerges from this process will truly be the highest and best bid obtainable for the Debtor's assets. The Purchaser's bid will be tested through the Auction consistent with the requirements of the Bankruptcy Code and Bankruptcy Rules and pursuant to procedures approved by the Court. Consequently, the fairness and reasonableness of the consideration to be paid by the Purchaser ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process.

### *Sale Free and Clear of Liens*

42.     The Debtor requests authorization to sell the Assets free and clear of liens, claims, encumbrances and other interests.  Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property under § 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*11 U.S.C. § 363(f).*

43. The Debtor believes that one or more of the tests of Section 363(f) will be satisfied with respect to the Sale.

44. Under Section 363(f)(5), the Court can compel existing lienholders to accept money satisfaction of their interests in a legal or equitable proceeding. Applicable case law provides that a sale of a debtor's assets free and clear of liens, interests and encumbrances, with such liens, interests and encumbrances attaching to the net proceeds of the sale, is permissible under § 363(f). See, e.g., *In re Goffena, 175 B.R. 386, 387 (Bankr. D. Mont. 1994)*; *In re Granite Lumber Co., 63 B.R. 466, 471 (Bankr. D. Mont. 1986)* ("the real and personal property of the Debtor's estate was sold by the Trustee pursuant to *Section 363(f) of the Code*, free and clear of liens, with valid liens to attach to the proceeds of sale."); see also, e.g., *Folger Adam Security, Inc. v. DeMatteis/MacGregor, J.V., 209 F.3d 252, 259 (3d Cir. 2000)* ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of § 363(f) and, therefore, attaches to the proceeds of the sale."); *In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988)* .

45. The Debtor expects that, with respect to Section 363(f)(2), each of the parties asserting liens or encumbrances will consent to, or absent any objection to the Sale Motion, will be

16

deemed to have consented to, the Sale. The Debtor has three secured creditors: Signature Bank (the "**Bank**"), and Messrs. Magee and McNulty. The Bank has consented to the sale of the Debtor's assets. Messrs. Magee and McNulty consent to the sale of the Debtor's assets.

46. Therefore, the Debtor satisfies the requirements of Bankruptcy Code Section 363(f) to sell free and clear of liens.

## *Successor Liability*

47. Under the terms of the Purchase Agreement, the Purchaser is not liable for any of the Debtor's liabilities as a successor to the Debtor's business or otherwise. Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

48. Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code. *In re General Motors Corp.,* 407 B.R. 463, 501 (Bankr. S.D.N.Y. 2009) (while "claim" is defined in the Bankruptcy Code, neither "interest" nor "interest in property" is defined).

49. Courts addressing the issue have found that the scope of section 363(f) is broad enough to encompass successor liability. *In re Trans World Airlines. Inc.,* 322 F.3d 283, 288-89 (3rd Cir. 2003) (the Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"); *In re Leckie Smokeless Coal Co.,* 99 F.3d 573, 581-82 (4th Cir. 1996). See also, *In re General Motors*, 407 B.R.

at 504 (agreeing that in personam claims, including any potential successor or transferee liability claims against the debtor, as well as in rem interests, are encompassed by section 363(f) and can therefore be extinguished); *In re Grumman Olson Indus. Inc.*, Case No. 02-16131 (SMB (Bankr. S.D.N.Y. February 25, 2011) (by its terms, section 363(f) of the Bankruptcy Code cleanses the transferred assets of any attendant liabilities, and allows the buyer to acquire them without fear that an estate creditor can enforce its claim against those assets).

50.     Here, the Purchaser has engaged in arms' length negotiations with the Debtor. The Purchaser is a wholly unrelated entity to the Debtor and is not an insider of Debtor.

51.     For obvious reasons, the very purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and other "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's prior conduct. *See In re General Motors,* 407 B.R. at 500 (if a buyer cannot obtain protection against successor liability, it may pay less for the assets because of the risk).

52.     Therefore, the order approving the sale of the Assets to the Purchaser should state that the Purchaser is not liable as a successor under any theory of successor liability, as set forth herein and in the Purchase Agreement.

**_Good Faith Protection_**

53.     The Purchase Agreement provides that a Sale Order shall have a finding of the Court that the Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization
> under subsection (b) and (c) of this section of a sale or
> lease of property does not affect the validity of a sale or
> lease under such authorization to an entity that purchased
> or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

*11 U.S.C. § 363(m).*

54.     While the Bankruptcy Code does not define "good faith," the Second Circuit has

indicated that a party would have to show fraud or collusion between the buyer and the

debtor in possession or trustee or other bidders in order to demonstrate a lack of good

faith. See *Kabro Assocs. of West Islip, L..LC v. Colony Hill Assocs. (In re Colony Hill

Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would

destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the

[buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of

other bidders"); see also *In re Angelika Films, 57th, Inc.,* 1997 WL 283412, at *7

(S.D.N.Y. 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

55.   The Purchase Agreement has been negotiated at arms' length and in good faith. There has

been no fraud or collusion in those negotiations. In addition, the Purchaser is not an

"insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

The consideration to be received by the Debtor pursuant to the Purchase Agreement is fair

and reasonable. Thus, the Purchaser is entitled to the full protections afforded good faith

purchasers under section 363(m) of the Bankruptcy Code.

56.   For the same reasons mentioned above, the Purchase Agreement does not constitute an

19

avoidable transaction pursuant to section 363(n) of the Bankruptcy Code. There is no indication of fraud or improper insider dealing of any kind. Therefore, the Purchaser has not engaged in any conduct that would cause the Sale to be affected under section 363(n) of the Bankruptcy Code.

57. Furthermore, due to the open and competitive nature of the Auction, any asset purchase agreement finalized with the successful bidder will, by definition, be the result of arms' length negotiations in good faith.

### *Assumption and/or Assignment of Executory Contracts and Unexpired Leases*

58. Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See, In *re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,* 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume, the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

59. Pursuant to this Sale Motion, the Debtor seeks to assume (to the extent not already done pursuant to prior orders of this Court) the executory contracts and unexpired leases of the

Debtor to be assigned to the Purchaser pursuant to the terms of the Purchase Agreement. To the extent a proposed Assigned Contract is not an executory contract within the meaning of Section 365 of the Bankruptcy Code, the Debtor's interest in such proposed Assigned Contract will nevertheless be transferred to the Purchaser as an asset of the Debtor pursuant to Section 363 of the Bankruptcy Code.

60. As part of the Purchase Agreement, the Debtor, pursuant to Bankruptcy Code Section 365(f), will assign all of the assumed executory contracts and unexpired leases that are required to be assigned to the Purchaser pursuant to the terms of the Purchase Agreement.

61. Section 365(f) of the Bankruptcy Code authorizes a debtor in possession to assign an assumed executory contract or unexpired lease subject to bankruptcy court approval. Specifically, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See *11 U.S.C. § 365(f)(2)*. Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., *In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

62. The Debtor will pay, from the sale proceeds, any and all cure amounts in connection with the Assigned Contracts, as set forth in the notice of assumption and/or assignment,

attached hereto as <u>Exhibit D</u> (the "**Assignment Notice**"). The Purchaser has sufficient assets to continue performance thereunder, and at the Sale Hearing the Purchaser will demonstrate to the satisfaction of the Bankruptcy Court, upon request, that adequate assurance of future performance is present by the promise to perform the obligations of the Assigned Contracts first arising thereunder from and after the closing date.

63.     Because the Debtor cannot obtain the benefits of the Purchase Agreement without the assumption and assignment of the Assigned Contracts, such transfer of the Assigned Contracts is a sound exercise of the Debtor's business judgment. The requirements of section 365 of the Bankruptcy Code are satisfied.

64.     To assist in the assumption, assignment and/or sale of the Assigned Contracts, the Debtor also requests that the Bankruptcy Court enter an order providing that anti-assignment provisions in the Assigned Contracts, if any, shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

***Fee Protections***

65.     To compensate the Purchaser for serving as a "stalking horse" whose bid will be subject to higher and/or better offers, the Debtor seeks authority for the Debtor to pay the Purchaser, to the extent applicable, the Termination Fee and the Break-Up Fee as set forth herein and in the Purchase Agreement. This determination to pay the Fee Protections is within the reasonable business judgment of the Debtor.

66.     The Fee Protections constitute a critical component in the Purchaser's decision to enter

into the Purchase Agreement and continue negotiations with the Debtor. The Debtor's management believes that it is in the Debtor's best interest to have this Court approve the Fee Protections. The Debtor's management believes that the Termination Fee and the Break-Up Fee are fair and reasonable and are beneficial to the estate of the Debtor and all interested parties.

A.    *The Termination Fee*

67.    The Purchaser has expended and will continue to expend, considerable time, money and energy pursuing the consummation of the Purchase Agreement and related transactions.

68.    In recognition of this expenditure of time, energy and resources, and the benefits of securing the Purchase Agreement, the Debtor has agreed to pay the Termination Fee, which was a material inducement for, and a condition of, the Purchaser's entry into the Purchase Agreement. The Debtor's management believes that the Termination Fee is fair and reasonable in view of, among other things, (i) the due diligence investigation and negotiation undertaken by the Purchaser in connection with the proposed Sale, and (ii) the benefits to the estate of having the Purchase Agreement as a definitive agreement.

69.    The Purchaser will not receive the Termination Fee in the event of an Alternative Transaction and the Break-Up Fee is applicable.

70.    The approval of the Termination Fee is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

B.    *Break-Up Fee*

71. Considering the benefits of securing a "stalking horse" or minimum bid, the Debtor has agreed to pay the Break-Up Fee. The Break-Up Fee was also a material inducement for, and a condition of, the Purchaser's entry into the Purchase Agreement.

72. Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which, as discussed above, prescribes against judicial second-guessing of the actions of a debtor taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Avenue Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992). Bidding incentives, such as the Break-Up Fee, "are important tools to encourage bidding and to maximize the value of the debtor's assets." *In re Integrated Resources, Inc.*, 147 B.R. at 659-60. Such fees and payments encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. *Id.* at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

73. Courts in this Second Circuit have established three basic factors for determining whether to permit such incentive fees in bankruptcy, such as whether: (1) the relationship of parties which negotiated the break-up fee is tainted by self-dealing or manipulation; (2) the fee hampers, rather than encourages, bidding; and (3) the amount of fee is unreasonable relative to the purchase price. *In re Integrated Res., Inc.*, 147 B.R. at 657. See also, *Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the stalking horse bid brings value to the

24

estate by setting a floor on the price and providing a structure for potential competing bids... [and] would provide comfort to the Debtor's employees and customers that the company was entering the auction with a locked-in bid.").

74. Nevertheless, there is no fixed formula or percentage of the purchase price for determining the amount of break-up fees. Whether a break-up fee is warranted is determined on a case-by-case basis. See *General Order M-383, Section I.B.4(b)*; *In re Integrated Res., Inc.*, 147 B.R. at 660 (in assessing the incentive effect of the break-up fee, a court should determine whether the dollar amount of the fee is so substantial that is has a "chilling effect" on other prospective bidders; in making this determination, the court should consider whether the proposed stalking horse bidder attracted other bidders or simply received a potential windfall.).

75. After the status conference before the Court on March 29, 2011, the Purchaser agreed to reduce the original break-up fee amount, based on the Court's observations and comments, which was originally comprised of $175,000.00 plus reimbursement of up to $300,000.00 of the Purchaser's reasonable, actual out-of-pocket fees and expenses. The first amendment to the asset purchase agreement between the parties has substantially reduced the Break-Up Fee to $250,000.00, as partial reimbursement of the Purchaser's reasonable, actual out-of-pocket fees and expenses. The Purchaser does not stand to benefit from any windfall whatsoever in the event it is not the successful bidder. In fact, the Purchaser has already incurred actual costs and expenses above the requested Break-Up Fee amount.

76. Bankruptcy courts, including courts in this district, generally compare the break-up fee

and expense reimbursement against the proposed purchase price in determining the acceptable range of such fees. While the Break-Up Fee here may be higher than the range generally approved by courts in this district,[2] the requested Break-Up Fee amount is warranted considering the facts of this case and under the circumstances. As stated above, the requested Break-Up Fee amount represents only a partial reimbursement of the Purchaser's already incurred, actual out-of-pocket fees and expenses.

77.     While the percentage test based on purchase price would be sufficient in larger deals to cover the proposed buyer's actual costs and expenses, that is not always the case for smaller deals such as this one.  The parties do not believe that a percentage test is critical or appropriate to this case considering (i) the complicated nature of the contemplated transactions under the Purchase Agreement, (ii) the size and dollar amount of the transaction, (iii) the Break-Up Fee will not deter potential bidders, (iv) the Break-Up Fee is not independent of the transaction costs; and (v) the Break-Up Fee represents only a partial reimbursement of the actual costs and expenses of the Purchaser.

78.     The Purchaser has expended more than four months negotiating the Purchase Agreement, and it has represented that it has incurred significant legal fees.  In addition to the

---

[2] See, e.g., *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr.7, 2009) [Docket No. 369] (approving break-up fee of approximately 3% of the purchase price plus expense reimbursement of up to $5 million- up to 1.42% of the purchase price); *In re Silicon Graphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. April. 3, 2009) [Docket No. 55] (approving break-up fee of approximately 2.8% of the purchase price plus expense reimbursement of up to $750,000- 2.7% of the purchase price); *In re Steve & Barry's Manhattan LLC*, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 369] (approving break-up fee of 2% of the purchase price plus expense reimbursement of up to $2 million- 1.22% of the purchase price); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb 22, 2008) [Docket No. 190] (approving break -up fee of approximately $2.8% of the purchase price plus expense reimbursement of up to $1 million- 1.25% of the purchase price); *In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269]

Purchase Agreement and related exhibits, the parties spent a considerable amount of time negotiating and drafting other documents to satisfy certain conditions precedent to the transactions under the Purchase Agreement. The parties also initially wanted to proceed with the Sale pursuant to the Debtor's amended Chapter 11 plan which required the Purchaser to spend time and resources to accommodate the Debtor.

79.     It is expected that the Purchaser's bid will serve as a minimum or floor bid on which other bidders can rely. Any such other bidder will also benefit from the deal structure and documents already created without having to spend as much time, effort and resources as the Purchaser did.

80.     The Break-Up Fee here satisfies the *Integrated Resources* test.

81.     The Purchase Agreement and the Break-Up Fee are the product of good faith, arms' length negotiations between the Debtor and Purchaser.

82.     Moreover, the Break-Up Fee is fair and reasonable in amount, (i) particularly in view of the Purchaser's efforts to date and the risk to the Purchaser that a third-party offer ultimately may be accepted, (ii) given the benefits to the estate of having the Purchase Agreement as a definitive agreement, and (iii) considering the fact that the Purchaser would agree to establish a bid standard or minimum for other bidders.

83.     The approval of the Break-Up Fee is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

## Sale and Bidding Procedures

---

(approving break-up fee of 4.3% of the purchase price plus expense reimbursement of up to $5 million-2.1% of the purchase price).

84. The Bidding Procedures are fair and reasonable and comply with the local rules of this Court. As required under General Order M-383, the initial bidding increment is sufficient to pay the maximum amount payable with respect to the Break-Up Fee. The bidding increments are neither too high that they would chill counterbids nor so low that they provide insubstantial consideration to the Debtor's estate.

85. The Purchaser shall not be deemed to waive the Break-Up Fee by rebidding. In the event the Purchaser bids at the Auction, the Purchaser will receive a "credit" in an amount equal to the amount of the Break-Up Fee as set forth in the Purchase Agreement.

## NOTICE

86. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. Further, pursuant to Bankruptcy Rule 2002, a twenty- one day notice by mail is sufficient notice of the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. See Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id.*

87. To ensure that adequate notice of the Sale and the other relief requested herein is provided, the Debtor seeks approval of the Sale Notice, attached hereto as Exhibit E (the "**Sale Notice**"), and the Assignment Notice, attached hereto as Exhibit D.

88. In accordance with *Fed. R. Bankr. P. 2002*, the Debtor proposes to give notice of the

Auction, this Sale Motion, and the Sale Hearing by serving (a) a copy of the Sale Motion, with exhibits, including the Purchase Agreement (without the schedules and exhibits thereto) and any initial hearing notice, upon (i) all secured creditors; (ii) all other creditors of the Debtor; (iii) all parties that have filed a notice of appearance; (iv) all non-debtor parties to the Debtor's executory contracts and unexpired leases; (v) all parties that have expressed an interest in purchasing the Debtor's assets; (vi) the Office of the United States Trustee; and (vii) applicable federal and state taxing authorities (collectively, the **Notice Parties**"). After the hearing on the Sale Procedures Order, the Debtor shall serve (a) the Sale Procedures Order, (b) the Bidding Procedures, and (c) the Sale Notice upon the Notice Parties. The Debtor shall serve a copy of the Assignment Notice upon all parties with executory contracts and unexpired leases to be assigned pursuant to the terms of the Purchase Agreement after the hearing on the Sale Procedures Order.

89.    The Debtor submits that such notice constitutes good and sufficient notice of the competitive offer procedures, the Sale Motion, and all proceedings to be held thereon and that no other or further notice need be given.

90.    Based on the foregoing, the Debtor respectfully submits that the relief requested herein is necessary and appropriate, is in the best interests of the Debtor and its estate, and should be granted in all respects. The Debtor respectfully requests that the Court enter the proposed orders granting to the Debtor the relief requested herein and such other and further relief as is just and proper

91.    No previous request for the relief sought herein has been made to any Court.

WHEREFORE, the Debtor respectfully requests that this Court grant orders: (A)

Authorizing and Scheduling an Auction to Solicit Bids for the Sale of Substantially All Assets Related to the Debtor's Business Free and Clear of Liens, Interests and Encumbrances; (B) Approving Bidding Procedures and Certain Fee Protections; (C) Approving Asset Purchase Agreement or Subsequent Overbid; (D) Scheduling a Hearing to Consider Approval of the Sale; (E) Establishing Procedures for Determination of Cure Amounts and for the Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant to the Sale; and (F) Establishing the Form and Manner of Notices Related Thereto; and such other further relief as this Court deems just and equitable.

Dated: New York, New York
      April 6 , 2011

                              CUEVAS & GREENWALD, P.C.
                              Attorneys for the Debtor

                      By:
                           Wayne M. Greenwald
                           475  Park Avenue South – 26th Floor
                           New York, New York 10016
                           Tel. No. 212-983-1922