---

[1] The exhibits and schedules attached to the Asset Purchase Agreement constitute form documents as of the execution of the Asset Purchase Agreement and filing of the sale motion, and such documents are subject to further updates before closing. Pursuant to Section 2.1(a) of the Asset Purchase Agreement, the assigned contracts schedule may be amended by the Purchaser up to the day immediately preceding closing to add or remove contracts or leases.

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ROCKWOOD-CWFS LLC
as Purchaser

and

ROCKWOOD REAL ESTATE ADVISORS LLC
as Seller

March 18, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................... 1

ARTICLE II PURCHASE AND SALE .................................................................................. 9
    2.1    Purchased Assets ..................................................................................... 9
    2.2    Excluded Assets .................................................................................... 11
    2.3    Assumed Liabilities .............................................................................. 11
    2.4    Excluded Liabilities ............................................................................. 12

ARTICLE III PURCHASE PRICE ..................................................................................... 12
    3.1    Purchase Price; Use of Purchase Price Proceeds. ............................... 12
    3.2    Closing ................................................................................................. 12
    3.3    Purchase Price Allocation .................................................................... 13
    3.4    Transfer Taxes ...................................................................................... 13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ................ 13
    4.1    Organization and Qualification ............................................................ 13
    4.2    Subsidiaries .......................................................................................... 13
    4.3    Certificate of Formation, Operating Agreement and LLC Records ...... 13
    4.4    Authorization; Enforceability .............................................................. 14
    4.5    No Violation or Conflict ...................................................................... 14
    4.6    Contracts. ............................................................................................. 14
    4.7    Litigation ............................................................................................. 15
    4.8    Brokers ................................................................................................. 15
    4.9    Compliance with Law .......................................................................... 15
    4.10  Governmental Consents and Approvals ............................................... 15
    4.11  No Other Agreements to Purchase ....................................................... 15
    4.12  Financial Information ........................................................................... 15
    4.13  Personal Property. ................................................................................ 16
    4.14  Real Property; Leases ........................................................................... 16
    4.15  Insurance .............................................................................................. 17
    4.16  Permits ................................................................................................. 17
    4.17  Accounts Receivable ........................................................................... 18
    4.18  Intellectual Property ............................................................................ 18
    4.19  Chapter 11 Expenses; Accounts Payable ............................................ 18
    4.20  Disclosure ............................................................................................ 18

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ........... 18
    5.1    Organization and Qualification ............................................................ 19
    5.2    Authorization; Enforceability .............................................................. 19
    5.3    No Violation or Conflict ...................................................................... 19
    5.4    Governmental Consents and Approvals ............................................... 19
    5.5    Brokers ................................................................................................. 19

ARTICLE VI COVENANTS ............................................................................................... 19
    6.1    Bankruptcy Court Approval. ................................................................ 19
    6.2    Assigned Contracts. ............................................................................. 21
    6.3    Continuing Operations ......................................................................... 22
    6.4    Performance ......................................................................................... 22
    6.5    Regulatory and Other Authorizations; Notices and Consents .............. 22

6.6    Access. ..............................................................................................................23

6.7    Notification ......................................................................................................23

6.8    Name Change ..................................................................................................24

6.9    Exclusivity ......................................................................................................24

6.10  Final Decree of the Bankruptcy Case and Accounting of Disbursements to

Seller's Principals ...........................................................................................24

ARTICLE VII EMPLOYEE MATTERS ..............................................................................24

7.1    Offer of Employment ......................................................................................24

7.2    Responsibility for Seller Severance Obligations ...........................................24

ARTICLE VIII CONDITIONS PRECEDENT TO CLOSING; TERMINATION ...................25

8.1    Conditions to Purchaser's and Seller's Obligations to Close .........................25

8.2    Conditions Precedent to the Obligations of Purchaser ...................................29

8.3    Conditions Precedent to the Obligations of the Seller ....................................32

8.4    Termination. ....................................................................................................32

8.5    Conditions to Effectiveness of this Agreement ..............................................35

ARTICLE IX MISCELLANEOUS .......................................................................................35

9.1    Survival of Representations and Warranties ..................................................35

9.2    Break-Up Fee; Allowed Administrative Expenses ........................................35

9.3    Notices ............................................................................................................35

9.4    Entire Agreement ...........................................................................................36

9.5    Binding Effect ................................................................................................36

9.6    Assignment .....................................................................................................37

9.7    Modifications and Amendments .....................................................................37

9.8    Waivers and Consents ....................................................................................37

9.9    No Third Party Beneficiary ............................................................................37

9.10  Severability ....................................................................................................37

9.11  Publicity .........................................................................................................38

9.12  Governing Law; Forum; Service of Process ..................................................38

9.13  Counterparts ...................................................................................................38

9.14  Descriptive Headings .....................................................................................38

9.15  Expenses .........................................................................................................38

9.16  Further Assurances .........................................................................................38

**SCHEDULES**

| | |
|---|---|
| Schedule 2.1(a) | List of Assigned Contracts |
| Schedule 2.1(b) | List of Excluded Tangible Personal Property |
| Schedule 4.1 | Foreign Qualifications of Seller |
| Schedule 4.2 | Subsidiaries |
| Schedule 4.6(a) | List of Contracts and Summary of Oral Proposals |
| Schedule 4.7 | Litigation |
| Schedule 4.12 | Compensation Earned by Seller's Principals |
| Schedule 4.13(b) | Personal Property of Seller |
| Schedule 4.14(b) | Leases |
| Schedule 4.14(d) | Letters of Credit and Security Deposits |
| Schedule 4.15 | Insurance Policies |
| Schedule 4.16 | Permits |
| Schedule 4.17 | Accounts Receivable |
| Schedule 4.18 | Intellectual Property |
| Schedule 4.19 | Chapter 11 Expenses; Accounts Payable |
| Schedule 7.1 | Seller Employees |

**EXHIBITS**

| | |
|---|---|
| EXHIBIT 2.1(a) | Form of Bill of Sale |
| EXHIBIT 2.3 | Form of Assignment and Assumption Agreement |
| EXHIBIT 3.1 | Wire Instructions for Deposit |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*") is entered into as of March 18, 2011 (the "*Contract Date*") by and between Rockwood Real Estate Advisors LLC, a New York limited liability company (the "*Seller*") and Rockwood-CWFS LLC, a Delaware limited liability company (the "*Purchaser*").

## RECITALS

**WHEREAS**, on June 1, 2009 (the "*Petition Date*"), Seller commenced a case, Case No. 09-13566-SMB (the "*Bankruptcy Case*") under Chapter 11 ("*Chapter 11*") of Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), thereby creating an estate (the "*Bankruptcy Estate*") in accordance with Bankruptcy Code Section 541 et seq., and Seller has continued in the possession of its assets and the management of its business under Sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, the Seller is engaged in the business (the "*Business*") of real estate advisory and transactional services throughout the United States (the "*Territory*"); and

**WHEREAS**, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all right, title and interest of the Seller and of the Bankruptcy Estate in, to and under certain of the assets of the Seller used in or relating to the Business, free and clear of all Liens, and the Purchaser is willing to assume only those liabilities of the Seller which are specifically set forth herein, all upon the terms and conditions set forth herein and in a Sale Order, pursuant to Sections 363 and 365 and other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants, representations and warranties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

In addition to terms defined elsewhere in this Agreement (including the introductory paragraph and Recitals), the following terms when used in this Agreement shall have the respective meanings set forth below:

"Action" means any claim, demand, action, cause of action, chose in action, right of recovery, right of set-off, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to a specified Person, any other Person which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes, with respect to the specified Person: (a) any other Person which

beneficially owns or holds 5% or more of the outstanding voting securities or other securities convertible into voting securities of such Person, (b) any other Person of which the specified Person beneficially owns or holds 5% or more of the outstanding voting securities or other securities convertible into voting securities, or (c) any director, managing member, manager, general partner, officer or employee of such Person. As noted in this definition, the term "control" (including, with correlative meanings, variations thereof) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Equity Interests, by Contract, or otherwise. For the purposes of this Agreement, in no event shall Seller or any of its Affiliates be deemed an Affiliate of Purchaser or any of its Affiliates.

"Agreement" has the meaning set forth in the introductory paragraph to this Agreement.

"Alternative Transaction" has the meaning set forth in Section 8.1(c)(iii).

"Ancillary Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Assigned Contracts" has the meaning set forth in Section 2.1(a).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.1.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in Section 8.1(c)(i).

"Avoidance Actions" means any avoidance actions or similar causes of action arising under Sections 544 through 553 of the Bankruptcy Code.

"Bankruptcy Case" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Estate" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, and the local rules of the Bankruptcy Court as now in effect or hereafter amended, as applicable to the Bankruptcy Case.

"Bid Deadline" has the meaning set forth in Section 8.1(c)(i).

"Bill of Sale" has the meaning set forth in Section 2.1.

"Break-Up Fee" has the meaning given that term in Section 8.1(c)(iii).

"Business" has the meaning set forth in the recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in the State of New York are required or authorized to be closed.

"Compensation" means cash remuneration earned, and paid or payable to a Principal by Seller for services rendered by such Principal to Seller or an Affiliate, including salary, wages, bonuses, and all commission and other transaction-based compensation, but excluding any draw paid or payable to a Seller's Principal.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any regulations promulgated thereunder.

"Certificate of Formation" means the Certificate of Formation of the Seller filed with the Secretary of State of New York on July 18, 1996 as amended and in effect on the date hereof.

"Chapter 11" has the meaning set forth in the Recitals.

"Chapter 11 Plan" means the Chapter 11 plan of the Seller, as a debtor-in-possession, in the Bankruptcy Case, among other things seeking the entry of the Sale Order and the approval of this Agreement and the consummation of the transactions contemplated hereby in their entirety in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Sale Order, together with any supplement thereto or other modification thereof.

"Closing" has the meaning set forth in Section 3.2.

"Closing Date" has the meaning set forth in Section 3.2.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Chapter 11 Plan pursuant to Section 1129 of the Bankruptcy Code and in compliance with the Bankruptcy Rules.

"Contract" means any contract, subcontract, plan, undertaking, agreement, license, lease, sublease, note, mortgage or other commitment, obligation, arrangement, or understanding of any kind, whether written or oral, and including all amendments, renewals, extensions, or other modifications thereof.

"Contract Date" has the meaning set forth in the recitals to this Agreement.

"Court" means any court or arbitration tribunal of the United States, any domestic state, or any foreign country, and any political subdivision thereof.

"Cure Costs" has the meaning set forth in Section 6.2(b).

"Database" means all data and other information recorded, stored, transmitted and retrieved in electronic form.

"Deposit" has the meaning set forth in Section 3.1.

"Disclosure Schedule" has the meaning set forth in Article IV.

"Disclosure Statement Order" means the order of the Bankruptcy Court approving the disclosure statement filed with the Chapter 11 Plan, if any, in compliance with the Bankruptcy Code and the Bankruptcy Rules.

"Employee Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA) and any other bonus, stock or other security option, stock or other security purchase, stock or other security appreciation rights, incentive, deferred compensation, retirement or supplemental retirement, severance, golden parachute, vacation, cafeteria, dependent care, medical care, employee assistance program, education or tuition assistance programs, insurance and other similar fringe or employee benefit plans, programs or arrangements, and any current or former employment, executive compensation, consulting, or severance agreements, contracts, commitments, programs, or other arrangement or policy providing for any of the foregoing, written or otherwise, which have ever been sponsored, maintained entered into, or contributed or required to be contributed to by the Seller, or any trade or business (whether or not incorporated) which is a member of a controlled group or which is under common control with the Seller within the meaning of Section 414 of the Code, whether or not such plan is terminated.

"Environmental Law" means any Law or Regulation pertaining to: (a) the protection of health, safety and the indoor or outdoor environment; (b) the conservation, management or use of natural resources and wildlife; (c) the protection or use of surface water and ground water; (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, emission, discharge, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Substance; or (e) pollution (including any emission, discharge or release to air, land, surface water and ground water of any material); and includes, without limitation, CERCLA and the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 et seq.

"Equity Interest" means any debt or equity security, capital stock, membership interest, partnership interest, joint venture interest, or other ownership interest of whatever form in any Person, and any warrant, right or option for the purchase or acquisition of any of the foregoing and all agreements, instruments and documents convertible, in whole or in part, into any one or more of the foregoing, and whether or not issued or outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Fee Order" has the meaning set forth in Section 6.1(b).

"Fee Provisions" has the meaning set forth in Section 6.1(b).

"Final Order" means an Order of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of the Bankruptcy Case, that has not been reversed, rescinded, stayed, modified or amended, that is in full force in effect, and with respect to which: (a) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; (b) any right to appeal, seek review or rehearing, or petition for certiorari has been waived in writing; or (c) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which review, rehearing or certiorari was sought.

"GAAP" means United States generally accepted accounting principles and practices currently in effect consistently applied.

"Governmental Authority" means any governmental, or legislative agency or authority (other than a Court) of the United States, any domestic state, or any foreign country, and any political subdivision or agency thereof, and includes any authority having governmental or quasi-governmental powers, including any administrative agency or commission.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the Seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for

property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss and all Indebtedness referred to in clauses (a) through (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indemnification Agreement" has the meaning set forth in Section 8.5(a).

"Intellectual Property" means Seller's right, title and interest in all intellectual property arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisions, continuations in part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, including the Business Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, (iv) all computer software, including source code, executable code, data, databases and related documentation, (v) confidential information, know-how, trade secrets and inventions and (vi) all other intellectual property and all other intangible assets used in the Business.

"IRS" shall mean the United States Internal Revenue Service.

"Law" means all laws, statutes, ordinances and Regulations of any Governmental Authority including all decisions of Courts having the effect of law in each such jurisdiction.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use, or occupy any land, buildings, structures, improvements, fixtures, and other interests in real property.

"Leases" means all leases, subleases, licenses, and other agreements, including all amendments, extensions, renewals, and other agreements and any Bankruptcy Court Orders with respect thereto, pursuant to which the Seller has the right to possess, use, or occupy any Leased Real Property.

"Liabilities" means any and all Indebtedness, debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including, without limitation, those arising under any Law (including, without limitation, any Environmental Law), Action or Order, Liabilities for Taxes and those Liabilities arising under any Contract (including, without limitation, under an Employee Plan).

"Liens" means all liens or other interests as defined in 11 U.S.C. § 363(f), encumbrances, rights of third parties (express or implied), claims (as defined in Section 101(5) of the Bankruptcy Code), Indebtedness, obligations, Liabilities, judgments,

demands, subleases, contractual commitments, mortgages, pledges, guarantees, security interests, conditional sale or other title retention agreements, defects, charges, options, rights of first refusal, reservations, restrictions or interests of any kind, rights of others of every type and description, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise, whether secured or unsecured, including without limitation:

(i)      any and all claims, demands, damages, actions, causes of action, contracts, agreements, charges, sums of money, claims for attorney's fees, claim of any violation of any state or federal statutes, rules or regulations, and lawsuits of every kind and description, whether known or unknown, now existing, or which may hereafter arise against Seller; and

(ii)      employment contracts, accrued wages, salary or vacation pay, or unemployment compensation or severance pay to any present or former employee of Seller, any obligation to hire or otherwise employ any employees of Seller whether under any union agreements or otherwise, or obligations under any other employee benefit plan maintained by or for which Seller is obligated or bound including, without limitation, those based upon length of service with Seller or any and all other obligations owed to the former or present employees of Seller or any liabilities under the WARN Acts or similar statutes and regulations; and

(iii)      any and all liabilities and obligations under any Environmental Law; and

(iv)      any claims based on or asserting that the Purchaser is a successor in interest to the Seller.

"Litigation" means any suit, action, arbitration, cause of action, claim, complaint, criminal prosecution, investigation, inquiry, demand letter, governmental or other administrative proceeding, whether at law or at equity, before or by any Court, Governmental Authority, arbitrator or other tribunal.

"Magee Employment Agreement" has the meaning set forth in Section 8.5(b).

"Material Adverse Effect" means (a) any circumstance, change in, or effect on, the Business or the Seller, other than the Bankruptcy Case, that, individually or in the aggregate with any other circumstances, changes in, or effects on, the Seller or the Business (i) is, or could be, materially adverse to the Purchased Assets, or (ii) could materially adversely affect the ability of the Purchaser to use the Purchased Assets in the manner in which it is currently operated or conducted, or contemplated to be conducted, by the Seller, or (b) the termination of a Seller's Principal's employment with Seller.

"McNulty Employment Agreement" has the meaning set forth in Section 8.5(b).

"Operating Agreement" means the Operating Agreement of the Seller dated as of May 10, 2006, as amended and in effect on the date hereof,

"Newly Hired Employee" has the meaning set forth in Section 7.1.

"Order" shall mean any judgment, order, writ, injunction, ruling, stipulation, determination, award or decree of or by, or any settlement under the jurisdiction of, any Court or Governmental Authority.

"Permits" means any licenses, permits, pending applications, consents, certificates, registrations, approvals and authorizations.

"Person" means any natural person, corporation, limited liability company, unincorporated organization, partnership, association, joint stock company, joint venture, trust or any other entity.

"Post-Petition Costs" has the meaning set forth in Section 6.2(b).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchaser" has the meaning set forth in the recitals to this Agreement.

"Qualifying Bidder" has the meaning set forth in Section 8.1(c)(i).

"Receivables" means any and all accounts receivable, notes, book debts and other amounts due or accruing due to the Seller in connection with the Business, whether or not in the ordinary course, and including the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing, together with any unpaid or unbilled financing charges accrued thereon and the benefit of all security therefor.

"Regulation" shall mean any rule or regulation of any Governmental Authority.

"Sale Documents" means this Agreement, the Ancillary Agreements, and the other agreements, documents and instruments executed and to be executed in connection herewith, including, without limitation, the Indemnification Agreement, the Magee Employment Agreement, and the McNulty Employment Agreement, and including in all cases all Schedules and Exhibits hereto (including the Disclosure Schedule) and thereto.

"Sale Order" means an Order of the Bankruptcy Court, which may be included in the Confirmation Order in the event the sale transaction is consummated through the Chapter 11 Plan as contemplated by this Agreement, approving this Agreement and the consummation of the transactions contemplated hereby in their entirety in accordance with the terms and conditions set forth herein, and Section 363 and other applicable sections of the Bankruptcy Code and in compliance with the Bankruptcy Rules, and which includes the findings and holdings specified in Section 8.1(e).

"Sale Procedures Order" has the meaning set forth in Section 6.1(d).

"Sale Procedures" has the meaning set forth in Section 6.1(d).

"Seller" has the meaning set forth in the introductory paragraph of this Agreement.

"Seller's Knowledge" (and words of similar import) means (a) all facts actually known by Seller, a Seller's Principal or Ellen Burke with respect to the matters at hand, and (b) all facts that any of the foregoing Persons should have known with respect to the matters at hand if such Person had made due inquiry and exercised reasonable diligence.

"Seller's Principals" means Daniel McNulty and John Magee.

"Subsidiary" or "Subsidiaries" of a specified Person means any other Person in which such Person owns, directly or indirectly, more than 50% of the outstanding voting securities or other securities convertible into voting securities, or which may effectively be controlled, directly or indirectly, by such Person.

"Successor Trustee" has the meaning set forth in Section 6.6(a).

"Successful Bid" has the meaning set forth in Section 8.1(c)(ii)(F).

"Successful Bidder" has the meaning set forth in Section 8.1(c)(ii)(F).

"Tax" or "Taxes" means any and all federal, state, local, or foreign taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Authority or other taxing authority, including, without limitation: taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, disability, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs' duties, tariffs, and similar charges, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Returns" means returns, reports and information statements, including any schedule or attachment thereto, with respect to Taxes required to be filed with the IRS or any other Governmental Authority or other taxing authority or agency, domestic or foreign, including consolidated, combined and unitary tax returns.

"Termination Fee" has the meaning set forth in Section 8.4(c).

## ARTICLE II

## PURCHASE AND SALE

2.1    Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver (pursuant

to Sections 363 and 365 of the Bankruptcy Code) to the Purchaser, free and clear of all Liens, pursuant to a Bill of Sale in substantially the form attached hereto as Exhibit 2.1(a) (the "*Bill of Sale*"), and an Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit 2.3 (the "*Assignment and Assumption Agreement*"), and the Purchaser shall purchase from the Seller, free and clear of all Liens, all of the Seller's assets, other than the Excluded Assets, including, without limitation, the following assets and property used in connection with the Business (collectively, the "*Purchased Assets*"):

(a) Certain Contracts. All rights under the Contracts listed on Schedule 2.1(a) (which includes Leases, and all confidentiality, non-competition, and non-solicitation agreements) together with all of the Seller's claims or rights of action with respect to such Contracts, including all security deposits thereunder, which Schedule 2.1(a) may be amended by the Purchaser up to the day immediately preceding Closing to add or remove Contracts (each Contract on Schedule 2.1(a), as amended by Purchaser, an "*Assigned Contract*" and collectively, the "*Assigned Contracts*");

(b) Personal Property. Except as set forth on Schedule 2.1(b), all tangible personal property, including all machinery and equipment, furniture and fixtures, leasehold improvements, automobiles and other vehicles, tools, spare parts and supplies, computers, cell phones, telephone systems, supplies, and all other tangible personal property;

(c) Books and Records; Data. All books and records relating to the Purchased Assets and the Business (other than those necessary for the administration of the Bankruptcy Case or required by law to be retained by the Seller, copies of which will be made available to the Purchaser) including, without limitation, customer and prospective customers lists, customer database, database of prospective customers, all customer books and records, supplier lists, sales and expense records, forms of commission agreements, commission and brokerage fee data; price lists and catalogues, sales literature, advertising material, manufacturing data, production records, employee manuals, personnel records for employees hired by Purchaser, customer records, supply records, inventory records and correspondence files, and any and all additional documents relating to the customers, vendors, and suppliers (including all contact information) or such other documents used in the operation of the Business (together with, in the case of any such information which is stored electronically, the media on which the same is stored);

(d) Name and Goodwill; Telephone Numbers, Addresses, Etc. The exclusive and perpetual right for the Purchaser to use the name "Rockwood Real Estate Advisors", any trademarks, trade names, business names, and service marks, trade dress, logos, internet domain names, and other commercial product or service designations of the Seller (including, without limitation, "Concorde Realty Advisors" and all goodwill and other intangible rights of Seller thereto), together with all translations, adaptations, derivations and combinations thereof; all telephone numbers, facsimile numbers, websites, e-mail addresses, post office boxes, and telephone and other directory listings and other similar property used or intended to be used in connection with the Business used in the Business; all goodwill and other intangible assets, including all goodwill associated with the foregoing, the Business, and the Purchased Intellectual Property;

10

(e)     Claims and Causes of Action.  (i) all Actions of any kind, to the extent assignable or otherwise transferable generally or in a sale conducted under the Bankruptcy Code (including rights to tax refunds and insurance proceeds; (ii) all rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof, together with any and all Liens granted or otherwise available to Seller as security for collection of any of the foregoing; and (iii) any Avoidance Actions that currently exist and may exist pertaining to or arising out of or relating, directly or indirectly, to the Assigned Contracts or regarding the non-debtor parties to the Assigned Contracts;

(f)     Prepaid Expenses.  All prepaid expenses of the Seller related, directly or indirectly, to the Purchased Assets;

(g)     Certain Insurance Rights.  To the extent assignable, Seller's rights under insurance policies to the extent they relate to the Purchased Assets;

(h)     Intellectual Property.  All Intellectual Property, all rights to sue and recover for past, present and future infringements, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including any Intellectual Property licensed by Seller (collectively, the *"Purchased Intellectual Property"*); and

(i)     Certain Permits.  To the extent transferable, assignable, or reissuable, all Permits held or used by the Seller in connection with, or required for or useful for, the Assigned Contracts and/or the Business, including, without limitation, those listed in Schedule 4.16.

2.2     Excluded Assets.  For all purposes of and under this Agreement, the term *"Excluded Assets"* means all assets of the Seller other than those listed in Section 2.1 as *"Purchased Assets."* The Excluded Assets include the following:

(a)     Certain Contracts.  All Contracts not listed on Schedule 2.1(a).  The parties hereby acknowledge and agree that the Assigned Contracts shall in no event include any Employee Plan, or any other employment, consulting, bonus, severance, equity incentive, pension, profit-sharing, deferred compensation or any other employee health or other benefit plan, policy, agreement or arrangement of Seller;

(b)     Equity Interests.  Equity Interests of the Seller in any entity including, without limitation, Rockwood Hargrave, L.L.C. (*"Hargrave"*); Rockwood Asociados, L.L.C. (*"Asociados"*); RA Asociados de Mexico, S. de R.L. de C.V. (*"RA Asociados"*); and RA Servicios Asociados de Mexico, S. de R.L. de C.V. (*"RA Servicios"*);

(c)     Cash. Seller's Cash;

(d)     Receivables. Seller's Receivables; and

(e)     Seller's Rights.  Seller's rights under this Agreement.

2.3     Assumed Liabilities.  Subject to the terms and conditions of this Agreement, the Assignment and Assumption Agreement, at the Closing, the Purchaser shall assume and agree

to pay, perform and discharge only the Liabilities of the Seller first arising or first accruing under the Assigned Contracts from and after the Closing Date, and specifically excluding any Cure Costs (whether or not relating to Purchased Assets), and any liability or obligation relating to or arising out of any Assigned Contract as a result of any breach thereof or any other matter occurring prior to the Closing Date (the "*Assumed Liabilities*").

2.4     Excluded Liabilities. The Purchaser shall not be the successor to the Seller or any Affiliate of Seller, and the Seller shall retain and the Purchaser shall not assume or have any responsibility for, any Liens or Liabilities of the Seller or the Bankruptcy Estate other than the Assumed Liabilities (the "*Excluded Liabilities*").

# ARTICLE III

# PURCHASE PRICE

3.1     Purchase Price; Use of Purchase Price Proceeds.

(a) The purchase price shall be $3,180,000 (the "*Purchase Price*"). The Purchaser shall deposit within one (1) Business Day after the Contract Date, $160,000 as a good faith deposit (the "*Deposit*") in cash by wire transfer in accordance with the wire instructions attached hereto as Exhibit 3.1 to a mutually acceptable escrow agent (the "*Escrow Agent*") to be held separate from the assets of the Seller and Bankruptcy Estate. If the Chapter 11 Plan is approved or if the Purchaser is declared the Successful Bidder (as defined below), as applicable, then, at the Closing, in consideration of the sale, transfer, conveyance and assignment of the Purchased Assets to Purchaser, upon the terms and subject to the conditions and possible adjustments set forth in this Agreement, (i) the Escrow Agent shall pay the Deposit in cash by wire transfer as directed by the Purchaser solely for the uses set forth in Section 3.1(b) and as a credit to the Purchase Price, (ii) Purchaser shall pay the balance of the Purchase Price in cash by wire transfer as set forth in Section 3.1(b), and (iii) the Purchaser shall assume the Assumed Liabilities. If the Deposit is returnable to the Purchaser pursuant to the terms of this Agreement, then the Deposit shall be returned to the Purchaser free and clear of any Liens.

(b) The Purchase Price shall be used toward the payment of allowed claims on the effective date of, and as to be provided in, the Chapter 11 Plan as confirmed. Such payment shall be made pursuant to a procedure to be set forth in the Chapter 11 Plan. Seller shall provide Purchaser with an accounting on the effective date of the Chapter 11 Plan showing the uses of the Purchase Price.

3.2     Closing. Subject to the terms and conditions of this Agreement and entry of the Sale Order, the closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Riemer & Braunstein, LLP, Seven Times Square, Suite 2506, New York, New York 10036 at 10:00 A.M. on the third Business Day following the satisfaction or waiver of all other conditions to the obligations of the parties set forth in Article VIII, or at such other place or time or on such other date as the Seller and the Purchaser may mutually agree upon in writing, subject, however, to the termination provisions set forth herein (the day on which the Closing takes place being the "*Closing Date*").

3.3 <u>Purchase Price Allocation</u>. The Purchaser shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Code §1060 and the Treasury regulations thereunder (and any similar provision of state, local or foreign law, as appropriate), which allocation shall be binding upon Seller unless Seller advises Purchaser in writing of any objection in which case the parties agree any dispute shall be resolved by an accounting firm mutually agreeable to the parties. The Purchaser shall deliver such allocation to Seller within 60 days after the Closing Date. The Purchaser and Seller and their Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation prepared by the Purchaser. Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as the Purchaser may reasonably request to prepare such allocation. Neither the Purchaser nor Seller shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

3.4 <u>Transfer Taxes</u>. The Seller shall be liable for and shall pay all federal and state sales Taxes (including any retail sales Taxes and land transfer Taxes) and all other Taxes, duties, fees or other like charges of any jurisdiction properly payable in connection with the transfer of the Purchased Assets by the Seller to the Purchaser.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The disclosure schedules of the Seller attached hereto (the *"Disclosure Schedules"*) identify by Section and Subsection any exception to a representation or warranty in this Article IV. As an inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller represents and warrants to the Purchaser as of the date hereof and the Closing Date, as follows:

4.1 <u>Organization and Qualification</u>. The Seller is (i) a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, and (ii) duly licensed or qualified to transact business as a foreign corporation and is in good standing in each of the jurisdictions listed on <u>Schedule 4.1</u>, such jurisdictions being the only jurisdictions in which the nature of the Assigned Contracts or the ownership or leasing of its properties by the Seller requires such licensing or qualification.

4.2 <u>Subsidiaries</u>. <u>Schedule 4.2</u> is a true and correct list of all Equity Interests in any Person owned, directly or indirectly, by the Seller or any Subsidiary of the Seller, including Asociados, RA Asociados, RA Servicios, and Hargrave. The Seller owns all right, title and interest in the name "Concorde Realty Advisors", no claims have been made against the Seller in connection with the use of such name in the Business and, to the Seller's Knowledge, no third party has threatened to make a claim against the Seller with respect thereto. Concorde Realty Advisors engages in no business activities, has no assets, and has no liabilities.

4.3 <u>Certificate of Formation, Operating Agreement and LLC Records</u>. True, correct and complete copies of each of (a) the Certificate of Formation, (b) Operating Agreement, and

(c) the minute books of the Seller have been previously delivered or made available to the Purchaser.

4.4    Authorization; Enforceability.  Subject to the entry of the Sale Order and applicable bankruptcy law, the Seller has the power and authority to own, hold, lease and operate its properties and assets and to carry on its business as currently conducted. Subject to the entry of the Sale Order, the Seller has the power and authority to execute, deliver and perform each of the Sale Documents. Subject to entry of the Sale Order, the execution, delivery and performance of each of the Sale Documents and the consummation of the transactions contemplated herein and therein have been duly authorized and approved by the Seller, and no other consent on the part of the Seller is necessary in order to give effect thereto. Each of the Sale Documents to be executed and delivered by the Seller have been duly executed and delivered by, and shall, upon entry of the Sale Order constitute the valid and binding obligations of the Seller, enforceable against the Seller, as the case may be, in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.

4.5    No Violation or Conflict.  Subject to the entry of the Sale Order, none of the (a) execution and delivery by the Seller of this Agreement and the other Sale Documents to be executed and delivered by the Seller, (b) consummation by the Seller of the transactions contemplated by this Agreement and the other Sale Documents, or (c) the performance of this Agreement and the other Sale Documents required by this Agreement to be executed and delivered by the Seller at the Closing, will conflict with or violate the Certificate of Formation and Operating Agreement.

4.6    Contracts.

(a)    The Seller has delivered or made available to the Purchaser true, correct and complete copies of all Contracts which are in writing. Schedule 4.6(a) contains a list of such Contracts and an accurate summary of all proposals outstanding for the Seller to enter into any material Contract, including any engagement/retention agreement, with any Person. The Seller is not a party to any material Contract which is not in writing. The Assigned Contracts are all of the Contracts necessary to operate the Business as currently conducted.

(b)    The Seller shall provide to the Purchaser a list containing the true and accurate amounts due (including all Cure Costs, if any) as of the Petition Date and Closing Date under all Assigned Contracts contemporaneously with the filing of the Disclosure Schedules with the Bankruptcy Court.

(c)    The Assigned Contracts are in full force and effect and are the valid and binding obligations of the Seller and, to the Sellers' Knowledge, the other parties thereto, enforceable in accordance with their respective terms. The Seller has not received notice of default by the Seller under any of the Assigned Contracts and no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default by the Seller thereunder. To the Seller's Knowledge, none of the other parties to any of the Assigned

Contracts is in default thereunder, nor has an event occurred which, with the passage of time or the giving of notice or both would constitute a default by such other party thereunder. The Seller has not received notice of the cancellation, revocation or termination of any of the Assigned Contracts or disputes arising under the Assigned Contracts.

4.7    Litigation. Except for the Bankruptcy Case and except as set forth on Schedule 4.7, there is no Litigation, or, to the Seller's Knowledge, investigation, pending or, to the Seller's Knowledge, threatened against or adversely affecting the Purchased Assets, before any Court or Governmental Authority. Except for the Bankruptcy Case, the Seller is not subject to any outstanding Litigation or Order, which, individually or in the aggregate, would prevent, or materially delay the Seller from consummating the transactions contemplated by this Agreement. There is no action by the Seller pending or threatened against any third party with respect to any of the Purchased Assets. None of the matters disclosed on Schedule 4.7 has had or could reasonably be anticipated to have a Material Adverse Effect.

4.8    Brokers. Neither the Seller, nor the Bankruptcy Estate has employed any financial advisor, broker or finder, and neither of them has incurred or will incur any broker's, finder's, investment banking or similar fees, commissions or expenses in connection with the transactions contemplated by this Agreement.

4.9    Compliance with Law. The Seller has not received any notice or other communication (whether written or oral) from any Governmental Authority or other Person regarding any actual, alleged, possible or potential breach, violation of or non-compliance with any Laws or Orders by the Seller, as it relates to the Business and the Purchased Assets. The Seller has no Knowledge of any Law or Order that would prohibit or restrict the Purchaser from conducting the Business as it relates, directly or indirectly, to the Purchased Assets in any manner and/or in any jurisdiction in which such Business is now conducted.

4.10    Governmental Consents and Approvals. Other than entry of the Sale Order, the execution, delivery and performance of each of the Sale Documents by the Seller do not and will not require any consent, approval, authorization, Permit or other order of, action by, filing with or notification to, any Governmental Authority.

4.11    No Other Agreements to Purchase. Except for those rights that any third party may have by reason of Bankruptcy Code Section 363, no person other than the Purchaser has any written or oral agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase or acquisition from the Seller of any of the Purchased Assets.

4.12    Financial Information; Compensation. Prior to the date of this Agreement, Seller has provided Purchaser with true, complete and correct copies of all of Seller's Federal and State Tax Returns from 2005 through the date hereof (the "*Seller Tax Returns*"). To the Seller's Knowledge, the Seller Tax Returns include all of the tax returns required to be filed by or on behalf of Seller during such period and have been duly and timely filed with the appropriate taxing authority in all jurisdictions in which such tax returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings). To the Seller's Knowledge, all such other financial information provided by Seller to Purchaser as of

the date hereof is accurate and complete in all material respects, was prepared in accordance with GAAP (if applicable), and presents fully, fairly and accurately the financial position of Seller and the Business in all material respects as of the dates set forth therein and the operational results of Seller and the Business for the periods covered thereby. The Seller is not delinquent in the payment or contribution of any amounts under any ERISA Employee Plan. Neither of the Seller's Principals is owed any Compensation by Rockwood for any period prior to the Petition Date. Schedule 4.12 sets forth the aggregate amount of Compensation respectively earned by, but which has not yet been paid to, the Seller's Principals during the period from the Petition Date to the Contract Date. Schedule 4.12 sets forth the aggregate amount of Compensation respectively earned by and paid to the Seller's Principals during the period from the Petition Date to the Contract Date.

    4.13    Personal Property.

        (a)    Except for such property as is leased by the Seller pursuant to a lease described on Schedule 4.13(b), the Seller has good and marketable title to all tangible personal property used in the Business, and all such tangible personal property is free and clear of all Liens.

        (b)    Schedule 4.13(b) sets forth a complete and accurate list of all personal property that is used in the Business and indicates whether it is owned or leased by the Seller, and, in the case of such personal property that is leased, true, complete and correct copies of all such leases have been provided to the Purchaser. All personal property used by the Seller is either owned by the Seller or leased by the Seller. All of the personal property listed on Schedule 4.13(b) is in good working order and condition, ordinary wear and tear excepted.

        (c)    All leases and agreements included on Schedule 4.13(b) are in full force and effect and constitute valid and binding agreements of the Seller and, to the Seller's Knowledge, of the other parties thereto in accordance with their respective terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.

        (d)    The Purchased Assets constitute all of the assets, including Contracts, Permits, and Intellectual Property, necessary to conduct the Business as presently conducted. Each asset that is material to the operation of the Business as presently conducted is a Purchased Asset.

    4.14    Real Property; Leases.

        (a)    Other than pursuant to the Leases, the Seller does not own any real property or interest therein.

        (b)    There are no Leases other than the Leases more particularly described on Schedule 4.14(b). Complete and correct copies of the Leases and all amendments thereto have been furnished to the Purchaser. The Seller is not in default in any respect beyond any applicable notice or grace period and has not received written notice of any such default still outstanding on the date hereof under the Leases. To the Seller's Knowledge, there exists no

uncured default under the Leases by any other party. The Leases are in full force and effect as of the date hereof and are enforceable against the Seller and, to the Seller's Knowledge, the other parties thereto in accordance with its terms, except as may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought. There is no brokerage commission or finder's fee due from the Seller and unpaid with regard to the Leases, or which will become due at any time in the future with regard to the Leases.

(c)     To the Seller's Knowledge, the premises demised under the Leases, including the walls, ceilings and other structural elements of any improvements erected on the properties demised under the Leases and the building systems such as heating, plumbing, ventilation, air conditioning, mechanical and electric, are: (i) in good working order, repair and operating condition as of the date hereof, ordinary wear and tear excepted; and (ii) have been maintained in accordance with generally accepted industry practices.

(d)     Schedule 4.14(d) sets forth a true and correct list of all letters of credit or security deposits provided by the Seller under the Leases.

(e)     Seller has timely paid in full, or will have paid as of the Closing Date, all New York Commercial Rent Tax applicable to the Lease of its New York Leased Real Property, and has provided the Purchaser with true and complete copies of all returns filed in connection therewith.

4.15    Insurance. The Seller has provided or made available to the Purchaser true and complete copies of all insurance policies and fidelity and surety bonds covering the assets, business, equipment, properties and operations of the Seller as it relates to the Purchased Assets, a list of which (by type, carrier, policy number, limits, premium and expiration date) is set forth in Schedule 4.15. All such insurance policies are in full force and effect and will remain in full force and effect with respect to all events occurring prior to the Closing. Such policies of insurance and bonds are of the type and in amounts customarily carried by Persons conducting businesses similar to the Business of the Seller. Such policies and bonds are carried in an amount and form and are otherwise adequate to protect the Seller from any material loss resulting from risks and liabilities reasonably foreseeable as of the date hereof.

4.16    Permits. Schedule 4.16 lists all Permits used in or otherwise necessary for the conduct of the Business as it relates, directly or indirectly, to the Purchased Assets (including Permits issued to, held by, used by or otherwise necessary for the Seller's Principals and employees of the Seller in connection with the operation of the Business). The Seller is, and at all times has been, in compliance with all conditions and requirements imposed by the Permits issued to it and the Seller has not received any notice of, and has no Knowledge that, any appropriate authority intends to cancel or terminate any of the Permits issued to it. The Seller's Principals are, and at all times have been, in material compliance with all conditions and requirements imposed by the Permits issued to them and the Seller's Principals have not received any notice of, and have no Knowledge that, any appropriate authority intends to cancel or terminate any of the Permits issued to them. The Seller owns or has the right to use the Permits in accordance with the terms thereof. Each of the Permits is valid and in full force

and effect. No loss or expiration of any such Permit is pending or, to the Seller's Knowledge, threatened or reasonably foreseeable, other than expiration in accordance with the terms of such Permits that may be renewed in the ordinary course of business without lapsing.

4.17    Accounts Receivable. A true, complete and accurate list of all Receivables of the Seller as of the date hereof (which shall be updated as of the Closing Date) are set forth on Schedule 4.17.

4.18    Intellectual Property. Schedule 4.18 sets forth a complete and accurate list of all registered Intellectual Property and material unregistered Intellectual Property. Except as set forth on Schedule 4.18, Seller owns the entire right, title and interest in, or has a valid license to use pursuant to an Assigned Contract, all Purchased Intellectual Property. The Purchased Intellectual Property is all the Intellectual Property needed to conduct the Business as conducted prior to the Closing. Except as set forth on Schedule 4.18, no claims are pending against any Seller before a Governmental Authority or, to the Knowledge of Seller, threatened with regard to the ownership by the Seller of any Purchased Intellectual Property. All Purchased Intellectual Property is subsisting, is not expired or abandoned, and is valid and enforceable. No Purchased Intellectual Property is subject to any Order or agreement materially restricting the use thereof by Seller, or materially restricting the licensing thereof by Seller to any Person and Seller has taken commercially reasonable action to maintain and protect all Purchased Intellectual Property. Except as set forth on Schedule 4.18: (i) to the Knowledge of Seller, the Seller has not infringed, misappropriated or otherwise violated any Intellectual Property of any other Person, (ii) Seller is not aware of any facts that indicate a likelihood of any of the foregoing and have not received any notices regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any third party); and (iii) to the Knowledge of Seller, the Purchased Intellectual Property is not being infringed, misappropriated or otherwise violated by any other Person.

4.19    Chapter 11 Expenses; Accounts Payable. Schedule 4.19 sets forth Seller's good faith estimate as of the Contract Date of the expenses of the Chapter 11 Plan and of Seller's accounts payable, to be updated as of the Closing Date.

4.20    Disclosure. No representation or warranty of the Seller contained in this Agreement and the other Sale Documents, and no statement, report, or certificate furnished by or on behalf of the Seller to the Purchaser or its agents pursuant to this Agreement or any of the other Sale Documents, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading or omits or will omit to state a material fact necessary in order to provide the Purchaser with full and proper information as to the Purchased Assets and the Business.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

In order to induce the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Purchaser represents and warrants to the Seller as follows:

5.1     Organization and Qualification. The Purchaser is a limited liability company duly organized validly existing and in good standing under the laws of the State of Delaware.

5.2     Authorization; Enforceability.  The Purchaser has the power and authority to execute, deliver and perform this Agreement and the other Sale Documents.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Sale Documents and the consummation of the transactions contemplated herein and therein have been duly authorized and approved by the Purchaser, and no other action on the part of the Purchaser is necessary in order to give effect thereto.  This Agreement and each of the other Sale Documents to be executed and delivered by the Purchaser have been duly executed and delivered by, and constitute the legal, valid and binding obligations of, the Purchaser, enforceable against the Purchaser, in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefor may be brought.

5.3     No Violation or Conflict. None of (a) the execution and delivery by the Purchaser of this Agreement and the other Sale Documents to be executed and delivered by the Purchaser, (b) consummation by the Purchaser of the transactions contemplated by this Agreement and the other Sale Documents, or (c) the performance of this Agreement and the other Sale Documents required by this Agreement to be executed and delivered by the Purchaser at the Closing, will (i) conflict with or violate the limited liability company agreement of the Purchaser, or (ii) conflict with or violate any Law, Order or Permit applicable to the Purchaser.

5.4     Governmental Consents and Approvals.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Sale Documents by the Purchaser do not and will not require any consent, approval, authorization, Permit or other order of, action by, filing with or notification to, any Governmental Authority.

5.5     Brokers. The Purchaser has not employed any financial advisor, broker or finder, and has not incurred nor will it incur any broker's, finder's, investment banking or similar fees, commissions or expenses in connection with the transactions contemplated by this Agreement.

## ARTICLE VI

## COVENANTS

6.1     Bankruptcy Court Approval.

(a)     The approval of the Bankruptcy Court is required for the transactions contemplated by this Agreement.

(b)     On or promptly after the Contract Date, the Seller shall file with the Bankruptcy Court (i) the Chapter 11 Plan (to be in form and substance satisfactory to the Purchaser) and related disclosure statement (to be in form and substance satisfactory to the Purchaser), as applicable, and (ii) a separate motion, on an expedited basis, seeking entry of an

order approving the payment of the Termination Fee (if and to the extent it becomes due and payable under Section 8.4(c)) and the Break-Up Fee (if and to the extent it becomes due and payable under Section 8.1(c)(iii)) (the *"Fee Order"*). The Fee Order shall include (but not be limited to) the following provisions: **(i)** a provision approving the Termination Fee and the Break-Up Fee, as applicable, and a further factual finding that, but for the Termination Fee and the Break-Up Fee, the Purchaser would not have entered into this Agreement; **(ii)** a provision that the Termination Fee and the Break-Up Fee, as applicable, shall be paid as administrative expenses of Seller with priority over any and all administrative expenses, including without limitation, the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114, as applicable, of the Bankruptcy Code, which allowed super-priority claim shall be payable from, and have recourse to, all prepetition and post-petition property of the Seller, including any amounts that are recovered or otherwise received by the Seller in respect of claims under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of, or any other avoidance actions under, the Bankruptcy Code; **(iii)** a provision that the Termination Fee and the Break-Up Fee shall be secured by a perfected first priority lien pursuant to Section 364(c) of the Bankruptcy Code on all of the Seller's assets and any proceeds therefrom; and **(iv)** a provision that the Break-Up Fee shall be entitled to a lien on the proceeds of an Alternative Transaction until the Break-Up Fee is paid in full and the Break-Up Fee shall be set aside from the sale proceeds of the Alternative Transaction, at closing, pending payment of such amount to the Purchaser (collectively, the *"Fee Provisions"*).

(c)     The Seller shall use commercially reasonable efforts to prosecute the pleadings described in clause (b), above, and to (i) ensure that the Fee Order is entered and approved no later than 17 days after the Contract Date, (ii) to the extent a new disclosure statement is required to be filed in connection with the Chapter 11 Plan, ensure that the Disclosure Statement Order is entered and approved no later than 30 days after the entry of the Fee Order, (iii) make certain that the Confirmation Order is entered and approved no later than 45 days after the entry of the Fee Order, and (iv) request that the Confirmation Order provide that it shall become effective immediately. The Chapter 11 Plan and any related documents, including any disclosure statement, the Confirmation Order, and the Fee Order shall be in final form and substance acceptable to the Purchaser, in its discretion, and consistent with this Agreement.

(d)     In the event the Confirmation Order is not entered by the Bankruptcy Court within 60 days after the Contract Date, the Seller shall file a motion or motions with the Bankruptcy Court seeking, on an expedited basis, (i) entry of an order (the *"Sale Procedures Order"*) approving sale procedures (the *"Sale Procedures"*) for the sale of the Purchased Assets, which sale shall be subject to higher and better offers, as provided in Section 8.1(c) and (ii) entry of the Sale Order, and each of such motion or motions, the Sales Procedures Order, the Sale Procedures and the Sale Order shall be in final form and substance acceptable to Purchaser, in its discretion, and consistent with this Agreement.

(e)     In the event clause (d) applies, the Seller shall use commercially reasonable efforts to prosecute such motion or motions and to (i) ensure that the Sale Procedures Order is entered and approved no later than 75 days after the Contract Date, (ii) ensure that the Sale Order is entered and approved no later than 30 days after the entry of the Sale Procedures Order, and (iii) request that the Sale Order provide that it shall become effective immediately.

6.2    <u>Assigned Contracts.</u>

(a)    Subject to the terms and conditions of this Agreement and entry of the Sale Order, and in reliance on the representations, warranties and covenants set forth in this Agreement, Seller shall, pursuant to Sections 363 or 365 of the Bankruptcy Code, assume and then sell, assign, transfer and convey to Purchaser, and Purchaser shall accept from Seller, all of Seller's right, title and interest in and to all Assigned Contracts; *provided, however*, that, to the extent an Assigned Contract is not an executory contract within the meaning of Section 365 of the Bankruptcy Code, the Seller's interest in such Assigned Contract is nevertheless transferable to the Purchaser as an asset of the Seller pursuant to Section 363 of the Bankruptcy Code.

(b)    The Seller shall be responsible for any and all monetary cures (including payment of all costs and expenses incurred prior to the Petition Date) or other payments required under Bankruptcy Code Section 365 to assume and assign the Assigned Contracts to Purchaser (the *"Cure Costs"*), and shall also be responsible for and shall timely pay all direct and indirect costs and expenses associated with the Assigned Contracts arising or accruing between and including the Petition Date and the Closing Date (the *"Post-Petition Costs"*). All payments received from the counterparty to any Assigned Contract between and including the Petition Date and the Closing Date shall be applied by the Seller to any Cure Costs and Post-Petition Costs relating to such Assigned Contract. For purposes of clarity, the Purchase Price provided in Section 3.1, above, shall not be subject to any setoffs, deductions or recoupments for the payment of Cure Costs or any Post-Petition Costs, if any.

(c)    At the Closing, the Seller shall provide to the Purchaser an updated list, as set forth in Section 4.6(b), containing the true and accurate amount of all Cure Costs and Post-Petition Costs due as of the Closing Date under all Assigned Contracts.

(d)    The Seller shall cause or have each of the Assigned Contracts assigned or otherwise transferred to the Purchaser.

(e)    This Agreement shall not constitute an agreement to assign any Assigned Contract if such attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser as the assignee of such Assigned Contract thereunder, notwithstanding the application of Sections 363 and 365 of the Bankruptcy Code; *provided, however*, that the Sale Procedures Order (the Disclosure Statement Order, if applicable, or any other applicable plan document in the event the sale transaction is consummated through the Chapter 11 Plan) shall provide that, if the third party to an Assigned Contract, upon receiving appropriate notice of the proposed assumption of such Assigned Contract by Seller and assignment of such Assigned Contract to Purchaser, does not file a timely objection with the Bankruptcy Court to the assignment of the Assigned Contract, then such third party shall be deemed to consent to the assignment of the Assigned Contract to Purchaser. Notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, if third-party consent or approval is required to the assignment of an Assigned Contract and the third party whose consent or approval is required files a timely objection with the Bankruptcy Court to the assignment of the Assigned Contract by Seller to Purchaser, Seller shall cooperate with Purchaser without further consideration in any reasonable arrangement designed to provide Purchaser with the benefits of or under any such Assigned Contract,

including enforcement of any and all rights of Seller against the other party or parties thereto arising out of the breach or cancellation by such other party or otherwise.

6.3 <u>Continuing Operations</u>. Between the date of this Agreement and the Closing, the Seller shall operate the Business and perform the Assigned Contracts in the ordinary course of business. Seller shall only accept payments with respect to the Assigned Contracts in accordance with the terms of such contracts. Further, between the date of this Agreement and the Closing, Seller shall not take any of the following actions without the prior written approval of the Purchaser:

(a) Increase the salary, bonus, benefits or other wages or remuneration of any employees or consultants of Seller;

(b) Amend, modify, terminate, or waive any provision of any of the Assigned Contracts;

(c) Waive, settle, or release claims of Seller against third parties;

(d) Collect any Receivable in advance or other than in the ordinary course of Seller's Business, consistent with Seller's historical practices.

(e) Take any action inconsistent with this Agreement or which is reasonably likely to have a Material Adverse Effect.

(f) Pay the Seller's Principals any Compensation other than the draw the Seller is currently paying to the Seller's Principals (all at the same draw amounts and frequency of payment); the Seller represents and warrants that Daniel McNulty currently receives an annual draw from the Seller of $200,000.00 payable in bi-weekly installments (i.e., every other week) of $8,333.33 and John Magee currently receives an annual draw from the Seller of $200,000 payable in bi-weekly installments (i.e., every other week) of $8,333.33.

6.4 <u>Performance</u>. Subject to the terms and conditions provided in this Agreement, each of the parties to this Agreement shall use its respective reasonable commercially efforts in good faith to take or cause to be taken as promptly as practicable all reasonable actions that are within its power to cause to be performed and fulfilled those of the conditions precedent to its obligations to consummate the transactions contemplated by this Agreement that are dependent upon its actions, including obtaining all necessary approvals, to the end that the transactions contemplated hereby will be fully and timely consummated.

6.5 <u>Regulatory and Other Authorizations; Notices and Consents</u>. The Seller will use its reasonable best efforts to obtain all authorizations, consents, orders and approvals of all Governmental Authorities and officials that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the other Sale Documents and will cooperate fully with the Purchaser in promptly seeking to obtain all such authorizations, consents, orders and approvals. The Seller will provide any and all notices to Governmental Authorities, employees, and third parties as may be required under any Contracts, applicable law, or otherwise.

6.6    Access.

(a)    From the date hereof until the Closing, upon reasonable notice, the Seller (or any successor trustee appointed under Chapter 7 or 11 of the Bankruptcy Code (the "**Successor Trustee**")) shall and shall cause each of the Seller's or Successor Trustee's officers, directors, employees, agents, accountants and counsel to: (i) afford the officers, employees and authorized agents, accountants, counsel, and representatives of the Purchaser reasonable access, during normal business hours, to the offices, other facilities, books and records of the Seller and to those officers, directors, employees, agents, accountants and counsel of the Seller who have any knowledge relating to the Seller or the Purchased Assets, and (ii) furnish to the officers, employees and authorized agents, accountants, counsel, financing sources and representatives of the Purchaser such additional financial and operating data and other information regarding the Purchased Assets as the Purchaser may from time to time request.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by the Purchaser after the Closing or for any other reasonable purpose, for a period of up to the date of the Final Order closing the Bankruptcy Case, the Seller or Successor Trustee shall (i) retain all books and records of the Seller which are not transferred to the Purchaser pursuant to this Agreement and which relate to the Seller, its operations or the Purchased Assets for periods prior to the Closing and which shall not otherwise have been delivered to the Purchaser; and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Purchaser, reasonable access (including the right to make photocopies at the expense of the Purchaser), during normal business hours, to such books and records.

(c)    Should Seller (or any Successor Trustee) fail to fulfill or comply with its obligations under this Section 6.6, Purchaser shall be permitted to bring a proceeding before the Bankruptcy Court to compel such compliance.  At the reasonable request of Seller at Closing and at any time or from time to time thereafter, Purchaser shall cooperate with Seller or any Successor Trustee to make available for inspection and copying, at Seller's or its trustee's expense, business records of Seller acquired by Purchaser which Seller or any Successor Trustee may reasonably request.  Seller's obligations under this Section 6.6 shall terminate upon the entry of a final decree closing the Bankruptcy Case; *provided, however*, that after entry of the final decree, Purchaser may, at its expense, seek an Order of the Bankruptcy Court deeming any documents to be executed and delivered that may be reasonably required to effectively convey, transfer and assign the Purchased Assets to Purchaser, or for Purchaser to obtain necessary regulatory certifications, approvals, consents and licenses, accreditations or permits, to which order Seller hereby consents.

6.7    Notification.  From the date hereof until the Closing, each party to this Agreement shall promptly notify the other party in writing of the occurrence, or pending or threatened occurrence, of (a) any event that would constitute a breach or violation of this Agreement by any party or that could reasonably be anticipated to cause any representation or warranty made by the notifying party in this Agreement to be false or misleading in any material respect (including without limitation, any event or circumstance which would have been required to be disclosed on the Disclosure Schedule if such event or circumstance occurred or existed on or prior to the date of this Agreement), and (b) all other material developments affecting the Purchased Assets.  Any such notification shall not limit or alter any of the representations,

warranties or covenants of the parties set forth in this Agreement nor any rights or remedies a party may have with respect to a breach of any representation, warranty or covenant.

6.8 Name Change. The Purchased Assets include the name "Rockwood Real Estate Advisors" and all derivations thereof and Seller shall cease use of such name as of the Closing Date, other than for reporting or recordkeeping purposes. As soon as practicable after Closing, Seller shall (i) change its name, and the name of any Subsidiaries that are similar thereto and might cause confusion as to the affiliation of any such Subsidiary with the Purchaser, to a name that does not include a name confusingly similar to "Rockwood Real Estate Advisors", (ii) provide evidence of such change promptly to Purchaser, and (iii) file such notice of name change in the Bankruptcy Case and change the case caption for the Bankruptcy Case going forward.

6.9 Exclusivity. While the Chapter 11 Plan is pending with the Bankruptcy Court and before the filing of any 363 sale motion seeking entry of the Sale Procedures Order and the Sale Order, each of the Seller and each Seller Principal agrees that it or he shall not, and that it or he shall ensure that its or his Affiliates and its or his and their respective directors, officers, employees, representatives and agents shall not directly or indirectly, (i) take any action to solicit, initiate, encourage or assist the submission of any proposal, negotiation or offer from any person or entity other than Purchaser or an Affiliate of Purchaser relating to the sale or issuance of any of membership interests in the Seller or the acquisition, sale, lease, license or other disposition of the Seller or any Purchased Asset, or (ii) enter into any discussions, negotiations or execute any agreement related to any of the foregoing.

6.10 Final Decree of the Bankruptcy Case and Accounting of Disbursements to Seller's Principals. The Seller shall provide, or shall cause the disbursing agent in the Bankruptcy Case to provide, a copy of the final decree of the Bankruptcy Case filed with Bankruptcy Court along with a detailed accounting prepared by the disbursing agent of all disbursements made to the Seller's Principals since the Petition Date, including disbursements made to the Seller's Principals for Compensation.

## ARTICLE VII

## EMPLOYEE MATTERS

7.1 Offer of Employment. The names, addresses, positions, salary, bonus and other incentive compensation of the current employees of Seller are set forth on Schedule 7.1. As of the Closing Date, the Purchaser may offer employment to any of the then current employees of the Seller. "*Newly Hired Employee*" shall mean each such employee to whom an offer is made and who accepts such offer. The Seller hereby consents to the employment of any such Newly Hired Employee by the Purchaser.

7.2 Responsibility for Seller Severance Obligations. The Purchaser shall in no event have any responsibility or liability under any Employee Plan, or to any current or former employee of the Seller, including any Newly Hired Employee, as a result of the termination of such employee's employment by the Seller in connection with, or as a result of, the transactions contemplated by this Agreement or otherwise, whether for accrued and unpaid

vacation time, severance payments, or any other amounts whatsoever of any kind or nature. Subject to applicable bankruptcy law, the Seller shall be responsible for any liabilities under any Employee Plans, and for paying any accrued and unpaid vacation time, severance or other compensation or payment or other amounts due to any such employee under any contractual or other legal obligation of the Seller existing prior to the Closing and after Closing, including any obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, for continuation coverage available to affected qualified beneficiaries who are not Newly Hired Employees for any group health plan of the Seller.

<h1 style="text-align:center">ARTICLE VIII</h1>

<h2 style="text-align:center">CONDITIONS PRECEDENT TO CLOSING; TERMINATION</h2>

8.1 <u>Conditions to Purchaser's and Seller's Obligations to Close</u>. The respective obligations of Purchaser and Seller to effect the Closing hereunder shall be subject to the satisfaction and fulfillment of each of the following conditions, except as Purchaser and Seller may expressly waive in writing:

(a) <u>Sale Approval Under the Chapter 11 Plan</u>. In the event the transactions contemplated herein are consummated pursuant to the Chapter 11 Plan, (i) the Bankruptcy Court shall have approved the Fee Order, the Disclosure Statement Order (if applicable), and the Confirmation Order and such orders shall be Final Orders, which shall all be subject to approval, in form and substance, of the Purchaser; and (ii) the effective date of the Chapter 11 Plan shall have occurred (subject only to receipt by the Seller of the Purchase Price).

(b) <u>Sale Approval Pursuant to 363 Sale Motion</u>. In the event the transactions contemplated herein are consummated pursuant to a Section 363 sale motion and a separate Sale Order, the Bankruptcy Court shall have approved the Fee Order, the Sale Procedures Order and the Sale Order and such Orders shall be Final Orders, which shall be in form and substance satisfactory to the Purchaser in its discretion. The Sale Order shall (i) have been entered on the docket of the Bankruptcy Court, and (ii) provide that if the Sale Order is not stayed that the Closing may, with the consent of Purchaser and Seller, occur immediately upon entry of the Sale Order; *provided, however*, the Sale Order need not be a Final Order if the Sale Order is not stayed and Purchaser consents to occurrence of the Closing at any time prior to the Sale Order becoming a Final Order.

(c) <u>Form of Sale Procedures</u>. If applicable, the Sale Procedures shall be, at all times, subject to the approval, in form and substance, of the Purchaser in its discretion, and shall in any event include the following provisions:

(i) <u>Determination of "Qualifying Bidder" Status</u>. Any potential bidder who wishes to participate in the auction (the "*Auction*") and bid on the Purchased Assets must demonstrate to the satisfaction of Seller that such potential bidder is a Qualifying Bidder. A "*Qualifying Bidder*" is a potential bidder other than the Purchaser, or an Affiliate of the Purchaser, who has executed a confidentiality and non-disclosure agreement with the Seller and delivers to Seller a written and binding offer on or before the bid deadline (the "*Bid Deadline*") that:

(A)    is a bid for substantially the same assets and upon substantially the same or more favorable terms as the terms set forth in this Agreement for a price not less than the aggregate sum of the Purchase Price, Break-Up Fee and initial overbid amount of $100,000 in cash;

(B)    states the bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Purchased Assets on terms and conditions no less favorable to Seller than the terms and conditions contained in this Agreement, including, without limitation, the purchase of the Purchased Assets and the assumption of the Assumed Liabilities; and is accompanied by a clean and duly executed asset purchase agreement (the "*Modified Asset Purchase Agreement*") and a marked Modified Asset Purchase Agreement reflecting the variations from this Agreement;

(C)    states that the bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets if such bidder is the Successful Bidder (as defined below);

(D)    does not request or entitle the bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;

(E)    fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(F)    adequately demonstrates to the Seller and its financial advisors, if any, the financial wherewithal of each entity to perform the Assigned Contracts and complete the transaction contemplated by such entity's bid; and

(G)    is accompanied by a cash deposit or cashier's check in an amount of $160,000 (the "*Good Faith Deposit*"), which Seller's attorney will hold in a segregated account containing only deposits from bidders participating in the Auction.

(ii)    Auction. If authorized by the Bankruptcy Court, the Auction shall be held before the Bankruptcy Court.  The Auction shall be governed by the following procedures:

(A)    Only representatives of Seller, Purchaser, any secured lenders of Seller that existed prior to the Petition Date and any creditors' committee (if appointed) and Qualifying Bidders may participate at the Auction;

(B)    Only Purchaser and other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(C)    Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(D)    Bidding shall commence at the amount of the highest and/or best qualifying bid submitted by the Qualifying Bidders prior to the Auction;

(E)     Qualifying Bidders or Purchaser (if not the highest and/or best bidder) may then submit successive bids in increments of at least $75,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $75,000 higher than the previous bid. Nothing contained herein shall be construed to require the Purchaser to bid any incremental amount in excess of the competing bid of any other party at the Auction (less the amount of the Break-Up Fee);

(F)     The Auction shall continue until there is only one offer that Seller determines, subject to Bankruptcy Court approval, is the highest and best offer submitted at the Auction from among the Qualifying Bidders and Purchaser (the "*Successful Bid*"). The bidder submitting such Successful Bid shall become the "*Successful Bidder*" and shall have such rights and responsibilities of the purchaser as set forth in the applicable Modified Asset Purchase Agreement. For purposes of determining the highest and best bid during each round of bidding, all overbids submitted by Purchaser shall be deemed to include the full amount of the Break-Up Fee. Within three days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Bankruptcy Court.

(iii)     <u>Payment of Break Up Fee</u>. So long as Purchaser is not in material breach of its obligations under this Agreement (and has been provided reasonable notice and opportunity to cure by Seller in the event of any material breach by Purchaser), if Seller sells, transfers, leases or otherwise disposes of the Purchased Assets (or any portion thereof) in a transaction or a series of transactions with one or more Persons other than Purchaser in any circumstance, including in accordance with the Sale Procedures (such event being an "*Alternative Transaction*"), Seller shall pay to Purchaser in cash at the closing of such Alternative Transaction the "***Break-Up Fee***" which is the sum of (A) a fee of $175,000, and (B) reimbursement of up to $300,000.00 of Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, incurred in connection with the transactions contemplated by this Agreement. The Sale Procedures Order shall include the Fee Provisions. The Termination Fee and Break-Up Fee, as applicable, shall survive termination of the Agreement and entry of the Sale Procedures Order by the Bankruptcy Court, and shall bind Seller's secured lender to the treatment of the Termination Fee and Break-Up Fee as provided herein.

(d)     <u>Procedures For Assigned Contracts</u>. The Sale Procedures Order (Disclosure Statement Order, or Chapter 11 Plan, as applicable, in the event the sale transaction is consummated through the Chapter 11 Plan) will contain the Cure Costs believed to be correct by the Seller and provide a procedure whereby contra parties will have an opportunity to object to the amount of the cure or adequate assurance of future performance, and in the absence of such objection, the contra party will have waived all objections to the assignment and shall be bound to the Cure Amount. A procedure shall be established whereby any objections by contra parties will be heard on or before the hearing on the sale and will be disposed of as part of the Sale Order.

(e)     <u>Form of Sale Order and Confirmation Order (as applicable)</u>. The Sale Order and the Confirmation Order, as applicable, shall be in form and substance acceptable to

the Purchaser and in all events shall provide for all necessary and customary findings and holdings, including at minimum the following:

(i) Seller has adequately marketed the Purchased Assets, and all interested parties, potential bidders and parties who hold Liens in the Purchased Assets are deemed to have received proper and adequate notice of the sale in accordance with the Bankruptcy Code and applicable orders of the Bankruptcy Court, including the Sale Procedures Order, Disclosure Statement Order (if applicable) and any other related orders;

(ii) Seller is authorized to consummate the transactions contemplated under this Agreement and its decision to do so is a proper exercise of its business judgment and fiduciary duties;

(iii) this Agreement was negotiated at arm's-length between the parties and the terms of this Agreement are fair and reasonable and provide fair and reasonably equivalent value for the Purchased Assets. Purchaser's bid is the highest and best offer for the Purchased Assets and the sale to Purchaser is in the best interests of the Bankruptcy Estate and its creditors and provides the best reasonably achievable disposition of the assets therefor;

(iv) except as provided in this Agreement, at the Closing the Purchased Assets shall be sold free and clear of all Liens with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Purchaser would not enter into this Agreement or purchase the Purchased Assets otherwise;

(v) at the Closing, the transfer of the Purchased Assets to Purchaser will be a legal, valid and effective transfer of the Purchased Assets and will vest Purchaser with all right, title and interest of Seller and the Bankruptcy Estate in and to the Purchased Assets free and clear of all Liens including any such Liens (A) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination as a result of the consummation of the transactions contemplated hereby of Seller's, the Bankruptcy Estate's or Purchaser's interest in the Purchased Assets, or any similar rights, or (B) relating to taxes or any other liabilities arising under or out of, in connection with, or in any way relating to the Purchased Assets, Seller, the Bankruptcy Estate, or their respective operations or activities prior to the Closing Date;

(vi) Seller's assumption and assignment of any Assigned Contracts that are executory contracts under Section 365 of the Bankruptcy Code is approved on the terms provided in the Agreement and all cure costs paid and Purchaser has provided adequate assurances of future performance thereunder; *provided, however,* that to the extent an Assigned Contract is not an executory contract within the meaning of Section 365 of the Bankruptcy Code, that such Assigned Contract is nevertheless transferable to the Purchaser as an asset of the Seller pursuant to Section 363 of the Bankruptcy Code;

(vii) Purchaser is a good faith Purchaser entitled to the protections afforded by Bankruptcy Code Section 363(m) such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Purchased Assets as contemplated

hereunder, negotiations have been fair and at arm's-length, and no party has engaged in any conduct that would cause the sale to be affected under Bankruptcy Code Section 363(n). In the event the transactions contemplated herein are consummated pursuant to the Chapter 11 Plan, the Chapter 11 Plan has been proposed in good faith under Section 1129(a)(3) of the Bankruptcy Code and the Purchaser is entitled to the protections afforded by Bankruptcy Code Section 1144, to the extent applicable;

(viii)    The provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) shall be waived for cause;

(ix)    Purchaser shall have no obligations under any Liens of Seller or the Bankruptcy Estate other than the Assumed Liabilities;

(x)    Except to the extent expressly included in the Assumed Liabilities, Purchaser shall not assume (and shall have no liability or obligation for) any Liens of Seller, as a successor in interest or otherwise, including without limitation with regard to any conduct of Seller occurring prior to the Closing Date or any other liability to, arising out of, or related to (in each case whether arising prior to or after the Closing Date) the Excluded Liabilities;

(xi)    the assumption and assignment to Purchaser of the Assigned Contracts is approved, subject only to payment of all cures or other payments by Seller or actions required to assume and assign the Assigned Contracts to Purchaser and if Seller neglects to pay such amounts, in addition to all other rights of the Purchaser hereunder, including, without limitation the right to terminate this Agreement without liability, the Purchaser may elect to use, or direct the use, of the Purchase Price to the satisfaction of any or all cures;

(xii)    upon the Closing, the Purchaser shall not be deemed to (A) be the successor to Seller, (B) have (de facto or otherwise) merged with or into Seller, or (C) be a continuation or substantial continuation of Seller or the enterprise of Seller for purposes of being deemed a successor of Seller; and

(xiii)    a factual finding by the Bankruptcy Court that all applicable notice and hearing requirements for the transaction contemplated hereby under the Bankruptcy Code, Bankruptcy Rules, and any local rules of the Bankruptcy Court have been satisfied.

(f)    Purchaser's Review of Pleadings.    All substantive motions and other pleadings and documents related to the transactions contemplated by this Agreement that the Seller files with the Bankruptcy Court, including, without limitation, the Chapter 11 Plan and as set forth in Sections 6.1(c) and 6.1(d), shall be in form and substance satisfactory to the Purchaser, in its discretion.

8.2    Conditions Precedent to the Obligations of Purchaser.    The obligation of the Purchaser to consummate the transactions described in this Agreement and any and all liability of the Purchaser to the Seller shall be subject to the fulfillment on or before the Closing of the following conditions precedent, each of which may be waived by the Purchaser in its sole discretion:

(a) <u>Assigned Seller Contracts</u>. For all contracts listed on <u>Schedule 2.1(a)</u> that are in fact to be assigned to the Purchaser, (A) the Sale Order of the Bankruptcy Court (or the Confirmation Order to the extent the sale transaction is consummated through the Chapter 11 Plan) shall authorize the assumption and assignment thereof to Purchaser, or (B) Seller shall have obtained all necessary consents from the non-debtor parties thereto to permit the assumption and assignment thereof to Purchaser and, with respect to (B), Purchaser shall not be responsible for any costs or expenses related to obtaining such consent or any other amount that would have been the responsibility of the Purchaser if authorized as described in (A), and Purchaser shall have been provided with written evidence of such consents in a form reasonably acceptable to Purchaser.

(b) <u>Representations, Warranties and Covenants</u>. The representations and warranties of the Seller contained in this Agreement shall have been true and correct when made and shall be true and correct in all material respects as of the Closing (other than such representations and warranties that are qualified by materiality, which shall be true and correct as of the Closing), with the same force and effect as if made as of the Closing Date, other than such representations and warranties that are expressly made as of another date, and the covenants and agreements contained in this Agreement to be complied with by the Seller on or before the Closing shall have been complied with in all material respects, and the Purchaser shall have received certificates from the Seller to such effect and, as applicable, signed by a duly authorized officer thereof.

(c) <u>No Reduction in Purchased Assets</u>. Seller shall not have filed any motion with the Bankruptcy Court seeking the rejection of any Assigned Contract. Seller shall not have abandoned or otherwise relinquished its or the Bankruptcy Estate's interest in any Purchased Asset, other than assets disposed of or abandoned in the ordinary course of business consistent with past practice. Without the consent of Purchaser, Seller shall not have taken any actions to dispose of or abandon any Purchased Assets or any Assigned Contract.

(d) <u>No Adverse Change</u>. No events or conditions shall have occurred which individually or in the aggregate, have had, or may reasonably be anticipated by the Purchaser to give rise to any Material Adverse Effect.

(e) <u>Governmental Approvals</u>. The Purchaser shall have received evidence, each in form and substance reasonably satisfactory to it, that any and all approvals from Governmental Authorities required for the lawful consummation of the transactions contemplated by this Agreement and the other Sale Documents shall have been obtained.

(f) <u>Consents</u>. The Purchaser shall have received evidence, each in form and substance reasonably satisfactory to it, that any and all consents and approvals from third parties which the Bankruptcy Court deems necessary for the consummation of the transactions contemplated by this Agreement and the other Sale Documents with respect to any Assigned Contract shall have been obtained.

(g) <u>No Actions, Suits or Proceedings</u>. No Order of any Court or Governmental Authority (or preliminary or permanent injunction) shall have been issued restraining, prohibiting, restricting delaying or staying the Sale Order or the Confirmation Order

(as applicable), the consummation of the transactions contemplated by this Agreement and the other Sale Documents. No Litigation shall be pending or, to the knowledge of the parties to this Agreement, threatened, before any Court or Governmental Authority to restrain, prohibit, restrict or delay, or to obtain damages or a discovery order in respect of this Agreement or the consummation of the transactions contemplated hereby. No court or any other Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, or non-appealable judgment which prohibits consummation of the Closing.

(h)    <u>Delivery of Purchased Assets</u>. The Seller shall have delivered possession of the Purchased Assets to the Purchaser, and shall have made all intangible Purchased Assets available to Purchaser.

(i)    <u>Closing Documents</u>. The Seller and/or Seller's Principals shall have delivered to, or shall caused the same to be deliver to the Purchaser, the resolutions, certificates, documents and instruments set forth below:

(i)    each of the Sale Documents to which it is a party and other instruments of conveyance in customary forms and as reasonably requested by Purchaser to vest in Purchaser all of Seller's and the Bankruptcy Estate's right, title and interest in, to and under the Purchased Assets;

(ii)    possession and control of the Purchased Assets, free and clear of all Liens pursuant to the Sale Order or otherwise;

(iii)    a copy of the Sale Order or Confirmation Order (as applicable) authorizing and approving the execution and delivery and performance of each of the Sale Documents and the transactions contemplated hereby and thereby and the acts of the officers and employees of the Seller in carrying out the terms and provisions hereof;

(iv)    all of the books, data, documents, instruments and other records relating to the Purchased Assets as set forth in Section 2.1(c);

(v)    the certificate of the Seller referred to in Section 8.2(b), which shall include certification of the names and signatures of the officers of the Seller authorized to sign this Agreement and the Sale Documents;

(vi)    any consents, approvals and authorizations of third parties that are necessary, including authorization by the Bankruptcy Court (in form reasonably acceptable to Purchaser) for the execution, delivery and consummation of this Agreement;

(vii)    Seller, on behalf of itself, the Bankruptcy Estate and any of its respective successors, legal representatives, and permitted assigns, including but not limited to any Successor Trustee that may be appointed in the Bankruptcy Case of the Seller or any subsequent Chapter 7 proceedings shall release all Liens, except for Purchaser's obligations under this Agreement; and

(viii)    such other documents and instruments as the Purchaser or its counsel may reasonably request.

(j)     Permits. Purchaser shall have in place all Permits necessary for the conduct of the Business, unless due to the Purchaser's willful failure to have obtained any such Permit.

(k)     No Dismissal or Conversion. The Chapter 11 proceedings shall not have been converted or dismissed and no Trustee shall have been appointed in such proceedings.

8.3     Conditions Precedent to the Obligations of the Seller. The obligation of the Seller to consummate the transactions described in this Agreement and any and all liability of the Seller to the Purchaser shall be subject to the fulfillment on or before the Closing Date of the following conditions precedent, each of which may be waived by the Seller in its sole discretion:

(a)     Representations, Warranties and Covenants. The representations and warranties of the Purchaser contained in this Agreement shall have been true and correct when made and shall be true and correct in all material respects as of the Closing (other than such representations and warranties that are qualified by materiality, which shall be true and correct as of the Closing), with the same force and effect as if made as of the Closing Date, other than such representations and warranties that are expressly made as of another date, and the covenants and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with, and the Seller shall have received a certificate from the Purchaser to such effect signed by a duly authorized officer thereof.

(b)     No Actions, Suits or Proceedings. No Order of any Court or Governmental Authority shall have been issued restraining, prohibiting, restricting or delaying, the consummation of the transactions contemplated by this Agreement and the other Sale Documents. No insolvency proceeding of any character including without limitation, bankruptcy, receivership, reorganization, dissolution or arrangement with creditors, voluntary or involuntary, affecting the Purchaser shall be pending, and the Purchaser shall not have taken any action in contemplation of, or which would constitute the basis for, the institution of any such proceedings.

(c)     Purchase Price. The Purchaser shall have delivered the Purchase Price as provided in Section 3.1.

(d)     Closing Documents. The Purchaser shall have delivered such other documents and instruments as the Seller or its counsel may reasonably request.

8.4     Termination.

(a)     Right to Terminate. This Agreement may be terminated and the transactions contemplated hereby may be abandoned as follows:

(i)     by mutual written consent duly authorized by the parties hereto;

(ii)     by the Purchaser if the Closing shall not have occurred within 105 days after the Contract Date; *provided, however*, that the right to terminate this Agreement under this Section 8.4(a)(ii) shall not be available in the event of the Purchaser's willful failure to fulfill

any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to have occurred on or before such date;

(iii)     by either the Purchaser or the Seller, upon the Seller entering into an agreement providing for an Alternative Transaction as set forth in Section 8.1(c)(iii); *provided, however,* that any termination pursuant to this Section 8.4(a)(iii) shall not become effective until Seller fulfills its obligation to pay the Break-Up Fee payable pursuant to this Agreement; and *provided further* that in the event this Agreement is terminated pursuant to Section 8.1(c)(iii), Seller shall pay the Break-Up Fee to Purchaser within 2 days following the consummation of such Alternative Transaction.

(iv)     by either the Purchaser or the Seller, if a Court or Governmental Authority shall have issued an Order or taken any other action which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement;

(v)     by the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (A) at any time the representations and warranties of the Purchaser herein become untrue or inaccurate such that Section 8.3(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.4(a)(v)), or (B) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that Section 8.3(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.4(a)(v)), and, in both case (A) and case (B), such breach (if curable) has not been cured within fifteen (15) days after notice to the Purchaser

(vi)     by the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, if (A) at any time any of the representations and warranties of the Seller herein are or become untrue or inaccurate such that Section 8.2(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.4(a)(vi)) or (B) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that Section 8.2(b) will not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.4(a)(vi)), and, in both case (A) and case (B), such breach (if curable) has not been cured within fifteen (15) days after notice to the Seller;

(vii)     by Purchaser provided Purchaser is not in material breach of its obligations under this Agreement, if the Fee Order and/or Sale Procedures Order (as applicable) shall not have been entered by the Bankruptcy Court on its docket within the time period set forth in Section 6.1(c) and Section 6.1(e), as applicable;

(viii)     by Purchaser provided Purchaser is not in material breach of its obligations under this Agreement, if the Confirmation Order and/or Sale Order (as applicable) shall not have been entered by the Bankruptcy Court on its docket within the time period set forth in Section 6.1(c) and Section 6.1(e), as applicable;

(ix)     by Purchaser provided Purchaser is not in material breach of its obligations under this Agreement, if the Closing shall not have occurred within 15 days

following the entry of the Sale Order or Confirmation Order (as applicable), notwithstanding any subsequent cure;

        (x)     by Purchaser provided Purchaser is not in material breach of its obligations under this Agreement and Purchaser has previously provided Seller with notice of a material violation by Seller of the Sale Procedures Order and Seller has failed, within two days after such notice, to perform such covenant, remedy such material violation, or provide reasonably adequate assurance to Purchaser of Seller's ability to remedy such material violation;

        (xi)     by Purchaser if Seller's Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code pursuant to the provisions of the Bankruptcy Code;

        (xii)     by Purchaser if the Bankruptcy Court orders the appointment of a trustee or examiner with expanded powers pursuant to the provisions of the Bankruptcy Code in the Bankruptcy Case;

        (xiii)     by the Purchaser if, between the Contract Date and the Closing an event or condition occurs that results in a Material Adverse Effect; or

        (xiv)     by the Purchaser if the Seller is not able, for any reason other than because of Purchaser, to assign any of the Assigned Contracts referred to in Schedules 2.1(a) and 4.6(a) at Closing.

        (b)     Effect of Termination. In the event of the termination of this Agreement pursuant to Section 8.4(a), this Agreement (other than this Section 8.4(b), Section 8.4(c), and Article IX, which shall survive such termination) will forthwith become void, and there will be no liability on the part of the Purchaser or the Seller or any of their respective officers or directors to the others and all rights and obligations of any party hereto will cease.

        (c)     Deposit Refund; Limitation of Damages; Expense Reimbursement. In the event this Agreement is terminated other than as a result of a material breach by the Purchaser of its obligations hereunder, the Deposit shall be immediately returned to the Purchaser free and clear of any Liens. In addition, in the event that the Closing does not occur within one hundred and five (105) days from the Contract Date, for any reason other than (i) due to a material breach of the Purchaser or (ii) an Alternative Transaction (in which case the Break-Up Fee shall apply), and this Agreement is terminated by the Purchaser, the Seller shall reimburse the Purchaser for all of the Purchaser's reasonable, actual out-of-pocket legal, tax, accounting, due diligence and other expenses incurred in connection with this Agreement (the "*Termination Fee*"). In the event this Agreement is terminated as a result of a material breach by the Purchaser of its obligations hereunder, the maximum amount of Seller's damages shall be the Deposit made hereunder and payment up to the full amount of such Deposit shall be the Seller's sole and exclusive remedy, at law in equity or otherwise, hereunder. In the event this Agreement is terminated other than as a result of (i) a material breach by the Seller of its obligations hereunder, (ii) the Chapter 11 Plan not being confirmed by the Bankruptcy Court, or (iii) any termination pursuant to Sections 8.4(a)(iii), (vi), (vii), (viii), (x), or (xi), Purchaser shall reimburse the Seller for up to $50,000 in the aggregate, for the reasonable, actual out-of-pocket fees incurred by the

Seller in connection with the this Agreement for the Seller's legal and tax advisors. The parties hereto agree and acknowledge that the provisions of this Section 8.4(c) shall survive termination of the Agreement.

8.5 <u>Conditions to Effectiveness of this Agreement</u>. In addition to conditions to the effectiveness of this Agreement set forth elsewhere herein, this Agreement shall not be effective as to the Purchaser unless simultaneously with the execution and delivery of this Agreement the Seller's Principals have executed and delivered to the Purchaser the following:

(a) An Indemnification Agreement in form and substance satisfactory to the Purchaser (the "*Indemnification Agreement*").

(b) Separate employment agreements with the Purchaser (respectively, the "*Magee Employment Agreement*" and the "*McNulty Employment Agreement*"), each to be in form and substance satisfactory to the Purchaser, and each to (i) become effective on the Closing Date, or (ii) be null and void if this Agreement is terminated in accordance with terms hereof or the Closing otherwise does not occur as provided herein.

## ARTICLE IX

## MISCELLANEOUS

9.1 <u>Survival of Representations and Warranties</u>. The parties hereto agree that in the absence of fraud, the representations and warranties of (a) the Seller and the Purchaser contained in this Agreement shall not survive the Closing hereunder, and shall, upon the Closing, automatically lapse and cease to be of any further force or effect whatsoever, and, except as set forth in the following clause (b) with respect to the Principals' Representation, neither the Seller nor the Purchaser nor any of their respective officers, directors, members, managers, agents, representatives or Affiliates shall have any liability to the other under this Agreement or any document or certificate delivered pursuant to this Agreement at any time after the Closing with respect to such representations and warranties, and (b) the Seller's Principals with respect to the Principals' Representations shall survive the Closing hereunder in accordance with and subject to the terms of the Indemnification Agreement. The parties hereto agree that the covenants contained in this Agreement to be performed prior to, at or after the Closing shall survive the Closing, in accordance with their terms and each party shall be liable to the other applicable parties after the Closing for any breach thereof.

9.2 <u>Break-Up Fee; Allowed Administrative Expenses</u>. The Break-Up Fee or Termination Fee, as may be applicable, shall be paid to the Purchaser and shall constitute allowed administrative expenses of Seller as set forth in Section 8.1(c)(iii).

9.3 <u>Notices</u>. All notices, requests, demands, waivers and communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered (a) by hand (including by reputable overnight courier), (b) by mail (certified or registered mail, return receipt requested, or (c) by telecopy facsimile transmission or a signature by scanned .pdf copy and sent by email (receipt of which is confirmed):

|                       |                                          |
|-----------------------|------------------------------------------|
| If to the Purchaser to: | Rockwood-CWFS LLC                      |
|                       | c/o CW Financial Services LLC            |
|                       | One Charles River Place                  |
|                       | 63 Kendrick Street                       |
|                       | Needham, Massachusetts 02494             |
|                       | Attn: Scott D. Spelfogel                 |
|                       | Facsimile: (866) 512-7745                |
|                       | Email: sspelfogel@cwcapital.com          |
| With a copy to:       | Riemer & Braunstein LLP                  |
|                       | Three Center Plaza                       |
|                       | Boston, Massachusetts 02108              |
|                       | Attn: Ronald N. Braunstein               |
|                       | Facsimile: (617) 880-3456                |
|                       | Email: rbraunstein@riemerlaw.com         |
| If to the Seller to:  | Rockwood Real Estate Advisors LLC        |
|                       | 555 Fifth Avenue                         |
|                       | New York, New York 10017                 |
|                       | Attn: Mr. Daniel McNulty                 |
|                       | Facsimile: (212) 286-5555                |
|                       | Email: DMcnulty@rockwoodrea.com          |
| With a copy to:       | Cuevas & Greenwald, P.C.                 |
|                       | 475 Park Avenue, 26th Floor              |
|                       | New York, New York 10016                 |
|                       | Attn: Wayne M. Greenwald                 |
|                       | Facsimile: (212) 983-1965                |
|                       | Email: grimlawyers@aol.com               |

or to such other person or address as any party shall specify by notice in writing to the other parties. All notices, requests, demands, waivers and communications shall be deemed to have been (a) on the date on which so hand-delivered, (b) on the third Business Day following the date on which so mailed (or actual date of delivery, if sooner), and (c) on the date on which telecopied or emailed and confirmed, except for a notice of change of address, which shall be effective only upon receipt thereof.

9.4    Entire Agreement. The Sale Documents embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in the Sale Documents shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

9.5    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, personal representatives, legal

representatives, and permitted assigns, including but not limited to any Trustee that may be appointed in the Bankruptcy Case of the Seller or any subsequent Chapter 7 proceedings. The Seller is entering into this Agreement in its capacity as a debtor and debtor in possession in the Bankruptcy Case.

9.6 Assignment. Neither this Agreement, nor any right hereunder, may be assigned by any of the parties hereto without the prior written consent of the other parties, except that the Purchaser may assign all or part of its rights and obligations under this Agreement to one or more direct or indirect Affiliates (in which event, representations and warranties relating to the Purchaser shall be appropriately modified).

9.7 Modifications and Amendments. The terms and provisions of this Agreement may be modified or amended only by written agreement executed by all parties hereto.

9.8 Waivers and Consents. The terms and provisions of this Agreement may be waived only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent. No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party. No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

9.9 No Third Party Beneficiary. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the parties hereto and their respective heirs, personal representatives, legal representatives, successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

9.10 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

9.11   Publicity.  No party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the Purchaser and the Seller, except as may be required by Law.

9.12   Governing Law; Forum; Service of Process.  This Agreement shall be governed by, construed and interpreted in accordance with, the laws of the State of New York, excluding choice of law principles that would require the application of the laws of a jurisdiction other than the State of New York.  The parties hereto consent to the jurisdiction of the Bankruptcy Court, **WITH ALL RIGHTS TO A JURY TRIAL BEING HEREBY WAIVED BY ALL PARTIES HERETO,** in any action brought to enforce any rights of the Purchaser under this Agreement and the Sale Documents contemplated hereby.  Service of process in any suit with respect to the subject matter of this Agreement may be made upon any party at the address set forth in Section 9.3 of this Agreement.

9.13   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together shall constitute one and the same agreement.

9.14   Descriptive Headings.  The descriptive headings contained in this Agreement are for convenience only and do not constitute a part of this Agreement.

9.15   Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.16   Further Assurances.  At any time and from time to time after the Closing Date, at the request of the Purchaser and without further consideration, the Seller shall execute and deliver such other instruments of sale, transfer, conveyance, assignment and confirmation as may be reasonably requested in order to more effectively transfer, convey and assign to the Purchaser, and to confirm the Purchaser's title to, the Purchased Assets.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have each executed and delivered this Agreement as of the day and year first above written.

<u>**PURCHASER:**</u>

ROCKWOOD-CWFS LLC

By: _____

Name: _Charles R. Spetka_____

Title: _Chief Executive Officer_

<u>**SELLER:**</u>

ROCKWOOD REAL ESTATE ADVISORS LLC

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF,** the parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**PURCHASER:**

ROCKWOOD-CWFS LLC

By:_____

Name: _____

Title: _____


**SELLER:**

ROCKWOOD REAL ESTATE ADVISORS LLC

By:_____

Name: _____John W. Magee_____

Title: _____Co-Chairman & Co-CEO____

# FIRST AMENDMENT TO
## ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT, dated as of April 6, 2011 ("First Amendment"), amends that certain Asset Purchase Agreement, dated as of March 18, 2011 (the "Agreement"), by and between Rockwood Real Estate Advisors LLC Inc., a New York limited liability company (the "Seller"), and Rockwood-CWFS LLC, a Delaware limited liability company (the "Purchaser"). Capitalized terms used herein without definition shall have the respective meanings for such terms set forth in the Agreement.

WHEREAS, the parties hereby wish to amend certain terms of the Agreement as a result of the parties' desire and agreement to consummate the transactions contemplated by the Agreement pursuant to a Section 363 of the Bankruptcy Code motion and a separate Sale Order, rather than pursuant to the Chapter 11 Plan; and

WHEREAS, pursuant to Section 9.7 of the Agreement, the parties may amend any provision of the Agreement by written agreement executed by all of the parties to the Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises made herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Sale Pursuant to Section 363 of the Bankruptcy Code. The Agreement currently contemplates that the Seller would first seek to consummate the transactions contemplated by the Agreement pursuant to the Chapter 11 Plan and in the event the same could not be timely accomplished, then the Seller would seek to consummate the transactions contemplated by the Agreement pursuant to a Section 363 of the Bankruptcy Code motion and a separate Sale Order as set forth in the Agreement. Now the parties hereto agree that the Seller shall immediately seek to consummate the transactions contemplated by the Agreement pursuant to a Section 363 of the Bankruptcy Code motion and a separate Sale Order as set forth in the Agreement, rather than pursuant to the Chapter 11 Plan. The parties agree and acknowledge that all provisions of the Agreement with respect to a party's or the parties' requirements and/or obligations to seek to consummate the transactions contemplated by the Agreement pursuant to the Chapter 11 Plan are null and void and of no force and effect.

2.    First Amendment Date. As used in the provisions of the Agreement which are being amended pursuant to this First Amendment, the term "*First Amendment Date*" means the date as of which this First Amendment is executed as set forth above.

3.    Amendment to Section 6.1(b) of the Agreement. Clauses (iii) and (iv) of, and the text thereafter to the end of, Section 6.1(b) of the Agreement are hereby deleted in their entirety and the following is hereby inserted in their place:

> "and (iii) a provision that the Termination Fee and the Break-Up Fee shall be secured by a perfected lien on all of the Debtor's assets and any proceeds therefrom, including the proceeds of an Alternative Transaction, that is junior

only to Signature Bank and superior to the secured liens of the Seller's Principals, until the Break-Up Fee is paid in full and the Break-Up Fee shall be set aside from the sale proceeds of the Alternative Transaction, at closing, pending payment of such amount to the Purchaser (all of the foregoing, collectively, the "*Fee Provisions*")."

4. <u>Amendment to Section 6.1(d) of the Agreement</u>. Section 6.1(d) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

> "The Seller shall immediately file a motion or motions with the Bankruptcy Court seeking, on an expedited basis and shall use commercially reasonable efforts to prosecute, (i) entry of an order, which may include the Fee Order (the "*Sale Procedures Order*"), approving sale procedures (the "*Sale Procedures*") for the sale of the Purchased Assets, which sale shall be subject to higher and better offers, as provided in Section 8.1(c), and (ii) entry of the Sale Order, and each of such motion or motions, the Sales Procedures Order, the Sale Procedures and the Sale Order shall be in final form and substance acceptable to Purchaser, in its discretion, and consistent with this Agreement."

5. <u>Amendment to Section 6.1(e) of the Agreement</u>. Section 6.1(e) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

> "The Seller shall use commercially reasonable efforts to prosecute such motion or motions contemplated pursuant to the immediately preceding clause (d), and to (i) ensure that the Sale Procedures Order is promptly entered and approved within seventeen (17) days after the First Amendment Date, (ii) ensure that the Sale Order is entered and approved no later than forty-five (45) days after the First Amendment Date (such period running concurrently with the period specified in the preceding clause (i)), and (iii) request that the Sale Order provide that it shall become effective immediately upon approval."

6. <u>Amendment to Section 8.1(c)(ii)(F) of the Agreement</u>. Section 8.1(c)(ii)(F) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

> "The Auction shall continue until there is only one offer that Seller determines, subject to Bankruptcy Court approval, is the highest and best offer submitted at the Auction from among the Qualifying Bidders and Purchaser (the "*Successful Bid*"). The bidder submitting such Successful Bid shall become the "*Successful Bidder*" and shall have such rights and responsibilities of the purchaser as set forth in the applicable Modified Asset Purchase Agreement. In the event that the Purchaser bids at the Auction, the Purchaser will receive a "credit" in an amount equal to the amount of the Break-Up Fee (determined as if an Alternative Transaction was being consummated and the Break-Up Fee was payable to the Purchaser). Within three days after adjournment of the Auction, the

Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Bankruptcy Court."

7. Amendment to Section 8.1(c)(iii) of the Agreement. Section 8.1(c)(iii) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

"So long as Purchaser is not in material breach of its obligations under this Agreement (and has been provided reasonable notice and opportunity to cure by Seller in the event of any material breach by Purchaser), if Seller sells, transfers, leases or otherwise disposes of the Purchased Assets (or any portion thereof) in a transaction or a series of transactions with one or more Persons other than Purchaser in any circumstance, including in accordance with the Sale Procedures (such event being an *"Alternative Transaction"*), Seller shall pay to Purchaser in cash at the closing of such Alternative Transaction a *"Break-Up Fee"* of $250,0000.00, which the parties hereto agree represents only a partial reimbursement of Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees and expenses of other consultants, already incurred in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, for the purposes of Section 8.1(c)(ii)(F), in the event that the Purchaser bids at an Auction, the Purchaser will receive a "credit" in an amount equal to the amount of the Break-Up Fee (determined as if an Alternative Transaction was being consummated and the Break-Up Fee was payable to the Purchaser). The Sale Procedures Order shall include the Fee Provisions. The Termination Fee and Break-Up Fee, as applicable, shall survive termination of the Agreement and entry of the Sale Procedures Order by the Bankruptcy Court, and shall bind Seller's secured lender to the treatment of the Termination Fee and Break-Up Fee as provided herein."

8. Amendment to Section 8.4(a)(ii) of the Agreement. Section 8.4(a)(ii) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

"(ii) by the Purchaser if all conditions precedent to the Closing shall not have been satisfied on or before the forty-fifth (45th) day after the First Amendment Date (as such period may be extended by Purchaser, in its discretion); *provided, however,* that the right to terminate this Agreement under this Section 8.4(a)(ii) shall not be available in the event of the Purchaser's willful failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the conditions precedent to have been satisfied prior to the expiration of such period;"

9. <u>Amendment to Section 8.4(c) of the Agreement</u>. The second sentence of Section 8.4(c) of the Agreement is deleted in its entirety and the following is hereby inserted in its place:

> "In addition, in the event that all conditions precedent to the Closing shall not have been satisfied on or before the forty-fifth (45th) day after the First Amendment Date (as such period may be extended by Purchaser, in its discretion) for any reason other than (i) due to a material breach of the Purchaser or (ii) an Alternative Transaction (in which case the Break-Up Fee shall apply), and this Agreement is terminated by the Purchaser, the Seller shall reimburse the Purchaser for all of the Purchaser's reasonable, actual out-of-pocket legal, tax, accounting, due diligence and other expenses incurred in connection with this Agreement (the *"Termination Fee"*)."

10. <u>No Adverse Change</u>. The Seller represents and warrants to the Purchaser that since the Contract Date no events or conditions have occurred which individually or in the aggregate, have had, or may reasonably be anticipated by the Purchaser to give rise to, any Material Adverse Effect.

11. <u>No Other Amendments</u>. Except to the extent amended hereby, all of the definitions, terms, provisions and conditions set forth in the Agreement are hereby ratified and confirmed and shall remain in full force and effect. The Agreement and this First Amendment shall be read and construed together as a single agreement and the term "Agreement" and references in the Agreement to "this Agreement," "hereunder," "hereof'" or words of similar import shall henceforth mean and be deemed a reference to the Agreement as amended and supplemented by this First Amendment.

12. <u>Counterparts</u>. This First Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together shall constitute one and the same agreement.

13. <u>Governing Law</u>. This First Amendment shall be governed by, construed and interpreted in accordance with, the laws of the State of New York, excluding choice of law principles that would require the application of the laws of a jurisdiction other than the State of New York.

*[The remainder of this page is intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this First Amendment as of the day and year first above written.

<div style="margin-left: 40%;">

**PURCHASER:**

ROCKWOOD-CWES LLC

By: _____
Name:     Charles R. Spetka
Title:     Chief Executive Officer


**SELLER:**

ROCKWOOD REAL ESTATE ADVISORS LLC

By: _____
Name:
Title:

</div>

1293668 v

**IN WITNESS WHEREOF**, the parties hereto have duly executed this First Amendment as of the day and year first above written.

**PURCHASER:**

ROCKWOOD-CWFS LLC

By: _____
Name:
Title:

**SELLER:**

ROCKWOOD REAL ESTATE ADVISORS LLC

By: _____
Name: John W. Maffee
Title: Co-Chairman & Co-CEO

1293668.6

**SECOND AMENDMENT TO**
**ASSET PURCHASE AGREEMENT**

THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT, dated as of April 14, 2011 (this "Second Amendment"), further amends that certain Asset Purchase Agreement, dated as of March 18, 2011 (as amended to date, the "Agreement"), by and between Rockwood Real Estate Advisors LLC, a New York limited liability company (the "Seller"), and Rockwood-CWFS LLC, a Delaware limited liability company (the "Purchaser"), as previously amended by that certain First Amendment to Asset Purchase Agreement dated as of April 6, 2011 (the "First Amendment"). Capitalized terms used herein without definition shall have the respective meanings for such terms set forth in the Agreement.

WHEREAS, the parties wish to amend certain terms of the Agreement to address comments made and concerns expressed by the Bankruptcy Court at a hearing held on April 14, 2011, and to conform to changes prescribed by the Bankruptcy Court to the proposed Sales Procedures and Sale Procedures Order (and including the Fee Order included as part thereof); and

WHEREAS, pursuant to Section 9.7 of the Agreement, the parties may amend any provision of the Agreement by written agreement executed by all of the parties to the Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises made herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Reaffirmation of Elimination of All Chapter 11 Plan and Related Provisions.

(a)    As provided in the First Amendment, the Seller and the Purchaser agree and acknowledge that all provisions of the Agreement with respect to a party's or the parties' requirements and/or obligations to seek to consummate the transactions contemplated by the Agreement pursuant to the Chapter 11 Plan were made null and void and of no force and effect.

(b)    For the avoidance of doubt or confusion, the following provisions of the Agreement are specifically hereby amended as follows:

(i)    In Section 6.1(c) of the Agreement, the references to: the disclosure statement, the Disclosure Statement Order, the Confirmation Order, and the Chapter 11 Plan, including all approval rights of the Purchaser with respect to any of the foregoing are hereby deleted.

(ii)    In Section 8.1(e), the references to the Confirmation Order, including any approval rights of the Purchaser with respect thereto, are hereby deleted.

(iii)    The approval rights of the Purchaser pursuant to Section 8.1(f) of the Agreement shall be limited exclusively to matters pertaining to matters relating to this Agreement, including the Sale Order and the Fee Order.

2.    <u>Additional Amendments to the Agreement</u>. The Agreement is hereby further amended as follows:

(a)    There shall be no Termination Fee payable to the Purchaser under any circumstance, and all provisions, terms, and conditions of the Agreement referring to the Termination Fee are hereby modified accordingly.

(b)    Section 8.1(c) is hereby amended as follows:

(i)    Section 8.1(c)(i)(G) is amended to provide that the Good Faith Deposit shall be in the form of a certified check in amount equal to at least 10% of amount of the Qualifying Bidder's opening bid.

(ii)    Section 8.1(c)(ii)(C) is amended to require that the Purchaser provide the same confirmation as Qualified Bidders that it has not engaged in any collusion with respect to the bidding or the sale.

(iii)    Section 8.1(c)(ii)(E) is amended to reduce the $75,000 higher bid increment amount to $50,000.

(iv)    Section 8.1(c)(iii) is amended to provide that the Break-Up Fee shall be payable immediately following, and from the proceeds of, the closing of the Alternative Transaction.

3.    <u>No Adverse Change</u>. The Seller represents and warrants to the Purchaser that since the Contract Date no events or conditions have occurred which individually or in the aggregate, have had, or may reasonably be anticipated by the Purchaser to give rise to, any Material Adverse Effect.

4.    <u>No Other Amendments</u>. Except to the extent amended hereby, all of the definitions, terms, provisions and conditions set forth in the Agreement are hereby ratified and confirmed and shall remain in full force and effect. The Agreement and this Second Amendment shall be read and construed together as a single agreement and the term "Agreement" and references in the Agreement to "this Agreement," "hereunder," "hereof"" or words of similar import shall henceforth mean and be deemed a reference to the Agreement as amended and supplemented by this Second Amendment.

5.    <u>Counterparts</u>. This Second Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together shall constitute one and the same agreement.

6.    <u>Governing Law</u>. This Second Amendment shall be governed by, construed and interpreted in accordance with, the laws of the State of New York, excluding choice of law principles that would require the application of the laws of a jurisdiction other than the State of New York.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Second Amendment as of the day and year first above written.

PURCHASER:

ROCKWOOD-CWFS LLC

By: _____

Name:

Title:

SELLER:

ROCKWOOD REAL ESTATE ADVISORS LLC

By: _____

Name:

Title:

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Second Amendment as of the day and year first above written.

**PURCHASER:**

ROCKWOOD-CWFS LLC

By: _____
Name:
Title:

**SELLER:**

ROCKWOOD REAL ESTATE ADVISORS LLC

By: _____
Name: John W. Magee
Title: Co-Chairman & Co-CEO